**RECEIVED**

AUG 0 7 2019

United States Court of Appeals
For The Federal Circuit

No: 19-2134

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LARRY GOLDEN
*Petitioner*

v.

Judge Eric G. Bruggink
*CFC Trial Court Judge*

&

THE UNITED STATES
*Defendant*

ON APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN 1:19-cv-104 (19-104C)
JUDGE ERIC G. BRUGGINK

BRIEF OF PLAINTIFF-APPELLANT LARRY GOLDEN

LARRY GOLDEN
740 Woodruff Rd., #1102
Greenville, S.C. 29607
(864-288-5605)
Atpg-tech@charter.net

Appearing ProSe

August 2, 2019

## STATEMENT OF RELATED CASES

Despite the Plaintiff's opposition, the Trial Court's Judge Bruggink combined Plaintiff's 28 U.S.C. § 1491(a) Government "Takings" claim under the Fifth Amendment Clause, in Case No. 19-104C, with Plaintiff's 28 U.S.C. § 1491(a) Government "Takings" claim under the Fifth Amendment Clause, in Case No. 13-307C.

ORDER; "Because this action shares the identical questions of law and fact with Golden's, No. 13-307C, and it is in the interest of judicial economy to consider them together, it is proper to consolidate the cases. *Golden v. United States*, 19-104C, therefore is consolidated with *Golden v. United States*, 13-307C. Signed by Senior Judge Eric G. Bruggink. (ew) Service on parties made. (Entered: 01/29/2019)" (Case No. 19-104C; Dkt. No. 4; filed 01/29/2019)

The Plaintiff has filed on 07/02/2019, a petition at the Patent Office (under the Administrative Procedures Act) to withdraw / unwind the cancellation certificate regarding the independent claims 11, 74, & 81 of the Plaintiff's RE43,990 patent. The *Return Mail, Inc. v. United States Postal Service* decision was based on "subject matter jurisdiction," which means it is Supreme Court law now that the entire action against Plaintiff's patent was outside of the agency's statutory authority. The "cure" will be to ask them to nuke the resulting certificate.

## STATEMENT OF JURISDICTION

This is an appeal from the Judgement and the Order, pursuant to the Trial Court's Order in Case No. 19-104C, filed May 14, 2019 (**Exhibit 1**), granting Defendant's motion to dismiss the Plaintiff's "takings' claims asserted under 28 U.S.C. § 1491(a); and, the Trial Court's Order in Case No. 13-307C, filed on May 8, 2019 (**Exhibit 2**), granting Defendant's motion to dismiss the Plaintiff's "takings' claims asserted under 28 U.S.C. § 1491(a); Judge Bruggink presiding. The U.S. Court of Federal Claims had jurisdiction pursuant to 28 U.S.C. § 1491. This Appeal seeks relief from the Orders

Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; Opinion and Order; Case No. 18-657C; filed January 29, 2019: "A. The Court of Federal Claims Has Jurisdiction to Consider Christy's Takings Clause Claim. The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. 'It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction' in the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008)".

The Notice of Appeal was filed July 12, 2019. The U.S. Court of Appeals has jurisdiction under 28 U.S.C. § 1295(a)(3).

## FACTURAL BACKGROUNG

The intellectual property subject matter that resulted in the Plaintiff-Appellant's patents asserted under 28 U.S.C. § 1491(a), "Government Takings under the Fifth

Amendment Clause" are U.S. Patent No. 7,385,497 ("'497 Patent"), U.S. Patent No. 7,636,033 ("'033 Patent"), U.S. Patent No. 8,106,752 ("'752 Patent"), U.S. Patent No. 8,334,761 ("'761" Patent), U.S. Patent No. 8,531,280 ("'280" Patent), U.S. Reissue Patent No. RE43,891 ("'891 Patent"), U.S. Reissue Patent No. RE43,990 ("'990 Patent"), U.S. Patent No. 9,096,189 ("'189 Patent"), U.S. Patent No. 9,589,439 ("'439 Patent), U.S. Patent No. 10,163,287 ("'287 Patent), Continuation Patent Application 16/350,683 filed December 19, 2018, and Reissue Patent Application 16/350,874 filed on 01/25/2019.

The above listed patents are lawfully issued, valid, and enforceable U. S. Patents.

Plaintiff is the sole owner of the entire intellectual property subject matter right, title, and interest in and to the above listed patents.

## HISTORY

Plaintiff-Appellant made a call to the Court of Federal Claims before filing his complaint (2013) and was advised by the Clerk's office to just "file your case under patent infringement", because "the CFC don't have a category for filing a Government "Takings" of intellectual property subject matter.

Over the next year the Government filed two "Motions for a More Definitive Statement", that the Trial Court later said, my response to the Motions by the Government constitutes an amendment for the Plaintiff. The Government was not

pleased with the fact that the Plaintiff had actually filed a Government "Takings" of intellectual property subject matter complaint by the merits.

The Government proceeded, without notifying the Plaintiff or the Trial Court and without seeking leave of the Trial Court, to file an Inter Partes Review (IPR) Petition with the USPTO Patent Trials and Appeals Board (PTAB).

After the Government filed the IPR, the Trial Court became complicit with the direction the Government had taken the Plaintiff's case and ordered a "stay" to the Plaintiff's case of a Government "Takings" of intellectual property subject matter. The Trial Court "stayed" the Plaintiff's case based on infringement for eighteen months.

After the final decision of the PTAB the Trial Court ordered the Plaintiff to file an amended complaint and claim chart (2015). The Plaintiff did not ask to file an amended complaint and claim chart, nor did the Plaintiff file a Motion to amend his complaint. The Trial Court made the decision. The Trial Court later charged the Plaintiff with having filed a third amended complaint and for the third time, deceptively portrayed the Trial Court as having granted Plaintiff a favor.

The Trial Court granted the Government's motion to file for "Lack of Jurisdiction" and "stayed" the four motions Plaintiff had pending at the time. After seven months the Trial Court denied the Government's motion to dismiss. Two days after the Trial Court denied the Government's motion to dismiss, the Trial Court without explanation and without a Government's motion for reconsideration, decided to

give the Government a second chance. The Trial Court ordered the Plaintiff to amend his response to the Government's motion to dismiss above the findings and the rulings the Trial Court had presented in its denial of the Government's motion (2016). The Trial Court later charged the Plaintiff with having filed a fourth amended complaint and for the fourth time, deceptively portrayed the Trial Court as having granted Plaintiff a favor.

The Trial Court ordered the Plaintiff to file a fifth and final amended complaint and claim chart (2017). The Plaintiff did not ask to file an amended complaint and claim chart, nor did the Plaintiff file a Motion to amend his complaint. The Trial Court made the decision. The Trial Court later charged the Plaintiff with having filed a fifth amended complaint and for the fifth time, deceptively portrayed the Trial Court as having granted Plaintiff a favor.

The Plaintiff is trying not to say the Trial Court and the Government is lying, each and every time they address a point of fact, or render a decision based on the Trial Court and Government's own determination that they have in some way done the Plaintiff a favor by allowing the Plaintiff to file five amended complaints.

It is the belief of the Plaintiff, that any future reference of the Trial Court and the Government to having allowed the Plaintiff to file five amended complaints is negligent, irresponsible and reckless. It is further the belief of the Plaintiff that the Trial Court and the Government should be sanctioned for lying.

**Standards for the "substantive rights enforceable against the United States for money damages"**

The Plaintiff-Appellant is conceding the Government has the authority to take the Plaintiff-Appellant's intellectual property subject matter,[1] before or after the intellectual property has been tested by way of intellectual property subject matter prosecution at the USPTO, or re-tested by way of intellectual property subject matter re-issue prosecution, or post-grant reexamination, or Petition for *Inter Partes Review* (IPR), or through Patent infringement litigation in the District Courts, to verify the validity of the Plaintiff-Appellant's intellectual property subject matter by way of a Patent, Patent rights, Patent franchise, Patent private property, or Patent personal property.

The Plaintiff-Appellant's patents are the results of various testing mechanisms used to verify and validate the Plaintiff-Appellant's intellectual property subject matter. Government has the right to take the Plaintiff-Appellant's property, be it "rights or franchise", "private or personal", to use with the public or for the benefit of the public.[2]

---

[1] A hallmark of a Fifth Amendment takings claim is a litigant's concession that the government's behavior is lawful; thus, plaintiff cannot state a "takings" claim to the extent he alleges the government's action was unlawful. See *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997). § 1491(a) government "takings" action is lawful.

[2] § 1498(a) provides that liability attaches when the government acts "without license . . . or lawful right." In other words, when the government uses or manufactures a patented invention, it is not presumed to have a preexisting license or lawful right to do so. *Cf. Leesona*, 599 F.2d at 965. § 1498(a) government "infringement" action is unlawful.

Judge Margaret Sweeney; Court of Federal Claims: *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; Case No. 12-774C; Contract Claims against the United States Arising Under the Tucker Act. "The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated **(Exhibit 3)**, or an express or implied contract **(Exhibit 4)** with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc)."

Plaintiff-Appellant's substantive right enforceable against the United States for money damages under **The Takings Clause** is a "money mandating constitutional provision". The last clause of the Fifth Amendment, limits the power of eminent domain by requiring that "just compensation" be paid if private property is taken for public use. The federal government is composed of three distinct branches: legislative, executive, and judicial whose powers are vested by the U.S. Constitution in the Congress, the president, and the federal courts, respectively. The powers and duties of these branches are further defined by acts of congress, including the creation of executive departments and courts inferior to the Supreme Court. The burden of proof rest with the Plaintiff-Appellant to show how at least one of, or any combination of the three branches of Government had, and has the right to take Plaintiff-Appellant's intellectual

property without paying "just compensation" but chose to take Plaintiff-Appellant's intellectual property through the power of eminent domain without paying "just compensation".

Plaintiff-Appellant's substantive right enforceable against the United States for money damages under a "statute or regulation that has been violated"; the Government violated certain statues and regulations when the DOJ/DHS petitioned the PTAB Court with unqualified prior art references; when the PTAB decided to institute the petition in view of the unqualified prior art references; and, when the CFC Trial Judge dismissed the dependent claims that depend on the three independent patent claims that were unjustly cancelled in the IPR. The burden of proof rest with the Plaintiff-Appellant to show how at least one of, or any combination of the three branches of Government had, and has the right to take Plaintiff-Appellant's intellectual property under certain statues and regulations without paying "just compensation" but chose to take Plaintiff-Appellant's intellectual property through the power of eminent domain without paying "just compensation".

Plaintiff-Appellant's substantive right enforceable against the United States for money damages under "an express or implied contract with the United States": There were several breaches of implied-in-fact contracts. The burden of proof rest with the Plaintiff-Appellant to show how at least one of, or any combination of the three branches of Government had, and has the right to take Plaintiff-Appellant's intellectual

property under "an express or implied contract with the United States without paying "just compensation" but chose to take Plaintiff-Appellant's intellectual property through the power of eminent domain without paying "just compensation". When pleading a contract the Plaintiff-Appellant must satisfy RCFC 9 (k) Contract or Treaty:

"In pleading a claim founded on a contract or treaty, a party must identify the substantive provisions of the contract or treaty on which the party relies. In lieu of a description, the party may annex to the complaint a copy of the contract or treaty, indicating the relevant provisions." "Even when a plaintiff properly alleges a contract with the government, the Court of Federal Claims cannot exercise its jurisdiction unless the plaintiff also satisfies the pleading requirements set forth in RCFC 9(k). See, e.g., *Baha v. United States*, 123 Fed. Cl. 1, 5 n.4 (2015) ("Satisfaction of RCFC 9(k) is a jurisdictional requirement."); see also *Huntington Promotional & Supply, LLC v. United States*, 114 Fed. Cl. 760, 766 (2014) ("If a plaintiff fails to comply with RCFC 9(k) and to allege sufficient facts to show that it had a contract with the United States, the court cannot exercise jurisdiction over the claim."); *Kissi v. United States*, 102 Fed. Cl. 31, 35 (2011) (finding no jurisdiction based on the plaintiff's failure to show an existing contract and failure to "adequately plead a contract claim under RCFC 9(k)"), aff'd per curiam, 493 F. App'x 57 (Fed. Cir. 2012)."

**Standard Requirements for a 28 U.S.C. § 1491 "Fifth Amendment Government Takings of Private Property under the Fifth Amendment Clause**

The Plaintiff-Appellant must have given the Government notice of the intellectual property subject matter: Six months after the DHS was established on November 25, 2002; and, after the Plaintiff-Appellant had given the Government notice, the Plaintiff-Appellant received response letters:

- on May 21, 2003 from the Honorable Senator Fritz Hollings stating, "I have contacted the Department of Justice and the Department of Homeland Security to try to be of assistance";

- on June 3, 2003 from the Office of the Vice President, Dick Cheney stating, "[y]our correspondence has been forwarded to the Department of Homeland Security for review. You will hear back directly from the Department";

- on October 1, 2003 from the Honorable Senator Fritz Hollings stating, "[t]hank you for contacting me regarding your difficulty with receiving a response from the Department of Homeland Security";

- on October 21, 2003 from the Honorable Senator Lindsey Graham stating, "I have contacted the Department of Homeland Security on your behalf. I have asked that they review your request and respond directly to you";

- on June 20, 2005 from the Office of the President, George Bush stating, "[t]hank you for your letter regarding homeland security technology procurement. Please know I have forwarded it to the Department of Homeland Security for review and response". (STATUS REPORT: CD of Plaintiff's Dis. Docs: Dkt. No. 101; filed 02/17/2017; Court of Federal Claims (CFC))

The intellectual property subject matter must survive certain "testing mechanisms" for verification and validity: The initial patent application of the Plaintiff-Appellant's intellectual property subject matter must survive prosecution at the USPTO; or re-testing of Plaintiff-Appellant's intellectual property subject matter through the reissue of a patent prosecution process; or post-grant reexamination; or Petition for *Inter Partes Review* (IPR); or through Patent infringement litigation in the District Courts. These testing mechanisms are in place to verify the validate the Plaintiff-Appellant's

11

intellectual property subject matter by way of a patent, patent rights, patent franchise, patent private property, or patent personal property.

The Plaintiff-Appellant must own the asserted patents intellectual property subject matter, that includes the "right to exclude others"; Plaintiff-Appellant is the sole holder of all rights, titles, and interests in and to the '497, '033, '752, '761, '280, '891, '990, '189, '439, and '287 patents asserted in Case numbers 13-307C and 19-104C, including all rights to enforce the intellectual property subject matter and collect past and future damages for a Government Takings under the Fifth Amendment Clause (**Exhibits 5, 6, &7** are testing charts and drawings to illustrated the private property "taken" by the Government is substantially the same as Plaintiff-Appellant).

The intellectual property subject matter used by the Government for the benefit of the public must be "substantially the same" as Plaintiff-Appellant's intellectual property subject matter in the form of a patent(s)[3]. The Plaintiff-Appellant's Final Claim Chart (Dkt. No. 121; filed on 08/10/2017) is the testing mechanism used to test the devices, apparatus, processes, systems, etc. on a "literal" standard and on a "doctrine of equivalents" standard. The Final Claim Chart illustrates at least seventy-two request made by the Government for a communicating, monitoring, detecting, and

---

[3] 28 U.S.C. § 1498(a) "Government Infringement" is <u>NOT</u> the same as 28 U.S.C. § 1491(a) "Government Takings under the Fifth Amendment Clause. One of the many ways to dismiss an infringement claim is the lack of "authorization and consent". Authorization and consent is not a consideration, nor is it a requirement or standard that must be met in satisfying a "takings" claim.

controlling (CMDC) devices (e.g. new and improved cell phones, new and improved smartphones, new and improved laptops, and new and improved tablets) that are substantially the same as the Plaintiff-Appellant's intellectual property subject matter the Plaintiff-Appellant gave the Government notice on beginning in year 2003; the same intellectual property subject matter the Government used with the public, and the same intellectual property subject matter the Plaintiff-Appellant has covered in the '497, '033, '752, '761, '280, '891, '990, '189, '439, and '287 patents asserted in Case numbers 13-307C and 19-104C.

The Government must "take" the intellectual property for public benefit: First, the Government took the intellectual property subject matter of the Plaintiff-Appellant's asserted patents and used the subject matter before and after the patents were issued in various publications and solicitations. Second, the Government took the intellectual property subject matter of the Plaintiff-Appellant (that resulted in certain devices, apparatus, processes, systems, etc.) and used the intellectual property subject matter in the form of patents for the benefit of the public.

The Government must "take" the Plaintiff-Appellant's intellectual property subject matter in the form of a patent(s) without paying "just compensation": The Government has taken the Plaintiff-Appellant's property for years without paying "just compensation".

The Plaintiff-Appellant must show he or she has suffered irreversible harm. The Plaintiff-Appellant believes, the United States has "taken" and continues to "take" the Plaintiff-Appellant's intellectual property subject matter for the benefit of the public without paying just compensation for the "takings". Plaintiff-Appellant believes the Government has developed and manufactured products, devices, methods, and systems that are significantly the same or equivalent to the intellectual property subject matter claimed inventions of the Plaintiff-Appellant. As a result of the "takings" as outline above:

    a. the economic impact is a reduction in value of the Plaintiff-Appellant's property and by virtue of the access, disclosure, use with the public, and in some instances manufacture and development by or for the Government and its third party awardees, has destroyed the Plaintiff-Appellant's competitive edge;

    b. the use with the public, disposal, and right of a government to take Plaintiff-Appellant's intellectual property subject matter, which in some instances has resulted in the development and manufacture products, devices, methods, and systems for public use, without paying just compensation, has had a substantial adverse impact (means unfavorable or harmful) on Plaintiff-Appellant;

    c. the "takings" is preventing success or development of Plaintiff-Appellant's CMDC device in accordance with the "reasonable investment-backed expectations" of the Plaintiff-Appellant;

    d. the character of the Government's action was triggered when the "takings" caused a permanent invasion of the Plaintiff-Appellant's property and eliminated all economically beneficial uses of such property;

e. the "takings" of Plaintiff-Appellant's intellectual property subject matter, which in some instances has resulted in the development and manufacture of products, devices, methods, and systems for public use in Case Nos. 13-307C & 19-104C was done without the Government paying just compensation to the Plaintiff-Appellant.

**Standard Provisions defined for a 28 U.S.C. § 1491 "Fifth Amendment Government Takings of Private Property under the Fifth Amendment Clause**

Eminent Domain Requirement: Eminent domain refers to the power of the government to take private property and convert it into public use. The Fifth Amendment provides that the government may only exercise this power if they provide just compensation to the property owners.

Private Property Requirement: Private property is property owned by private parties - essentially anyone or anything other than the government. Private property may consist of real estate, buildings, objects, intellectual property.

Intellectual Property Requirement: "[A] work e.g. subject matter work, or invention that is the result of creativity, such as a manuscript or a design, to which one has rights and for which one may apply for a patent, copyright, trademark, etc." "[R]efers to creations of the mind e.g. subject matter creations, inventions, literary and artistic works, designs, and symbols, names and images used in commerce." "The law of intellectual property is commonly understood as providing an incentive to authors

e.g. authors of subject matter and inventors to produce works for the benefit of the public..."

Subject Matter Requirement: Whether the specifications of the Plaintiff-Appellant's three "Economic Stimulus" packages shows that the Plaintiff-Appellant was in possession of the claimed subject matter is not a single, simple determination, but rather is a factual determination reached by considering a number of factors. Factors to be considered in determining whether there is sufficient evidence of possession include the level of skill and knowledge in the art, partial structure... functional characteristics alone or coupled with a known or disclosed correlation between structure and function, and the method of making the claimed inventions from the disclosed subject matter. "Disclosure of any combination of such identifying characteristics that distinguish the claimed [added: subject matter] invention from other materials and would lead one of skill in the art to the conclusion that the applicant was in possession of the claimed species is sufficient. See *Eli Lilly*, 119 F.3d at 1568, 43 USPQ2d at 1406.

Public Use Requirement: In *Kelo v. City of New London*, Connecticut, 545 U.S. 469 (2005), the Supreme Court held that general benefits which a community would enjoy from the furthering of economic development is sufficient to qualify as a "public use."

Just Compensation Requirement: In Kohl v. United States, 91 U.S. 367 (1875), the Supreme Court held that the government may seize property through the use of

eminent domain, as long as it appropriates just compensation the owner of the property.

**Standard for claiming "Intellectual Property Subject Matter" as Plaintiff-Appellant's Private Property**

After the events of 9/11 the Plaintiff-Appellant introduced to the United States ("government") three economic stimulus and terrorism prevention packages: The packages were titled: the "ATPG" project; the "SafeRack" project; and the "V-Tection" project. The Plaintiff-Appellant submitted the packages to President Bush and his administration, the U.S. Senators and U.S. Congressmen that was in office during the Bush administration beginning in the year 2004 and ending in 2008. Beginning in year 2004, the Government began enforcing and administering the Plaintiff-Appellant's intellectual property subject matter strategies. The packages outlined how the Government could stimulate the economy following the 9/11 attacks and provide protection against future terrorist activities.

**The "ATPG" Project:** Significant advancements in mobile technology have occurred since September 11, 2001, both in the advancement of the Plaintiff-Appellant's claimed Communicating, Monitoring, Detecting, and Controlling (CMDC) devices and the infrastructures that support them (**Exhibit 5: ATPG's testing charts and drawing**).

The Plaintiff-Appellant's planned strategy for the CMDC device was to: have a device capable of communicating, monitoring, detecting, and controlling; have a device capable of interconnecting with other computing devices, products, methods, and

systems from various governmental agencies, industries, and private companies; have a device capable of detecting for chemical, biological, radiological, nuclear, explosives, and humans; have a device capable of monitoring and reporting over cellular networks, government mobile networks, satellite networks, Wi-Fi networks, and capable of viewing the environment in real time; and, for example, CMDC mobile devices that can operate equally and seamlessly via traditional cellular networks, as well as with infrastructure/ad hoc wireless networks.

More specifically the Plaintiff-Appellant's CMDC device was, and is, designed for integration with any of the products grouped under this "ATPG" project, the "SafeRack" project, and the "V-Tection" project. The CMDC device was designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across all industries, agencies, groups, demographics, race, ages, and gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment to prevent terrorist activity.

It is the belief of the Plaintiff-Appellant that the Department of Homeland Security (DHS) entered into cooperative agreements with Apple, Samsung, LG, and Qualcomm under the DHS Cell-All solicitation for the development of Plaintiff-Appellant's CMDC device described in the Plaintiff-Appellant's intellectual property subject matter. "Verto Analytics looked at the numbers of Apple, Samsung, and LG (CMDC devices) smartphones currently owned by U.S. consumers, and the equivalent

market share. January 2018, Apple leads the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, has 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market.

As a result of the Government "Takings" without paying the Plaintiff-Appellant "just compensation", the telecommunication industry and wireless provider industry (i.e. the major mobile service providers in the United States include Verizon Wireless, Sprint, AT&T and T-Mobile.), has grown tremendously since year 2008. Evidence the Plaintiff-Appellant's ATPG stimulus package worked.

The Plaintiff-Appellant's claimed intellectual property subject matter antiterrorist technology products, devices, etc. can be placed in, on, upon, or adjacent any of the Plaintiff-Appellant's claimed Communicating, Monitoring, Detecting, and Controlling (CMDC) devices that is equivalent to a new and improved[4] personal digital assistance

---

[4] The term "basic patent" is frequently used to refer to a pioneering type of patent, such as a patent for the Plaintiff-Appellant's first communicating, monitoring, detecting, and controlling (CMDC) device. An improvement patent, such as a patent for the Plaintiff-Appellant's CMDC devices, are claimed by the Plaintiff-Appellant as new and improved PDAs, PCs, laptops, cell phones, tablets, smartphones, and other wearables such as pagers, smartwatches, etc. Evaluating and comparing patentability of a basic patent with an improvement patent, consideration is given not only the technology involved, but also to the identity of the inventors. If there is common ownership of the basic patent to the owner of the improvement, infringement would not be a problem. The Plaintiff-Appellant is the sole owner of the basic patent and all of the improvement patents asserted in this complaint. During the 15 years of patent prosecution and 10 patents issued, the Plaintiff-Appellant has never been presented with a basic patent nor an improvement patent by neither the Defendant-Appellee nor the USPTO.

(PDA), a new and improved personal computer (PC), a new and improved laptop, a new and improved cell phone, a new and improved tablet, a new and improved smartphone, and other new and improved wearables (i.e. pagers, watches, etc.), as they all are grouped together by common features of design similarities.

One of the strategies outlined in the ATPG package was the development of a Communicating, Monitoring, Detecting, and Controlling (CMDC) device that is capable of connecting and grouping various products, devices, methods, systems, networks, etc. for communicating, monitoring, detecting, and controlling. The Government entered into R&D contracts and cooperative agreements for the development and commercialization of the CMDC device(s). In year 2008, the contracts and cooperative agreements for the development of the CMDC device(s) was with Apple, Samsung, LG, and Qualcomm.

The subject matter of the various solicitations, request for information (RFI), request for proposals (RFPs), publications, and contract agreements used by the Government with the public, and the resulting products, devices, methods, systems, and networks developed and manufactured[5] for or by the Government for public use, are

---

[5] The Plaintiff-Appellant is not claiming infringement. The Chart is used as a test to verify and validate that the Plaintiff-Appellant's claimed intellectual property subject matter antiterrorist technology products, devices, etc. shared with the Government are significantly the same as the antiterrorist technology products, devices, etc. manufactured for or by the Government. For a 1491 "Takings" to occur, the property is viewed and valued holistically. The "test" emphasizes the importance of the whole property and the interdependence of its parts as illustrated by adding the dependent claims in the third column.

significantly the same and equivalent to the Plaintiff-Appellant's intellectual property subject matter and claimed products, devices, methods, and systems. The Plaintiff-Appellant's "testing mechanism" used to show the end products, devices, methods, and systems developed or manufactured as a result of the Government's use with the public of the Plaintiff-Appellant's intellectual property subject matter is the Final Claim Chart (Dkt. No. 121; filed on 08/10/2017).

The Government's request for a communicating, monitoring, detecting, and controlling (CMDC) device in the form of an improved cell phone, smartphone, laptop, or tablet to be used for the benefit of the public is significantly the same or equivalent to the Plaintiff-Appellant's intellectual property subject matter and claimed CMDC device(s). The specifications and capabilities of the CMDC device(s) developed and/or manufactured for or by the Government, are significantly the same as the Plaintiff-Appellant's CMDC device(s) as illustrated below:

- Communication: at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short range radio frequency (RF) connection, or GPS connection was "taken" for the benefit of the Government and for Government "use".
- Monitoring: at least one of a viewing screen for monitoring in real time, viewing screen monitoring for CBRNE-H signal alerts, viewing screen monitoring for CBRNE-H color coded indicator lights, or viewing screen monitoring for tracking, alerts, and heart rate. Turn on chem/bio heart rate notifications, so you know if your

heart rate remains above or below a chosen beats per minute (BPM), or check for an irregular heart rhythm.

- Detecting: at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the CMDC device. *Apple Watch*: "Apr 8, 2019 - The two sensors could also be used to detect pollution or carbon monoxide, patents from Apple that suggest the company might be working on chemical smell ... devices, which could mean phones, tablets or smartwatches." Article: *New patents suggest Apple wants to teach your Watch to smell, which...* Retrieved from: https://www.mobihealthnews.com/.../new-patents-suggest-apple-wants-teach-your-wat...

  You can also check your chem/bio heart rate any time using the Heart Rate app.

- Controlling: at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween, for sending signals to at least lock or unlock doors, stall, stop, or slowdown vehicles, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems.

The security features of the Government's CMDC device are significantly the same as the Plaintiff-Appellant's CMDC device as illustrated below:

- Biometrics: that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and or signature or a face recognition to at least gain access to the CMDC device or to prevent unauthorized use of the CMDC device.

- Lock, Unlock, Disabling Lock: the CMDC device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks after a certain number of failed attempts to unlock.

- Near-Field Communication: Near Field Communication or NFC is a short-range communication channel. The purposes for this technology is to simplify first-time connections to other wireless technologies, like Wi-Fi and Bluetooth. Near Field Communication in a CMDC device can be used as part of a two-factor access control system for unlocking a door. Biometric Fingerprint recognition is used for authentication and NFC is used to transmit authentication information to a computer controlling the door. NFC is preferred over RFID because RFID has a frequency vulnerable for detonating bombs.

- Location and Tracking: The CMDC tracking is a process for identifying the location of the device, whether stationary or moving. Localization may be effected by a number of technologies, such as using multi literation of radio signals between (several) cell towers of the network and the device, or simply using GPS. Some GPS CMDC devices use wireless-assisted GPS to determine the user's location. In wireless-assisted systems, the device uses the orbiting GPS satellites in conjunction with information about the device's signal. Sometimes called enhanced GPS, wireless-assisted GPS can often get a fix on the user's location faster than a GPS-only receiver. Some wireless-assisted systems can work inside buildings, under dense foliage and in city areas where traditional receivers cannot receive signals. GPS-enabled CMDC devices with view screens can often display turn-by-turn directions as well as announce them through the device's speaker. A database of maps is used to provide the directions. The CMDC device locator provides GPS coordinates and can dial emergency CMDC device numbers. The Government, parents and caregivers can track the device's location by device or online and can receive notification if it leaves a designated "safe area."

The Government's CMDC device comprising a stop, stall, or vehicle slowdown mean; and, the CMDC device being interconnected to the vehicle to control certain operating systems, are significantly the same as the Plaintiff-Appellant's device as illustrated below:

- Stall, Stop, Slowdown: the CMDC device being equipped to send signals to vehicles (i.e. driver, driverless, autonomous, unmanned aerial, unmanned land, unmanned sea, boats, trucks, etc.) that engages the computer, electrical, fuel, and/or air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to vehicle brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.
- Vehicle Operating Systems: ignition start/stop, door lock/unlock, temperature settings and temperature on/off, vehicle brakes, foot peddle, lights, speed controls, and steering.

The result of the Government sharing Plaintiff-Appellant's intellectual property subject matter with at least that of Samsung, Apple, LG, Qualcomm, Panasonic and Motorola for the development, manufacture, and commercialization of mobile devices which are substantially the same as Plaintiff-Appellant's communicating, monitoring, detecting, and controlling (CMDC) devices are illustrated below:

It is the belief of the Plaintiff-Appellant that the U.S. Government Accountability Office: According to the most recent OMB estimate, the federal government spends about $1.2 billion annually on about 1.5 million mobile (CMDC) devices and associated

services. View GAO-15-431. For more information, contact Carol R. Cha at (202) 512-4456 or chac@gao.gov.

It is the belief of the Plaintiff-Appellant that in 2008, the DHS S&T entered into what's known as cooperative research and development agreements with four cell phone (CMDC) manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes. Information taken directly from the Department of Homeland Security's website.

It is the belief of the Plaintiff-Appellant that in 2012, the U.S. Department of Defense granted two separate security approvals for Samsung's Galaxy (CMDC) smartphones, along with (CMDC) iPhones and iPads running Apple's latest operating system—moves that would boost the number of U.S. government agencies allowed to use those (CMDC) devices. An approval by the Pentagon is considered as the highest standards in security."

It is the belief of the Plaintiff-Appellant that in 2013, the U.S. Department of Defense dropped its exclusive BlackBerry contract and opening all of its (CMDC) mobile communications networks to Apple, Google, and other (CMDC) device makers. 'The Department of Defense is taking a leadership role in leveraging (CMDC) mobile

device technology by ensuring its workforce is empowered with (CMDC) mobile devices, Defense Department Chief Information Officer Teri Takai said in a statement...

It is the belief of the Plaintiff-Appellant that in 2014; by the Defense Information Systems Agency (DISA) opening its networks to Samsung and Apple (CMDC) devices, Defense DISA will broaden the variety of mobile (CMDC) computers that troops and civilian Defense Department employees can use in the field, on bases, in offices and elsewhere to receive and send information and work almost anywhere at any time.

It is the belief of the Plaintiff-Appellant that in 2014, Samsung has announced that five of its Galaxy (CMDC) devices have been approved for the U.S government's Defense Information System Agency (DISA) products list. All of them are using Android 4.4 (KitKat) along with Samsung's KNOX secure workspace platform, which includes system-level encryption for enterprise-based apps.

It is the belief of the Plaintiff-Appellant that in 2014, the United States Air Force replaced 5000 legacy BlackBerry smartphones with Apple's (CMDC) iPhones. The announcement, reported by Defense News, comes as the future of BlackBerry within the Department of Defense is debated, with the chips seeming to fall on the side of transitioning away from a network supporting a mish-mash of BlackBerry devices to a mix of modern (CMDC) devices — though apparently without BlackBerry 10 in that mix.

It is the belief of the Plaintiff-Appellant that in 2015, the Navy Enterprise Networks (NEN) Program Office a made transition to Android and iOS (CMDC) devices. Early users will be able to choose between the (CMDC) iPhone devices, but the Navy wants to be as flexible as possible and allow users to pick the (CMDC) devices that will work best for them. Approval of the (CMDC) iPhone 6 and iPad Air was made in Feb. 2015, and approval to use the Samsung Android (CMDC) phones and tablets was made in March.

It is the belief of the Plaintiff-Appellant that in 2016, is the fiscal year Marines received Samsung (CMDC) smartphones that make calling for fire support easier, quicker and more accurate.

**The "SafeRack" Project:** Every dollar spent fighting the war on terrorism is a stunning blow to world productivity and could well be echoed in a slow-down in the economy, higher inflation rates and higher unemployment, followed by a lowered standard of living. The events of September 11 were, indeed, attacks on the Nation's economy and on a way of life. The events of 9/11 effectiveness must be judged in terms of not only lost lives, but also lost livelihoods. Moreover, new enemies, aware as never before of our society's vulnerabilities, may well attempt to exploit them in the years ahead. That's why the Plaintiff-Appellant's coordinated campaign, introduced as his intellectual property subject matter, to combine terrorism prevention with economic growth became so crucial. The Plaintiff-Appellant have ample precedent for such a

campaign. In previous years, the U.S. government has come to recognize that many military technologies are too expensive to build independently and are best developed in tandem with civilian applications. Often called "dual-use" technologies, they have included the integrated circuit (**Exhibit 6: SafeRack's testing charts and drawings**).

The Plaintiff-Appellant's "dual-use technologies" strategies described in his intellectual property subject matter, offer dual economies in the war on terrorism. The strategies are designed to reduce costs by increasing production volume. But just as important, they expand the base of researchers, developers, designers, testers and users, thus greatly expanding the number of smart people evaluating and improving them. Cheaper products and more brainpower—a powerful one-two punch. Saving lives, saving money and saving the environment in one program is the purpose of the Plaintiff-Appellant's strategies outlined in the "SafeRack" project.

The roll of Congress and the various government agencies (i.e. DHS, DoD, ARL, NRL, DARPA, FEMA, etc.) in the Plaintiff-Appellant's coordinated campaign, introduced as his intellectual property subject matter, was to create a national and world demand for the research, development, and commercialization of the various antiterrorist technologies introduced as the Plaintiff-Appellant's intellectual property subject matter. Congress and the various government agencies was tasked with giving full attention to promoting antiterrorist technologies that follow two fundamental guidelines. First, the Plaintiff-Appellant's technologies should be designed to deny

terrorists tools and targets. Second, the Plaintiff-Appellant's technologies should not be an economic burden on society; they must have a broad and substantial impact on commerce and productivity.

The Plaintiff-Appellant's coordinated campaign, introduced as his intellectual property subject matter, include "Product Grouping" strategies. The strategies are to group anti-terrorism wearables (i.e. new and improved smartphones, smartwatches, etc.), networked systems' devices, detection devices, and scanners with communication methods like GPS, radio-frequency (RF), near-field communication (NFC), cellular towers, navigation, internet, wireless, telematics, satellite, alarms, and wired communication to deter and/or prevent terrorist acts, activities or threats while making it economically feasible for commercialization.

The strategy is to group by design similarities of common features, the Plaintiff-Appellant's intellectual property subject matter antiterrorist technologies into categories based on similarities of security problems, similarities of solutions, similarities of design, similarities of materials, similarities of cost, similarities of technical advancement capabilities, and similarities of availability. The strategy is centered on creating demands which encourages competition and by mass-producing, can significantly reduce cost. The advantages of the Plaintiff-Appellant's intellectual property subject matter "Product Grouping" strategies are: products uniform, greater specialization, optimum utilization of workers and machinery, low production cost per

unit, low stock-piling cost, production control is simplified, high sales turnover, and equipment standardized. The strategies are designed to stimulate the economy.

The Government's implementation of the Plaintiff-Appellant's intellectual property subject matter antiterrorist technology strategies, as part of the "SafeRack" project, gave society interchangeable, integrable sensors and detectors that offer improved dynamic response, greatly reduced size, high precision, increased reliability, specific design, high sensitivity, simplicity, low cost, quick response, low power requirement, that can be micro-machined and mass-produced. The sensors and detectors can be mass-produced in the millions at low prices, which is the main appeal.

The Plaintiff-Appellant's claimed intellectual property subject matter antiterrorist technology products, devices, etc. can be placed in, on, upon, or adjacent any of the products listed in any of the product grouping categories of: Product grouping 1 (storage & transportation); Product grouping 2 (sensors); Product grouping 3 (detector case; modified and adapted); Product grouping 4 (monitoring & communication devices); Product grouping 5 (communication methods); Product grouping 6 (biometrics); Product grouping 7 (authorized person); Product grouping 8 (chemical / biological / biometric / human heart rate); Product grouping 9 (processors) Product grouping 10 (locking mechanisms); and, Product grouping 11 (stall-to-stop / slowdown means)

The Plaintiff-Appellant's claimed intellectual property subject matter antiterrorist technology products, devices, etc. can be placed in, on, upon, or adjacent any of the

Plaintiff-Appellant's claimed Communicating, Monitoring, Detecting, and Controlling (CMDC) devices of a new and improved personal digital assistance (PDA), a new and improved personal computer (PC), a new and improved laptop, a new and improved cell phone, a new and improved tablet, a new and improved smartphone, and other new and improved wearables (i.e. pagers, watches, etc.) as they all are grouped together by common features of design similarities.

The "SafeRack" project allows us to group and integrate past government initiatives, current government initiatives and future government initiatives. When an announcement or solicitation is made by the various government agencies (i.e. DHS, DoD, ARL, NRL, DARPA, FEMA, etc.) that a large number of vulnerable places will be equipped with security devices that has an open platform for integrating chemical, biological, explosive, human, radiation, and nuclear sensors and detectors, the industry for developing the needed sensors and detectors will began producing high quality, low cost detectors and sensors to meet that demand. Satisfying and meeting the demand has stimulated the economy.

Unique within the Plaintiff-Appellant's intellectual property subject matter antiterrorist technologies for meeting the government's standards and requirements for antiterrorist devices to be used with the public, is the Plaintiff-Appellant's intellectual property subject matter "disabling locking mechanisms". The Plaintiff-Appellant's intellectual property subject matter includes grouping the "disabling locking

mechanisms" by common features of design similarities for: products that do not have locks (e.g. mail drop boxes, newspaper vending boxes, trash cans, etc.); products that have locks (e.g. cargo containers, mini-storage houses, warehouses, lockers, cluster mail boxes, keyed mail boxes, trailers, etc.); products that have biometric locks (e.g. airport lockers, vehicles, smartphones etc.); and, products that have locks and are mobile (e.g. cars, trains, ships, mail carriers, planes, trucks, vans, buses, campers, etc.).

It is the belief of the Plaintiff-Appellant that the Claims Court erred in dismissing seventy-two (72)[6] of the Plaintiff-Appellant's intellectual property subject matter, 28 U.S.C. § 1491(a) Government "Takings" claim under the Fifth Amendment Clause, in (Case No. 13-307C; Final Amended Complaint Dkt. No. 120) because the "Takings" claims *sounds* like infringement. There cannot be infringement without a valid patent and an infringing device, product, etc. The Government "Takings" of the Plaintiff-Appellant's claimed intellectual property subject matter, as described above, began in year 2003. The Plaintiff-Appellant's first patent was issued in year 2008 and the Plaintiff-Appellant's first claim of Government infringement stem from a 2007 DHS solicitation (*Cell-All*) that third parties developed from to making an infringing device,

---

[6] Final Amendment Complaint at 93-95, 98-100, 103-105, 108-110, 113-115, 118-120, 123-125, 128-130, 133-135, 138-140, 143-145, 148-150, 153-155, 158-160, 168-170, 173-175, 181-183, 186-188, 191-193, 196-198, 201-203, 206-208, 211-213, 216-218, 221-223, 227-229, 232-234, 237-239, 242-244, 247-249, 252-254, 257-259, 262-264, 267-269, 272-274, 277-279, 282-284, 287-289, 292-294, 297-299, 302-304, 307-309, 312-314, 317-319, 322-324, 327-329, 332-334, 337-339, 342-344, 347-349, 352-354, 357-359, 362-364, 367-369, 372-374, 377-379, 382-384, 387-389, 392-394, 397-399, 402-404

product, etc. in year 2010.

It is the belief of the Plaintiff-Appellant that the Plaintiff-Appellant's substantive right enforceable against the United States for money damages under **The Taking Clause** is a "money mandating constitutional provision". "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction' in the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008)".

It is the belief of the Plaintiff-Appellant that certain members of Congress[7], the Office of the Vice President (Cheney), and the Office of the President (Bush) has violated a "money mandating constitutional provision" when they took the Plaintiff-Appellant's intellectual property subject matter under the "taking clause" of the Fifth Amendment, and used it with or for the benefit of the public, without paying the Plaintiff-Appellant "just compensation".

It is the belief of the Plaintiff-Appellant that certain members of Congress, the Office of the Vice President (Cheney), and the Office of the President (Bush) entered into an implied-in-fact contract with the Plaintiff-Appellant, and that the implied-in-fact

---

[7] Certain members of Congress who entered into an implied-in-fact contract with the Plaintiff-Appellant and who forwarded the Plaintiff-Appellant's intellectual property subject matter over to the Department of Homeland Security for procurement are: the Honorable Senator Fritz Hollings (05/21/2003); the Honorable Senator Fritz Hollings (10/01/2003); the Honorable Senator Lindsey Graham (10/21/2003); the Honorable Senator Jim DeMint (08/01/2004). The Executive Branch: the Office of the Vice President, Dick Cheney (06/03/2003); the Office of the President, George Bush (06/20/2005)

33

contract was breached when certain members of Congress, the Office of the Vice President (Cheney), and the Office of the President (Bush) used the Plaintiff-Appellant's intellectual property subject matter with the public without paying the Plaintiff-Appellant "just compensation".

The result of the Government sharing Plaintiff-Appellant's intellectual property subject matter with various Government Agencies for the development, manufacture, and commercialization of mobile devices which are substantially the same as Plaintiff-Appellant's communicating, monitoring, detecting, and controlling (CMDC) devices that are capable of detecting for WMDs and hazardous agents and compounds, are illustrated below:

Upon information and belief, the US Department of Homeland Security (DHS), NASA's Ames Research Center, (the United States), and four cooperative agreements with Qualcomm Inc., LG Electronics, Apple Inc., and the Samsung Group, after several notices between the years 2006 -2012, has "taken" and continues to "take" the Plaintiff-Appellant's intellectual property and used it for the benefit of the public without paying just compensation, the "Cell-All": Synkera MikroKera Ultra, a low-cost, low-power, high-speed nanosensor-based chemical sensing chip which consists of 64 nanosensors to detect deadly gases and plugs into an Apple iTouch 30-pin dock connector. The new device is able to detect and identify chemicals in the air using a "sample jet" and sends detection data to another phone (e.g. Apple iPhone) or a computer via telephone

communication network or Wi-Fi. Additional monitoring equipment for this "Cell-All" project is at least a Samsung Galaxy s6 smartphone that has an Android operating system (O/S).

Upon information and belief, the US Department of Homeland Security (the United States) and at least Apple Inc. entered into a cooperative agreement for the development of a mobile detection (CMDC) device; and after several notices between the years 2006 -2012, has "taken" and continues to "take" the Plaintiff-Appellant's intellectual property and used it for the benefit of the public without paying just compensation, the "Cell-All" solicitation: "Apr 8, 2019" -- Apple's CMDC device has two sensors that is used to detect pollution or carbon monoxide, patents from Apple that suggest the company is working on chemical smell ... CMDC devices, which includes phones, tablets or smartwatches. The Plaintiff-Appellant's CMDC devices are equipped with *"chemical sensors"* as a means of chemical detection. *New patents suggest Apple wants to teach your Watch to smell, which...*https://www.mobihealthnews.com/... /new-patents-suggest-apple-wants-teach-your-wat...

Upon information and belief, the US Department of Homeland Security (the United States) and at least Apple Inc. entered into a cooperative agreement for the development of a mobile detection (CMDC) device; and after several notices between the years 2006 -2012, has "taken" and continues to "take" the Plaintiff-Appellant's intellectual property and used it for the benefit of the public without paying just

compensation, the "Cell-All" solicitation: "Dec 6, 2018 - Apple now says its (CMDC) smartwatch tech to detect atrial fibrillation (a quivering or irregular heartbeat) is not for... for the "worried well" who want to monitor their biological signals..." "[t]his is the beginning of a real sea change in how physiologic and biologic data can be collected outside traditional care settings." The Plaintiff-Appellant's CMDC devices are equipped with *"biological sensors"* as a means of biological detection.

*Apple now says its smartwatch tech to detect atrial fibrillation is not for...* https://www. washingtonpost.com/.../apple...smartwatch...detect.../cb5c46bc-f978-11e8-8...

Upon information and belief, the US Department of Homeland Security (the United States) and at least Apple Inc. entered into a cooperative agreement for the development of a mobile detection (CMDC) device; and after several notices between the years 2006 -2012, has "taken" and continues to "take" the Plaintiff-Appellant's intellectual property and used it for the benefit of the public without paying just compensation, the "Cell-All" solicitation: "Dec 4, 2018 - with *"fall detection"*, Apple's (CMDC) Watch users have some peace of mind. When a fall occurs, the watch can help you reach out to your ...With fall detection, your Apple Watch is intuitive enough to know if you're moving. When you are following a fall, it will wait for you to stop to respond to the alert. If you're immobile and not moving, the watch will contact emergency services automatically if you don't answer within 60 seconds." The Plaintiff-

Appellant's CMDC devices are equipped with *"fall detection"* as a means of human detection.

*How to set up and use fall detection on Apple Watch Series 4 | iMore*
https://www.imore.com/how-set-and-use-fall-detection-apple-watch-series-4

Upon information and belief, the U.S. Army Edgewood Chemical Biological Center (ECBC), the U.S. Army Communications-Electronics Research, Development and Engineering Center (CERDEC), and the Defense Threat Reduction Agency (DTRA), (the United States), after several notices between the years 2006 -2012, has "taken" and continues to "take" the Plaintiff-Appellant's intellectual property and used it for the benefit of the public without paying just compensation, the "Biotouch System" / "Nett Warrior" Smartphone System: The U.S. Army developed a biological and chemical detection system. They developed volatile organic compound (VOC) strips that work with a device called a Biotouch. Biotouch relays information from VOC strips and sends results to a Nett Warrior Samsung Galaxy Note II smartphone, Defense Systems reports.

Upon information and belief, the US Department of Homeland Security (DHS), (the United States), after several notices between the years 2006 -2012, has "taken" and continues to "take" the Plaintiff-Appellant's intellectual property and used it for the benefit of the public without paying just compensation, the PositiveID / "Firefly DX"; Samsung Galaxy s6 Smartphone: PositiveID's (PSID) M-BAND developed by

MicroFluidic Systems ("MFS") subsidiary; received funding excess of $30 million from Department of Homeland Security (DHS). Firefly DX, builds upon technology advances achieved in development of M-BAND system. Firefly Dx overview: Miniaturized version of M-BAND using same technologies, real-time PCR detection; Hand-held detection provides sample purification and biological analysis; A two-part device consisting of a portable handheld instrument with wireless communication and disposable single-use cartridges all analytical elements; Data processed in real time and communicated to PC or smartphone (e.g., Galaxy s6) using mobile applications and cloud storage; Has the ability to detect and identify common pathogens and diseases as various strains of influenza, E.coli, MRSA and human papilloma virus ("HPV").

It is the belief of the Plaintiff-Appellant that the Plaintiff-Appellant's proposed plan for government spending on the "war on terrorism" has stimulated our Nation's economy in the way of increased jobs, and increased revenue for the private sector which results in increased tax revenue received by the government:

"In the summer of 2017, the Stimson Center convened a nonpartisan study group to assess the adequacy and transparency of federal efforts to gather and report data on government wide spending on counterterrorism (CT). Stimson's research shows that total federal spending – including spending for government wide homeland security efforts, international programs, and the wars in Afghanistan, Iraq, and Syria – totaled $2.8 trillion for fiscal years 2002 through 2017. CT spending peaked at $260 billion

in 2008 at the height of the wars in Afghanistan and Iraq. This represents a 16-fold increase over the pre-9/11 total. In 2017, as war funding declined, total CT spending equaled $175 billion, nearly an 11-fold increase from the 2001 level. With this growth, CT spending has become a substantial component of total discretionary spending for programs across a wide range of areas, including defense, education, and medical research. With total U.S. discretionary spending of more than $18 trillion over fiscal years 2002-2017, CT spending made up 15 percent of the total during that period. At its peak in 2008, CT spending amounted to almost 22 percent of total discretionary spending. By 2017, CT spending had fallen to 14 percent of the total."

**The "V-Tection" Project:** Under the V-Tection project it was the Government's responsibility to institute mandates for the Plaintiff-Appellant's intellectual subject matter pre-programmed stall, stop, and vehicle slow-down systems for Government and consumer vehicles. Taken from 9/11, the Plaintiff-Appellant's intellectual subject matter pre-programmed stall, stop, and vehicle slow-down systems, if applied, possibly could have prevented the terrorist from taking over the planes because the aircraft would have been on an autonomous or pilotless flight pattern. If the plane deviated away from the perimeters established within the flight pattern, the control tower would receive an alert. If the pre-programmed stall, stop, and vehicle slow-down systems does not control the plane away from a crash and toward a safe landing, the personnel in the control tower has the ability to take control of the plane and steer it to a safe landing.

Some of the Plaintiff-Appellant's intellectual subject matter pre-programmed stall, stop, and vehicle slow-down systems include: lane departure stall, stop, and vehicle slow-down systems; unintended acceleration stall, stop, and vehicle slow-down systems; adapted cruise control stall, stop, and vehicle slow-down systems; reverse acceleration stall, stop, and vehicle slow-down systems; pre-crash stall, stop, and vehicle slow-down systems; and, a crowd sourcing stall, stop, and vehicle slow-down systems **(Exhibit 7: V-Tection's testing charts and drawings)**.

The operators (i.e. drivers, pilots, conductors, etc.) are equipped with the Plaintiff-Appellant's intellectual subject matter CMDC devices (new and improved desktop computers, new and improved PDAs, PCs, laptops, cell phones, tablets, smartphones, and other wearables such as smartwatches, etc.) are interconnected to vehicles' operating systems for initiating a stall, stop, and vehicle slow-down.

The Plaintiff-Appellant's intellectual property subject matter includes technology to ensure the Government and law enforcement has a way to stop, stall, or slow a vehicle down. The Government and law enforcement MUST have a way to control the stopping, stalling, and slowing down the autonomous or driverless vehicles (e.g. unmanned land, air, and sea vehicles), vehicles equipped with the Plaintiff-Appellant's programmed systems that have been hacked or overridden, as well as vehicles stolen and used for kidnapping or as a weapon of mass destruction.

Some of the Plaintiff-Appellant's intellectual subject matter stall, stop, and vehicle slow-down systems intended for Government and law enforcement includes sending signals over cellular or by satellite. The Government can also send signals by way of electromagnetic pulse, electrostatic discharge, microwave beam, or radio frequency.

The result of the Government sharing Plaintiff-Appellant's intellectual property subject matter with various Government Agencies and private industry for the development, manufacture, and commercialization of stall, stop, and vehicle slow-down systems for Government and consumer vehicles, which are substantially the same as the Plaintiff-Appellant's intellectual property subject matter stall, stop, and vehicle slow-down systems for Government and consumer vehicles are illustrated below:

Connected Vehicles:

"There are already millions of connected cars on the road and some of them connect over the same cellular network your phone does. In 2016, for the first time, cellular connections for cars grew at a faster rate than new phone connections. The Kymeta Corporation is delivering the next generation of the connected car. The company has developed a service called KĀLO, making it possible to gain access to satellite connectivity to deliver seamless, global internet access. It works just like a cellular plan for your car but, because it can use satellite networks, it works even where there are no cell towers."
https://spacenews.com/ satellites-and-the-connected-car/
Reported to Senate with amendment(s) (11/28/2017)

"American Vision for Safer Transportation through Advancement of Revolutionary Technologies Act or the AV START Act. This bill: (1) establishes a framework for a federal role in ensuring the safety of highly automated vehicles (HAVs); (2) preempts states from adopting, maintaining, or enforcing any law, rule, or standard regulating an HAV or automated driving system (ADS) regarding certain safety evaluation report subject areas; (3) sets forth conditions under which HAVs may be introduced into interstate commerce for testing, evaluation, or demonstration; and (4) applies certain safety exemptions to HAVs. The Department of Transportation shall: (1) establish a technical committee on HAV and ADS safety, (2) establish a working group on ADS education efforts, and (3) research the traffic safety implications of HAVs. Each HAV or ADS manufacturer shall execute a written plan for identifying and reducing cybersecurity risks." https://www.congress.gov/bill/115th-congress/senate-bill/1885

USDOT Automated Vehicles Activities:

"The U.S. Department of Transportation is committed to facilitating a new era of transportation innovation and safety and ensuring that our country remains a leader in automation. The Department of Transportation is acting as a convener and facilitator, partnering with a broad coalition of industry, academic, states and local, safety advocacy, and transportation stakeholders to support the safe development, testing, and deployment of automated vehicle technology. U.S. Department of Transportation invites public comment on the document, Preparing for the Future of Transportation: Automated Vehicles 3.0 (AV 3.0) [ISBN 978-0-16-094944-9]. This document builds upon Automated Driving Systems: A Vision for Safety 2.0 (ADS 2.0) and expands the scope to provide a framework and multimodal approach to the safe integration of AVs into the Nation's broader surface transportation system."

Government's stall, stop, or vehicle slowdown systems:

1- Eureka Aerospace High Powered Electromagnetic System, or HPEMS; 2- Laser Weapons System (LaWS); 3- ATHENA (Advanced Test High Energy Asset); 4- Counter-Electronics High-Powered Microwave Advanced Missile Project (CHAMP); 5- Northrop Grumman X-47B UCAS & X-47B Control Display Unit (CDU); 6- Boeing MH-6 Little Bird Helicopter; 7- K-Max Self-flying Helicopter; 8- Oshkosh Defense Autonomous Unmanned Ground Vehicle (UGV) "TerraMax; and, 9- Dream Hammer's "Ballista" Software for Computer, Tablet or Smartphone.

Upon information and belief, the Government (the United States) has entered into contracts and agreements for the development of stall, stop, and vehicle slowdown systems;[8] and, after several notices between the years 2006 -2012, has "taken" and continues to "take" the Plaintiff-Appellant's intellectual property subject matter and used it for the benefit of the public without paying just compensation for at least the Eureka Aerospace High Powered Electromagnetic System, or HPEMS; the Laser Weapons System (LaWS); the ATHENA (Advanced Test High Energy Asset); the Counter-Electronics High-Powered Microwave Advanced Missile Project (CHAMP); the Northrop Grumman X-47B UCAS & X-47B Control Display Unit (CDU); the Boeing MH-6 Little Bird Helicopter; the K-Max Self-flying Helicopter; the Oshkosh Defense Autonomous Unmanned Ground Vehicle (UGV) "TerraMax; and, the Dream Hammer's "Ballista" Software for Computer, Tablet or Smartphone.

---

[8] The Government's stall, stop, and slowdown systems being substantially the same as the Plaintiff-Appellant's intellectual property subject matter stall, stop, and vehicle slow-down systems for Government and consumer vehicles is <u>NOT</u> a claim for patent "literal infringement" which means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process.

It is the belief of the Plaintiff-Appellant that the Plaintiff-Appellant's proposed plan for government spending on "autonomous and driverless" vehicles has stimulated our Nation's economy in the way of increased jobs, and increased revenue for the private sector which results in increased tax revenue received by the government:

> "With automakers and technology companies rushing to develop self-driving cars, the Obama administration on Thursday pledged to expedite regulatory guidelines for autonomous vehicles and invest in research to help bring them to market. Until now, the federal government has taken a hands-off approach to regulating new technology that allows vehicles to operate independently and without an actual driver. But in an announcement here at the North American International Auto Show, Transportation Secretary Anthony Foxx said the government would remove hurdles to developing autonomous vehicles and set further guidelines for them within six months. "We are bullish on autonomous vehicles," Mr. Foxx said. "The actions we are taking today bring us up to speed." The government's new support includes a request in President Obama's proposed budget for the next fiscal year for $4 billion, to be spent over 10 years, to finance research projects and infrastructure improvements tied to driverless cars. Mr. Foxx said that autonomous vehicles had the potential to reduce traffic accidents and significantly improve safety on America's roads. He estimated that as many as 25,000 deaths could have been avoided last year if driverless technology had been in widespread use."

**Standard Provisions for Government authorization to pay "just compensation" for Intellectual Property Subject Matter**

Congress's Authority to Influence and Control Executive Branch Agencies:

"[t]he Supreme Court has generally recognized that Congress has broad constitutional authority to establish and shape the federal bureaucracy… [c]ongress also may enumerate the powers, duties, and functions to be exercised by agencies, as well as directly counteract, through later legislation, certain agency actions implementing delegated authority… [t]here also are many non-statutory tools (i.e., tools not requiring legislative enactment to exercise) that may be used by the House, Senate, congressional committees, or individual Members of Congress to influence and control agency action." https://fas.org/sgp/crs/misc/R45442.pdf

Appropriations by Congress:

"[t]he power to appropriate funds gives Congress influence over all activities of the federal government. Article 1, section 9 of the U.S. Constitution specifies that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Through appropriations Congress can fund a president's programs, dictate policy to government agencies, and reward members with federal projects in their home districts and states. Congress first enacted all appropriations in a single bill. To establish better control over spending, the House of Representatives in 1865 and the Senate in 1867 created their own Appropriations Committees. Each has thirteen subcommittees to handle specific appropriations".

Executive Order:

"[t]he Obama Administration circulated, but did not issue, a draft executive order directing "every contracting department and agency" to require contractors to "disclose certain political contributions and expenditures." The draft order cites the President's constitutional authority, as well as his authority pursuant to the Federal Property and Administrative Services Act of 1949 (FPASA), which authorizes the President to prescribe any policies or directives that he considers necessary to promote "economy" or "efficiency" in federal procurement. The draft executive order refers to FPASA's goals in that it directs actions "to ensure the integrity of the federal

45

contracting system in order to produce the most economical and efficient results for the American people... [s]ome courts and commentators also have suggested that Presidents have inherent constitutional authority over procurement."

https://fas.org/sgp/crs/misc/R41866.pdf

Executive Use of Procurement Power:

"In AFL-CIO v. Kahn, the United States Court of Appeals for the District of Columbia... opened the door to a substantial increase in executive use of procurement power. In Kahn the court held that the President is authorized by the Federal Property and Administrative Services Act of 1949 to implement national policy through the federal procurement process, provided there is a "close nexus" between the program and procurement "economy and efficiency." ...the court did not limit presidential authority under section 205(a) to prescribing mechanical, procedural aspects of the procurement process. This result is supported by the fact that section 205(a) allows the President to prescribe "policies and directives," implying a broader scope than only a power to establish procedures. ...there is some suggestion that the close nexus analysis need not focus on the primary thrust of the order or program, but that a court may find a secondary purpose or effect that satisfies the test." https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=2735& context=dlj

Federal Government contracting:

"In FY 2016 alone, the US Federal Government spent $461B on contracts. Contracts for federal government procurement usually involve appropriated funds spent on supplies, and services, whether the supplies, services, or interests are already in existence or must be created, developed, demonstrated, and evaluated. *See* 48 C.F.R. § 2.101 ("Acquisition" defined, as to goods and services only). Federal Government contracting has the same legal elements as contracting between private parties: a lawful purpose, competent contracting parties, an offer, an acceptance that

complies with the terms of the offer, mutuality of obligation, and consideration."
https://en.wikipedia.org/wiki/Government_procurement_in_the_United_States

**Standard Provisions for the Government to established Implied-in-Fact contract(s) to pay Plaintiff-Appellant "just compensation" for his Intellectual Property Subject Matter**

The Plaintiff-Appellant must have given the Government notice and have established an implied-in-fact contract(s) with the Government for Plaintiff-Appellant's intellectual property subject matter: Six months after the DHS was established on November 25, 2002; and, after the Plaintiff-Appellant had given the Government notice, the Plaintiff-Appellant received response letters (**Exhibit 8**):

- on May 21, 2003 from the Honorable Senator Fritz Hollings stating, "I have contacted the Department of Justice and the Department of Homeland Security to try to be of assistance";

- on June 3, 2003 from the Office of the Vice President, Dick Cheney stating, "[y]our correspondence has been forwarded to the Department of Homeland Security for review. You will hear back directly from the Department";

- on October 1, 2003 from the Honorable Senator Fritz Hollings stating, "[t]hank you for contacting me regarding your difficulty with receiving a response from the Department of Homeland Security";

- on October 21, 2003 from the Honorable Senator Lindsey Graham stating, "I have contacted the Department of Homeland Security on your behalf. I have asked that they review your request and respond directly to you";

- on January 24, 2005 the Honorable Senator Jim DeMint introduced Plaintiff-Appellant's intellectual property subject matter in a Bill. "S. 3 (109th Congress);

January 24, 2005. 1st Session 1. Short Title 'Protecting Americans in the War on Terror Act of 2005' was a bill in the United States Congress".

- on June 20, 2005 from the Office of the President, George Bush stating, "[t]hank you for your letter regarding homeland security technology procurement. Please know I have forwarded it to the Department of Homeland Security for review and response".

Implied-in-Fact Contracts:

"Williston (1920) moved away from contracts implied by law, saying: "Contracts are express when their terms are stated by the parties. Contracts are implied when their terms are not so stated." This implied-in-fact idea was recognized in *Baltimore & Ohio R. Co. v. United States*, 261 U.S. 592 (1923), where, in interpreting a Federal statute, the court defined an "implied contract" under the statute to mean "an agreement 'implied in fact' founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Justice Steakley, of the Texas Supreme Court, wrote that "[o]ur courts have recognized that the real difference between express contracts and those implied in fact is in the character and manner of proof required to establish them." *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972). http://www.orsinger.com/PDFFiles/the-Rise-of-American-Contract-Law.pdf

Breach of Implied-in-Fact Contracts:

"To sue the United States for congressional interference with a contract right (public or private), the United States must have waived its sovereign immunity: the United States is immune from suit except as it consents to be sued; *Library of Congress v. Shaw*, 478 U.S. 310, 315 (1986); *United States v. Mitchell*, 463 U.S. 206, 211 (1983). This waiver/consent precondition applies to both breach of contract claims and

takings claims; *See, e.g., Perry v. United States*, 294 U.S. 330, 352 (1935) (breach of contract claims). The consent to suit has been given, in both cases, in the form of the Tucker Act; 28 U.S.C. § 1491(a)(1). The Tucker Act gives the U.S. Court of Federal Claims jurisdiction over "claims" against the United States "founded either upon the Constitution… or upon any express or implied contract with the United States …." The phrase "upon the Constitution" plainly includes takings claims against the United States—important not only for jurisdictional reasons, but because the Takings Clause of the Fifth Amendment is not construed to contain its own waiver of sovereign immunity. The waiver comes only from the Tucker Act. As for breach of contract actions, the phrase "upon any express or implied contract" states the Tucker Act's coverage of such actions explicitly. However, the phrase "implied contract" has been limited by case law to contracts implied in fact, excluding contracts implied in law. As mentioned, plaintiffs filing breach of contract complaints against the United States often add a takings claim under the Fifth Amendment Takings Clause. The Takings Clause is relevant because contract rights generally are deemed to constitute "property" as that term is used in the Takings Clause. *See, e.g., United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken … provided that just compensation is paid."), and *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a State, or the United States.") A breach by the United States, therefore, can be argued to constitute a taking of one's property in a contract right. http://nationalaglawcenter.org/wp-content /uploads/assets/crs/R42635.pdf

### STATEMENT OF ISSUES

Did the Trial Court Judge (Bruggink) abuse its discretion by ruling against established precedence of the Court of Federal Claims by denying and dismissing the

Plaintiff-Appellant's substantive right(s) enforceable against the United States for money damages?

> Judge Margaret Sweeney; Court of Federal Claims: *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; Case No. 12-774C; Contract Claims against the United States Arising Under the Tucker Act. "The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc)."

It is the belief of the Plaintiff-Appellant that he had, and continue to have, implied-in-fact contracts with the United States, Congress, and several other members employed by the United States authorized to contract.

It is also the belief of the Plaintiff-Appellant a violation of a Constitutional provision (Government "Takings" of Plaintiff-Appellant's intellectual property subject matter) and used it with the public without paying the Plaintiff-Appellant just compensation. U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction' in the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008)".

It is further the belief of the Plaintiff-Appellant that certain statutes and procedurals were violated by the United States Court of Federal Claims, the Department of Justice, the Department of Homeland Security, and the Patent Trials and Appeals Board (PTAB) which facilitated and expedited the United States efforts to take Plaintiff-Appellant's intellectual property subject matter.

**SUBSTANTIVE RIGHT: MONEY MANDATING CONSTITUTIONAL PROVISION**

Plaintiff-Appellant first made contact with Senator DeMint's office in year 2004. Plaintiff-Appellant and Senator DeMint entered into an implied-in-fact contract. The Plaintiff-Appellant communicated with Senator DeMint's office personnel (Mr. Chris Socha) with a request to be put in contact with a Portfolio Manager at one or more of the Government Agencies for the purchase of Plaintiff-Appellant's intellectual property subject matter. At this time the implied-in-fact contract could not sound in infringement because the Government had not contracted with a third party for the development of any of the Plaintiff-Appellant's claimed inventions. Plaintiff filed his first patent application on 04/05/2006.

Senator DeMint used Plaintiff-Appellant's intellectual property subject matter for the benefit of the public when he introduced Plaintiff-Appellant's intellectual property subject matter in a Bill. "S. 3 (109th Congress); January 24, 2005. 1st Session 1. Short Title 'Protecting Americans in the War on Terror Act of 2005' was a bill in the United States Congress".

Senator DeMint had the right to take the Plaintiff-Appellant's intellectual property subject matter and use it for the benefit of the public. The bill must be passed by both the House and Senate in identical form and then be signed by the President to become law. The bill was introduced on January 24, 2005, but was not enacted. The bill was introduced in the 109th Congress and was sponsored by: Judd Gregg (NH); Co-sponsors: William H. Frist (TN); Jeff Sessions (AL); Mike DeWine (OH); George Allen (VA); Rick Santorum (PA); Mitch McConnell (KY); Jim DeMint (SC). The 109th Congress met from Jan 4, 2005 to Dec 9, 2006. The legislature was not enacted on by the end and was therefore cleared from the books.

"The Subtitle A—Product Development CHAPTER 1—PARTNERING WITH THE PRIVATE SECTOR SEC. 111. EXPANSION OF COUNTERMEASURES COVERED BY BIOSHIELD. "(B) DETECTION TECHNOLOGY.—The term 'detection technology' means a technology device and its use for the detection of the presence, concentration, or characteristics of a biological (including an infectious disease), chemical, or radiological agent in environmental or field samples... "(d) LIMITATION.—A patent may not be extended under this section where— "(1) the regulatory review period for the countermeasure product was concluded before the date of enactment of the Biological, Chemical, and Radiological Weapons Countermeasures Research Act; or "(2) the patent that is the basis of the application under this section expired before the date of enactment of the Biological, Chemical, and Radiological Weapons Countermeasures Research Act."... "(3) 'eligible entity' means a natural or legal person that has— "(A) alone or with others, successfully developed a countermeasure product; "(B) been certified under section 1812(d) of the Homeland Security Act of 2002; "(C) entered into a contract for the sale of the

countermeasure product under section 319F–1 or section 319F–2 of the Public Health Service Act... "(A) COUNTERMEASURES DEVELOPMENT MEETING AND CONSULTATIONS.—The Secretary may conduct meetings and consultations with parties involved in the development of priority countermeasures for the purpose of the development, manufacture, distribution, purchase, or sale of priority countermeasures consistent with the purposes of this title. The Secretary shall give notice of such meetings and consultations to the Attorney General and the Chairperson of the Federal Trade Commission (referred to in this subsection as the 'Chairperson')." Retrieved from: "S. 3 — 109th Congress: Protecting America in the War on Terror Act of 2005." www.GovTrack.us. 2005. June 23, 2019 <https://www.govtrack.us/congress/bills/109/s3>" GovTrack automatically collects legislative information from a variety of governmental and non-governmental sources.

Plaintiff-Appellant's substantive right enforceable against the United States for money damages under The Takings Clause is a "money mandating constitutional provision". It is the belief of the Plaintiff-Appellant that Senator Jim DeMint and Congress has violated a "money mandating constitutional provision" when he and Congress took the Plaintiff-Appellant's intellectual property subject matter under the "taking clause" of the Fifth Amendment, and used it with or for the benefit of the public without paying "just compensation". "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction' in the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008)."

Senator Jim DeMint and Congress has the lawful right to take the Plaintiff-Appellant's intellectual property subject matter and use it with the public under the "eminent domain" theory. The Plaintiff-Appellant and Senator DeMint entered into an implied-in-fact contract. The contract was breached when the Senator used the Plaintiff-Appellant's intellectual property subject matter with the public and fail to provide a method of just compensation (Results: seventy-two claims of substantive rights violations under the source of law; "money-mandating constitutional provision"; Count 1 of the Final Amended Complaint)

## SUBSTANTIVE RIGHT: EXPRESS OR IMPLIED CONTRACT

An implied-in-fact contract consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words:

"[a]n implied-in-fact contract is a "substitute [] for direct privity." Carter, 98 Fed. Cl. at 636. "An implied-in-fact contract requires a showing of the same contractual elements as an express contract." *Last Chance Mining Co. v. United States*, 12 Cl. Ct. 551, 555 (1987), aff'd, 846 F.2d 77 (Fed. Cir. 1988). When alleging that the federal government entered into a contract, a plaintiff must establish "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance[;] and (4) 'actual authority' on the part of the government's representative to bind the government." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc); accord *Anderson v. United States*, 85 Fed. Cl. 532, 542 (2009); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997). "An implied-in-fact contract is founded upon a meeting of the minds, which, although not embodied in an

express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Maher v. United States*, 314 F.3d 600, 603 (Fed. Cir. 2002) (citing *Hercules v. United States*, 516 U.S. 417, 424 (1996) (citing *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)))

Mr. Stephen Dennis, Program Manager for the BROAD AGENCY ANNOUCEMENT (BAA); BAA07-10; *CELL-ALL* Ubiquitous Biological and Chemical Sensing; Published: 10/30/2007 by the Department of Homeland Security (DHS); Science and Technology (S&T) Directorate, Washington DC, 20528 and Ms. Margaret L. "Margo" Graves, Office of Procurement Operations / Science & Technology Acquisitions Division; Team Lead / Contracting Officer for the BROAD AGENCY ANNOUCEMENT (BAA); BAA07-10; *CELL-ALL* Ubiquitous Biological and Chemical Sensing; Published: 10/30/2007 by the Department of Homeland Security (DHS); Science and Technology (S&T) Directorate, Washington DC, 20528; both having prior knowledge that the Plaintiff has a patent(s) that covers the development of the technology DHS requested in the Cell-All solicitation, entered into an implied-in-fact contracts with the Plaintiff-Appellant.

"With respect to a representative's ability to bind the government, however, such created "approval must be within the approving official's authority in order to be operative." *New Am. Shipbuilders, Inc. v. United States*, 871 F.2d 1077, 1080 (Fed. Cir. 1989); accord *Trauma Serv. Grp.*, 104 F.3d at 1327 (stating that a plaintiff "must allege facts sufficient to show that the Government representative who entered into its

alleged implied-in-fact contract was a contracting officer or had implied actual authority to bind the Government").

There was a meeting of the minds that the Plaintiff-Appellant were to be compensated in at least one of; funding as an awardee; royalty payments; or the purchase of Plaintiff-Appellant's intellectual property subject matter that has now been issued in Plaintiff-Appellant's 10 patents.

We had a meeting of the minds that any and all Government Agencies that issues a solicitation or request for the development of Plaintiff-Appellant's claimed invention(s), will be notified of the Plaintiff-Appellant's implied-in-fact contract and that arrangements needs be made for compensation in at least one of; funding as an awardee; royalty payments; or the purchase of Plaintiff-Appellant's intellectual property subject matter that has now been issued in Plaintiff-Appellant's 10 patents.

We had a meeting of the minds that any and all third-party Government contractors that enters into an agreement (i.e. contracts, grants, cooperative agreements, etc.) for the development of Plaintiff-Appellant's claimed invention(s) will be notified of the Plaintiff-Appellant's implied-in-fact contract.

The third-party Government contractors will be put on notice that arrangements needs be made for compensation in at least one of royalty payments or the purchase of Plaintiff-Appellant's intellectual property subject matter. Compensation should include the purchase of Plaintiff-Appellant's patents should the third-party Government contractors decide to commercialize Plaintiff-Appellant's claimed inventions.

Mr. Stephen Dennis and Ms. Margaret L. "Margo" Graves breached the implied-in-fact contracts when they contracted with third-party Government contractors (i.e. Apple, Samsung, Qualcomm, LG) for the development of Plaintiff-Appellant's claimed inventions covered by his intellectual property subject matter that has now been issued in Plaintiff-Appellant's 10 patents without paying Plaintiff-Appellant just compensation.

The Government was well within its rights to "Take" the intellectual property subject matter for public use, but not without paying the Plaintiff-Appellant just compensation. Three things to consider when adjudicating: Privity of Contract; Implied-in-fact contract; and, the Takings Clause of the Fifth Amendment:

**Breach of contract requires Privity of Contract:** Privity of contract refers to the relationship between the parties to a contract which allows them to sue each other but prevents a third party from doing so. It is a doctrine of contract law that prevents any person from seeking the enforcement of a contract, or suing on its terms, unless they are a party to that contract. As a general rule, a contract cannot confer rights or impose obligations arising under it on any person except the parties to it.

"For a plaintiff to maintain a claim for breach of contract under the Tucker Act, "there must be privity of contract between the plaintiff and the United States." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998); accord *First Annapolis Bancorp, Inc. v. United States*, 644 F.3d 1367, 1373 (Fed. Cir. 2011) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim."); *Flexfab v. United States*, 424 F.3d 1254, 1265 (Fed. Cir. 2005) (noting that as a general rule, the "government consents to be sued only by

those with whom it has privity of contract"). The parties to that contract must be the plaintiff and the defendant. See *Silverman v. United States*, 679 F.2d 865, 870 (Ct. Cl. 1982)."

Did the Trial Court Judge (Bruggink) err when he dismissed seventy-two of Plaintiff-Appellant's "Takings" claims under the Fifth Amendment Clause (Count 1 of the Final Amended Complaint; Case No. 13-307C)? The Plaintiff-Appellant pleaded the United States violated his substantive right under the source of law; "money-mandating constitutional provision".

## SUBSTANTIVE RIGHT: VIOLATION OF A STATUTE OR REGULATION

The Plaintiff is conceding the Government has the authority to take the Plaintiff-Appellant's intellectual property subject matter, that once tested by way of prosecution at the USPTO, or re-tested by way of re-issue prosecution, post-grant reexamination, Petition for *Inter Partes Review* (IPR), or through Patent infringement litigation in the District Courts, to verify the validity of the Plaintiff-Appellant's intellectual property subject matter by way of a Patent, Patent rights, Patent franchise, Patent private property, or Patent personal property. A Patent is only the results of testing mechanisms. The Government has the right to take the private property, be it "rights or franchise", "private or personal", to be used with the public or for the benefit of the public.

"Judge Susan G. Braden; *Linda Rosenberg, v. The United States*; Memorandum Opinion and Final Order; Case No. No. 05-1272T; filed Aug 3, 2006: "To invoke the court's jurisdiction over a takings claim, however, the plaintiff must admit that the Government had authority to take the property. See *Rith Energy, Inc. v. United States*,

247 F.3d 1355, 1365 (Fed. Cir. 2001) (explaining that "an uncompensated [t]aking and an unlawful government action constitute 'two separate wrongs [that] give rise to two separate causes of action,' and that a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated [t]aking in the [United States] Court of Federal Claims" (quoting Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1346 (Fed. Cir. 1998)); *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993) ("[C]laimant must concede the validity of the government action which is the basis of the [t]aking claim to bring suit under the Tucker Act.")."

The PTAB (Government) decided to institute the frivolous litigation after a preliminary review of the validity of Plaintiff-Appellant's independent claims 11, 74, and 81of the '990 patent using unqualified prior art submitted by the DOJ and DHS, that did not antedate the Plaintiff-Appellant's '990 Patent. The Government, in Case No. IPR2014-00714, introduced three prior art patents (Astrin, Breed, and Mostov) that the Government knew, or should have known, did not antedate the priority filings date of November 17, 2004[1] of the Plaintiff-Appellant's inventions.

It is the belief of the Plaintiff-Appellant that the United States ("Government") created liability for itself when the Government fail to adhere to the proper statues and accepted standard of proceedings (regulations) that caused the "Takings" of Plaintiff-Appellant's patented independent claims 11, 74, and 81of his RE43,990 patent, and the dismissal of forty-six (46) of Plaintiff-Appellant's dependent claims of the '990 Patent that depends on the independent claims of 11, 74, and 81of the '990 patent.

Did the United States (Trial Court, the DOJ, the DHS, and the PTAB), err when they collectively caused a "Takings" of the Plaintiff-Appellant's property under the Fifth Amendment Clause without paying the Plaintiff-Appellant just compensation?

"The Supreme Court recently on June 10, 2019, determined that United States government agencies cannot challenge a U.S. patent in an administrative trial proceeding conducted before the Patent Trial and Appeal Board (PTAB) of the U.S. Patent and Trademark Office (USPTO)... [i]n *Return Mail Inc. v. United States Postal Service*, the Supreme Court held in a 6-3 decision that a government agency does not constitute a "person" in the context of the AIA statute... [t]he Court also noted that "[e]xcluding federal agencies from AIA review proceedings also avoids the awkward situation of having a civilian patent owner defend the patentability of her invention in an adversarial, adjudicatory proceeding initiated by one federal agency and overseen by a different federal agency..."

*"It does seem like the deck is stacked against a private citizen who is dragged into these proceedings. They've got an executive agency acting as judge with an executive director who can pick the judges, who can substitute judges, can reexamine what those judges say, and change the ruling, and you've got another government agency being the prosecutor at the same time. In those situations, shouldn't you have a clear and express rule?" – Justice Sonia Sotomayor*

Respectfully submitted,

S/ *Larry Golden*

Larry Golden, Petitioner, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing "APPEAL FROM THE

UNITED STATES COURT OF FEDERAL CLAIMS; IN 1:19-cv-104 (19-104C);

JUDGE ERIC G. BRUGGINK presiding, was sent on August 5, 2019 via U.S.

Postal Service "Priority Mail", to:

NICHOLAS J. KIM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Email: *Nicholas.J.Kim@USDOJ.gov*
Telephone: (202) 616-8116
Facsimile: (202) 307-0345

# EXHIBIT 1

# In the United States Court of Federal Claims

No. 19-104C
(Filed: May 14, 2019)
NOT FOR PUBLICATION

* * * * * * * * * * * * * * * * * * * * * * * * * *

LARRY GOLDEN,

        *Plaintiff,*

v.

THE UNITED STATES,

        *Defendant.*

Takings; takings of intangible patented subject matter; 28 U.S.C. § 1491 (2012); 28 U.S.C. § 1498(a) (2012); subject matter jurisdiction; duplicate claims.

* * * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS

Pending before the court is defendant's motion to dismiss plaintiff's complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims. The motion is fully briefed. Oral argument is deemed unnecessary. The court grants defendant's motion, because plaintiff's complaint alleges a duplicative claim over which this court lacks jurisdiction and which also fails to state a claim.

The duplicate claims arise in a different proceeding, *Golden v. United States*, No. 13-307C. In that action, Mr. Golden first alleged in 2013 that the government was infringing one of his patents under 28 U.S.C. § 1498(a) (2012).[1] The court permitted Mr. Golden to amend his complaint four times over the next four years, and Mr. Golden added more patents and claims of infringement with each amendment. After plaintiff alleged for the first time in an amended complaint that the United States had "taken" the subject matter of his at least six of his patents, the court stayed his takings claims to consider the patent infringement allegations first, because the claims appeared to duplicate each other.

---

[1] The background facts are drawn from the briefing on this motion and the procedural history developed in *Golden*, No. 13-307C.

Amid amended complaints and procedural motions, the government petitioned for *inter partes review* ("IPR") of plaintiff's '990 Patent, just one of many patents involved in these cases, before the USPTO Patent Trial and Appeal Board. The PTAB decided to initiate IPR of three independent claims of the '990 Patent. Mr. Golden made a non-contingent motion to amend those claims. The PTAB's final decision granted Mr. Golden's motion to amend, which resulted in cancellation of those three independent claims of the '990 Patent. The PTAB denied plaintiff's request for rehearing.

After plaintiff's fourth amended complaint, the government moved to dismiss certain of Mr. Golden's patent infringement claims. The court denied that motion because plaintiff had stated sufficient facts to survive a motion to dismiss. Plaintiff sought to amend his complaint yet again. The court permitted plaintiff to file a fifth complaint comprehensively stating his claims against the United States. His 2017 final complaint alleged seventy-two patent infringement counts involving approximately ten patents, along with takings claims paralleling each patent infringement claim. *Golden*, No. 13-307C, ECF No. 120. Defendant moved to partially dismiss that complaint. The court granted defendant's motion, dismissing many of plaintiff's patent infringement claims. Mr. Golden appealed the dismissal to the Federal Circuit. The Federal Circuit dismissed the appeal. Mr. Golden next petitioned the Federal Circuit for a writ of mandamus, which the Federal Circuit denied.

*Golden*, No. 13-307C, was transferred to this judge in September 2018. The court has since lifted the stay on consideration of plaintiff's takings claims. The government filed a motion to dismiss plaintiff's takings claims and the court granted that motion. *See* Order of May 8, 2019. The court also determined how many patent infringement allegations remain and dismissed counts that relied solely on dependent patent claims. Mr. Golden's remaining patent infringement claims in the related action are awaiting claim construction.

Mr. Golden filed the present claim on January 17, 2019, alleging that, under 28 U.S.C. § 1491(a), he is entitled to compensation for the unauthorized use "for and by the United States, of inventions described in and covered by [several] United States Patent[s]." Compl. 1. Plaintiff alleges that his claim arises out of the Takings Clause of the Fifth Amendment of the United States Constitution and that various arms of the government, including the Department of Justice, Department of Homeland Security, this court, the Federal Circuit, and the PTAB, have taken the subject matter of his patents. The court consolidated this action with *Golden*, No. 13-

307C, on January 29, because the two claims share questions of law and fact.

Plaintiff's complaint, in large part, repeats the substance of his original takings claims in *Golden*, No. 13-307C. For instance, the jurisdiction section of both complaints alleges unauthorized use by the United States of the same patents. *Comp.* Compl. 3 *with Golden*, No. 13-307C, Compl. ¶ 3. He simply adds allegations that this court, the PTAB, and the Federal Circuit, in addition to the other accused entities, have also "taken" the subject matter of his patents.

"A trial court has discretion to dismiss a complaint which simply duplicates another pending related action." *Finch v. Hughes Aircraft Co.*, 926 F.2d 1574, 1577 (Fed. Cir. 1991). Mr. Golden's complaints repeat the same substantive allegations that the United States has "taken," through unauthorized use, the subject matter of his patents. Because Mr. Golden's takings claims are duplicates, we dismiss the complaint to the extent that it alleges the same takings dismissed in *Golden*, No. 13-307C.

Even if plaintiff's complaint did not duplicate his other pending action, we must also dismiss plaintiff's takings claim for lack of subject matter jurisdiction under Rules 12(b)(1) and 12(h). Plaintiff, even though he is proceeding *pro se*, must demonstrate that the court has jurisdiction over his claim. *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 747-48 (Fed. Cir. 1988). The court accepts as true plaintiff's factual allegations but is not required to credit conclusory or frivolous statements. *Id.*; *see also Bell v. Hood*, 327 U.S. 678, 682 (1946).

As discussed in our order granting defendant's motion to dismiss the takings claims in *Golden*, No. 13-307C, plaintiff cannot label what amounts to a patent infringement claim a "taking" in order to proceed under this court's Tucker Act jurisdiction. The Supreme Court first held that the Tucker Act did not waive the United States' sovereign immunity for the unauthorized use of a patent in 1894. *Schillinger v. United States*, 155 U.S. 163, 168-69 (1894). Congress thereafter passed the predecessor to 28 U.S.C. § 1498(a), waiving sovereign immunity with respect to certain patent claims against the United States. Since then, patent infringement claims are pursued exclusively under § 1498(a). *Zoltek v. United States*, 442 F.3d 1345, 1350-53 (Fed. Cir. 2006) (reciting the history between *Schillinger* and § 1498 and finding that *Schillinger* remains the law), *vacated on other grounds*, 672 F.3d 1309 (Fed. Cir. 2012) (en banc). In his response, plaintiff in fact relies on *Christy, Inc. v. United States*, 141 Fed. Cl. 641, 657-60 (2019) in which this court found that "patent rights are not cognizable property interests for

Takings Clause purposes." This court does not have jurisdiction to decide claims for patent infringement under the Tucker Act.[2]

Finally, as we held in the related action, plaintiff fails to state a claim to the extent that his complaint alleges a taking by the actions of this court, the Federal Circuit, or the PTAB. When considering a motion to dismiss under Rule 12(b)(6), the court takes factual allegations as true and makes reasonable inferences in plaintiff's favor, but plaintiff's complaint must plead facts that demonstrate "plausibility of 'entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[L]abels and conclusions" are not sufficient to state a claim. *Twombly*, 550 U.S. at 555. Here, plaintiff must at least point to "a cognizable Fifth Amendment property interest" and a "government[] action that amount[s] to a compensable taking of that interest." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1348 (Fed. Cir. 2013).

Plaintiff appears to argue that the cancellation of his '990 independent claims in the IPR at the PTAB constitutes a taking by the PTAB. Setting aside whether an action by the PTAB could ever constitute a government taking, plainly the cancellation was the result of Mr. Golden's voluntary amendment of his claims. Nor could the actions of the Federal Circuit and this court result in a taking of patent rights. Both courts *adjudicate* rights in patents, and, in any event, as Mr. Golden himself notes, both courts have allowed his patent claims to continue in Docket No. 13-307C.

In sum, plaintiff's takings claim duplicates his related patent action in Docket No. 13-307C, asserts claims over which this court does not have jurisdiction, and fails to state a takings claim. Defendant's motion is granted pursuant to Rule 12(b)(1) and 12(b)(6). Plaintiff's complaint is therefore dismissed. The Clerk is directed to enter judgment accordingly.

ERIC G. BRUGGINK
Senior Judge

---

[2] Plaintiff is not without recourse. His remaining patent infringement claims are moving on to claim construction. *Golden*, No. 13-307C, May 8, 2019 Order at 5.

# EXHIBIT 2

# In the United States Court of Federal Claims

No. 13-307C
(Filed: May 8, 2019)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

LARRY GOLDEN,

       *Plaintiff,*

v.

THE UNITED STATES,

       *Defendant.*

Takings; taking of intangible patented subject matter; 28 U.S.C. § 1491 (2012); 28 U.S.C § 1498(a) (2012); subject matter jurisdiction

* * * * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS

BRUGGINK, *Judge.*

Pending before the court is defendant's March 18, 2019 motion to dismiss plaintiff's takings claims under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims. Defendant argues that plaintiff's purported takings claims are, in substance, patent infringement claims, which cannot be brought under the Tucker Act, 28 U.S.C. § 1491 (2012), but must instead be brought under the court's separate patent jurisdiction, 28 U.S.C. § 1498(a) (2012). (Plaintiff already has pending claims under § 1498(a).) Defendant also argues that, in any event, plaintiff's allegations fail to state a viable takings claim. The motion is fully briefed. Oral argument is deemed unnecessary. We grant defendant's motion to dismiss all of plaintiff's takings claims. In many respects they fail to state a claim on which relief can be granted, but more importantly, we do not have jurisdiction over them under the Tucker Act.

The final amended complaint includes two general counts, a takings claim and a patent infringement claim, followed by a battery of particular takings and patent infringement allegations. Count I alleges that the United States has taken "Intangible Patented Subject Matter of U.S. Patents," stating:

87. [T]he United States has "taken" and continues to "take" the Plaintiff's personal property for the benefit of the public without paying just compensation for the "takings" . . . . [T]he Government has taken the private and personal Property subject matter as outlined in the Plaintiff's U.S. Patent No. [lists patent numbers] specifications and patent claims that are significantly the same or equivalent to the claimed inventions of the Plaintiff; the Government was given notice, made aware of, and told or signaled that the private and personal property subject matter as outlined in the Plaintiff's patent(s) specifications and patent claims that was taken by the Government are significantly the same or equivalent to the claimed inventions of the Plaintiff . . . resulting in the Government's manufacture and development of products, devices, methods, and systems that are significantly the same or equivalent to the claimed inventions of the Plaintiff . . . by virtue of the access, disclosure, manufacture, development or use, by or for the Government and its third party awardees, has destroyed the Patent Owner's competitive edge . . . the character of the Government's action was triggered when the "Takings" caused a permanent physical invasion of the Plaintiff's property and eliminated all economically beneficial uses of such property; without authorization and consent from the Patent Owner and without just compensation to the Plaintiff.

88. As a result of contracts, agreements, publications, solicitations, awards, announcements, and grants, the United States actions and conduct and the actions and conduct of its agents, including at least the following agencies: [lists agencies], has used for the benefit of the public, authorized the use for the benefit of the public, shared intangible subject matter, without license or legal right, or authorization and consent from the Plaintiff, Plaintiff's personal property subject matter as described in and covered by the Plaintiff's [lists patent numbers] patents.

Final Compl. ¶¶ 87-88.[1]

---

[1] Plaintiff follows Count I with discreet takings claims that mimic the language used Count I. Final Compl. ¶¶ 93-95, 98-100, 103-05, 108-10, 113-

The government contends that the "taking" plaintiff complains of consists of alleged patent infringement by or for the United States. The rights at issue are the subject matter of plaintiff's patents. 28 U.S.C. § 1498(a) provides a cause of action when a patented invention "is used or manufactured by or for the United States without license . . . ." The language plaintiff uses to describe the taking matches the language in § 1498(a): plaintiff pleads "manufacture. . . by or for the Government" and "use . . . by or for the Government." Final Compl. ¶ 87. Plaintiff's use of the terms manufacture, use, and develop mirror his patent infringement claims. Defendant argues that plaintiff cannot create jurisdiction under the Tucker Act by labelling what are in substance infringement claims as a taking.

Plaintiff submitted, by leave of court, an approximately 60-page response. Mr. Golden argues "[w]henever the Government use[s] with the public or contracts with other third party contractors for the development of Plaintiff's Intellectual Property Subject Matter . . . without just compensation, the Government has taken the Plaintiff's property . . . ." Pl.'s Resp. 53. He states that patent infringement is not a prerequisite to bringing a takings claim under the Fifth Amendment. Mr. Golden spends the bulk of his response alleging implied-in-fact contracts with various agencies. After our review of his response and exhibits, we understand Mr. Golden to argue that his takings claims are not concerned with patent infringement but with other actions such as alleged breaches of implied-in-fact contracts.

We conclude that plaintiff's "takings" claims seek compensation for patent infringement that cannot be pursued under the Tucker Act. This court has jurisdiction under the Tucker Act to adjudicate claims alleging violation of the Fifth Amendment Takings Clause. *See Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008). The Supreme Court first held in *Schillinger v. United States*, 155 U.S. 163, 168-69 (1894), however, that the Tucker Act does not confer jurisdiction over a claim that the United States used a patented invention without authorization, even if pled as a Fifth Amendment takings claim. Following *Schillinger*, Congress waived the

15, 118-20, 123-25, 128-30, 133-35, 138-40, 143-45, 148-50, 153-55, 158-60, 168-70, 173-75, 181-83, 186-88, 191-93, 196-98, 201-03, 206-08, 211-13, 216-18, 221-23, 227-29, 232-34, 237-39, 242-44, 247-49, 252-54, 257-59, 262-64, 267-69, 272-74, 277-79, 282-84, 287-89, 292-94, 297-99, 302-04, 307-09, 312-14, 317-19, 322-24, 327-29, 332-34, 337-39, 342-44, 347-49, 352-54, 357-59, 362-64, 367-69, 372-74, 377-79, 382-84, 387-89, 392-94, 397-99, 402-04.

government's sovereign immunity regarding certain patent infringement claims by enacting a new statute, the predecessor to 28 U.S.C. § 1498. Patent infringement claims against the United States have since been brought exclusively as claims under § 1498(a). The Federal Circuit and this court have confirmed that a Fifth Amendment claim under the Tucker Act is not an alternative to suing for patent infringement under the now-existing § 1498(a). *Christy, Inc. v. United States*, 141 Fed. Cl. 641, 659-60 (2019); *Keehn v. United States*, 110 Fed. Cl. 306, 335 (2013); *Demodulation v. United States*, 103 Fed. Cl. 794, 810-11 (2012); *Lamson v. United States*, 101 Fed. Cl. 280, 284-85 (2011); *see also Zoltek v. United States*, 442 F.3d 1345, 1350-53 (Fed. Cir. 2006), *vacated on other grounds*, 672 F.3d 1309, 1326 (Fed. Cir. 2012) (en banc).

Plaintiff's takings claims are only concerned with the subject matter of his patents. Each takings claim is paired with a patent infringement claim relating to the same patents and government action. *E.g.*, Final Compl. ¶¶ 93-97 (both takings and infringement claims relate to the "LG Electronics G5 Smartphone"). The final complaint offers only headings to distinguish between the types of claims. Mr. Golden properly sought relief for patent infringement under § 1498(a). Most of those claims have been dismissed. Simply labeling the same government action a "taking" rather than patent infringement does not transform the claim into one justiciable under the Tucker Act as a violation of the Takings Clause of the Fifth Amendment. We thus dismiss plaintiff's purported takings claims for lack of subject matter jurisdiction.

Defendant also argues that plaintiff fails to state a claim upon which relief can be granted. We agree. This problem arises by virtue of the fact that plaintiff's allegations are internally inconsistent and vague. Plaintiff cannot state a claim for a "taking" by alleging that the government used information disclosed, but not claimed by, plaintiff's patents. *Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2012). Similarly, plaintiff cannot state a claim for a "taking" by alleging that the government disclosed information that plaintiff himself had necessarily disclosed through patent prosecution. *See Festo Corp. v. Shoketsu Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002). Plaintiff also references unlawful or unauthorized actions by the government throughout the complaint. *E.g.*, Final Compl. ¶¶ 134, 144, 154 ("interagency exchange of unauthorized information . . . shared intangible subject matter without a license or legal right"). A hallmark of a Fifth Amendment takings claim is a litigant's concession that the government's behavior is lawful; thus, plaintiff cannot state a "takings" claim to the extent he alleges the government's action was unlawful. *See Crocker*

4

*v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997). Taken together, plaintiff's claims lack elements necessary to state a taking and must be dismissed for failing to state a claim on which relief can be granted.

Finally, plaintiff spends many pages in his response discussing breach of implied-in-fact contracts and tying breach of those contracts to his takings claims, but none of this material is present in plaintiff's five amended complaints. Rule 15(a)(2) requires plaintiff to seek the opposing party's consent or the court's leave to amend the complaint. The court will freely grant leave to amend "when justice so requires." *Id.* Plaintiff has not moved to amend the final complaint. In the past, the court has freely allowed plaintiff to amend the complaint, but we also communicated to plaintiff that the fifth amended complaint must be the final, comprehensive statement of his allegations against the United States. May 25, 2017 Order, ECF No. 116 ("[T]he court has determined that Plaintiff may amend his complaint and claim chart one final time, prior to the court's ruling on jurisdiction. . . . Plaintiff will file a Fifth and Final Amended Complaint, wherein Plaintiff will allege all claims asserted against the government.") To the extent that any aspect of plaintiff's response to the motion to dismiss could be construed as a motion to amend, that motion is denied. The court will not consider any of these new allegations in relation to the motion to dismiss or moving forward with this matter.

The court therefore grants defendant's motion to dismiss plaintiff's takings claims. The only claims remaining in this case are eleven claims of patent infringement relating to three patents that survived the government's motion to dismiss certain patent infringement claims; those claims are poised for claim construction. The parties are directed to file a status report proposing a schedule for next steps in this matter on or before May 31, 2019.

ERIC G. BRUGGINK
Senior Judge

5

# EXHIBIT 3

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LARRY GOLDEN,

    Plaintiff,

    V.

UNITED STATES,

    Defendant.

Case No: 19-104C

Judge: Eric G. Bruggink

April 15, 2019

## PLAINTIFF'S RESPONSE TO THE GOVERNMENT'S MOTION TO DISMISS PLAINTIFF'S GOVERNMENT TAKINGS CLAIMS UNDER THE FIFTH AMENDMENT CLAUSE: CASE NUMBER 19-104C

Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; Opinion and Order; Case No. 18-657C; filed January 29, 2019: A. The Court of Federal Claims Has Jurisdiction to Consider Christy's Takings Clause Claim. "The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction" in the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008)."

Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; Opinion and Order; Case No. 18-657C; filed January 29, 2019: C. Tucker Act "The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued. "*United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United

States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491 (2012). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages."

**Chief Judge Margaret Sweeney;** *Christy, Inc. v. The United States*; **Opinion and Order; Case No. 18-657C; filed January 29, 2019: A. The Court of Federal Claims Has Jurisdiction to Consider Christy's Takings Clause Claim.** "However, a plaintiff must still allege a nonfrivolous Takings Clause claim to invoke this court's Tucker Act jurisdiction. *Moden v. United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005)... In other words, Christy asserts that it had certain property rights that were taken by the federal government without just compensation. There is no indication (nor does defendant suggest) that such allegations are frivolous. Accordingly, the court has jurisdiction to consider Count I of Christy's complaint... "To prevail on a takings claim, a plaintiff must "identify[] a valid property interest" under the Fifth Amendment and show a "governmental action [that] amounted to a compensable taking of that property interest." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1212-13 (Fed. Cir. 2005); accord *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1348 (Fed. Cir. 2013); *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1329 (Fed. Cir. 2012). In addition, a plaintiff must concede the legitimacy of the government action that effected the taking. Hearts Bluff, 669 F.3d at 1332 (citing *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993)).

## PLAINTIFF PLEADINGS FOR AN UNCOMPENSATED "TAKINGS" UNDER THE FIFTH AMENDMENT CLAUSE

The Plaintiff is conceding the Government has the authority to take the Plaintiff's intellectual property subject matter, that once tested by way of intellectual property subject matter prosecution at the USPTO, or re-tested by way of intellectual property subject matter re-issue prosecution, post-grant reexamination, Petition for *Inter Partes Review* (IPR), or through Patent infringement litigation in the District Courts, to verify the validity of the Plaintiff's intellectual property subject matter by way of a Patent, Patent rights, Patent franchise, Patent private property, or Patent personal property. A Patent is only the results of testing mechanisms

used to verify and validate the Plaintiff's intellectual property subject matter. Government has the right to take the Plaintiff's property, be it "rights or franchise", "private or personal", to "be used with the public or for the benefit of the public".

**Judge Susan G. Braden;** *Linda Rosenberg, v. The United States;* **Memorandum Opinion and Final Order; Case No. No. 05-1272T; filed Aug 3, 2006:** "The United States Court of Federal Claims has jurisdiction over claims alleged under the Fifth Amendment Takings Clause. See *Murray v. United States,* 817 F.2d 1580, 1583-84 (Fed. Cir. 1987) ("Although the Claims Court has jurisdiction over a taking claim, the more difficult question is whether the [plaintiff] [has] stated such a claim[.]"). To invoke the court's jurisdiction over a takings claim, however, the plaintiff must admit that the Government had authority to take the property. See *Rith Energy, Inc. v. United States,* 247 F.3d 1355, 1365 (Fed. Cir. 2001) (explaining that "an uncompensated [t]aking and an unlawful government action constitute 'two separate wrongs [that] give rise to two separate causes of action,' and that a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated [t]aking in the [United States] Court of Federal Claims" (quoting Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1346 (Fed. Cir. 1998)); *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed. Cir. 1993) ("[C]laimant must concede the validity of the government action which is the basis of the [t]aking claim to bring suit under the Tucker Act.")."

The Plaintiff has elected to sue in the Court of Federal Claims (Case No. 19-104C) for the uncompensated "takings" under the Fifth Amendment clause.

The Government has created liability for itself when the Government took away the "new and useful process" of the Plaintiff's patented independent claims of the '439 patent and the "new and useful improvement thereof" of the Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices used with and describe in Plaintiff's intellectual property subject matter.

**Judge Margaret Sweeney; Court of Federal Claims:** *XP VEHICLES, INC. and LIMNIA, INC. V. The United States;* **Case No. 12-774C; Contract Claims against the United States Arising Under the Tucker Act.** "The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc)."

The Government has violated the constitutional provision, statute or regulation of "716.07 Inoperability of References [R-08.2012]". The Government has "taken" the independent

3

claims of Plaintiff's '439 Patent asserted in case no. 13-307C and made the claims "inoperable" and impractical for the Plaintiff to pursue Government infringement of every limitation, process or method of the asserted independent claims of the '439 Patent. The Government has created liability for itself by allowing the alleged infringing devices to be used with or for the benefit of the public without paying the Plaintiff just compensation.

> "Since every patent is presumed valid (35 U.S.C. 282 ), and since that presumption includes the presumption of operability (*Metropolitan Eng. Co. v. Coe*, 78 F.2d 199, 25 USPQ 216 (D.C. Cir. 1935), examiners [added: Judges] should not express any opinion on the operability of a patent... since in a patent it is presumed that a process if used by one skilled in the art will produce the product or result described therein, such presumption is not overcome by a mere showing that it is possible to operate within the disclosure without obtaining the alleged product. In re *Weber*, 405 F.2d 1403, 160 USPQ 549 (CCPA 1969)...

Patent law is U.S. federal law. It comes from the United States Constitution as well as from federal laws passed early in United States history. Article 1, Section 8 of the U.S. Constitution gives Congress the power to establish a system for awarding patents in the United States. The Constitution says that Congress may promote progress in science and the arts by allowing creators to have exclusive use of their products. Title 35 of the United States Code creates more specific laws for the U.S. patent system.

> Section 101 follows the wording of the existing statute as to the *subject matter* for patents, except that reference to plant patents has been omitted for incorporation in section 301 and the word "art" has been replaced by "process", which is defined in section 100. The word "art" in the corresponding section of the existing statute has a different meaning than the same word as used in other places in the statute; it has been interpreted by the courts as being practically synonymous with process or method. "Process" has been used as its meaning is more readily grasped than "art" as interpreted, and the definition in section 100(b) makes it clear that "process or method" is meant. The remainder of the definition clarifies the status of processes or methods which involve merely the new use of a known process, machine, manufacture, composition of matter, or material; they are processes or methods under the statute and may be patented provided the conditions for patentability are satisfied.

Judge Braden made the following statement in the Memorandum Opinion and Order in Case No. 13-307C (Dkt. No. 130; filed 03/29/2018)

> "The paragraphs in the Fifth Amended Complaint that include patent infringement allegations "relating generally to smartphones and other consumer devices" are: 96-97, 101-02, 106-07, 111-12, 116-17, 121-22, 126-27, 131-32, 136-37, 141-42, 146-47, and 151-52... To support this allegation, the Fifth Amended Complaint repeatedly cites to paras. 49-78 of the Fifth Amended Complaint. These paragraphs describe the

Government's intent to "allow" or "approve" the "use" of various "smartphones and other consumer devices," e.g., "the iPhone... The Fifth Amended Complaint, however, does not allege that the Government's intent to "allow" or "approve" the use of "smartphones and other consumer devices" infringes Plaintiffs patents. Instead, the Fifth Amended Complaint alleges that the Government's use of these devices in combination with other "devices" or "programs," e.g., the "'Cell-All' initiative," infringes Plaintiffs patents. 8/10/17 Am. Comp... paras. 96-97. No factual allegations, however, support assuming that the Government used or authorized the use of these other "devices" or "programs" to infringe Plaintiffs patents... For these reasons, the court has determined that even if the August 10, 2017 Fifth Amended Complaint established jurisdiction as to the patent infringement allegations contained in paras. 96-97, 101-02, 106-07, 111-12, 116-17, 121-22, 126-27, 131-32, 136-37, 141-42, 146-47, and 151-52 of the Fifth Amended Complaint, the allegations contained therein failed to state a claim upon which relief may be granted and must be dismissed under RCFC 12(b)(6)."

Plaintiff clearly states throughout the Final Complaint that it's the Government (Defendant) who is using the Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, and it's the Government who authorized and consented to the development of Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, and it's the Government who has developed at least seventy-two products or devices that reads on each and every limitation of Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, not the reversed.

The Plaintiff has introduced an abundance of evidence showing the Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) includes several means / methods (i.e. wired, wireless, Bluetooth connection, detection device placed in, on, upon, or adjacent the CMDC device) of detecting for CBRNE-H. The Plaintiff made a disclosure to the USPTO on Nov. 17, 2004 of the intellectual property subject matter invention of Plaintiff's CMDC device.

Scope of Work (SOW): Three years before Steve Jobs (APPLE Inc.) introduced the iPhone; three-and-a-half years before the DHS S&T released a solicitation ("Cell-All") for an improved cell phone capable of chemical and biological detection; and, four-and-a-half years before the DHS S&T entered into a contract with Apple, Samsung, LG, and Qualcomm, Plaintiff had introduced his Communicating, Monitoring, Detecting, and Controlling (CMDC) Device.

Zoltek Corporation v. United States (Fed. Cir. 2012):

"The Federal Circuit reasoned, the Government's liability "under 1498(a) is linked to the scope of the patent holder's rights as granted by the patent grant in title 35 U.S.C. section

5

154(a)(1). As the patent grant has expanded over the years, so too has the coverage of § 1498(a)." Applying this reasoning, the court concluded that the government could be liable here: "we hold that for the purposes of section 1498, the use or importation "within the United States [of] a product which is made by a process patented in the United States" constitutes use of the invention without lawful right because the products embody the invention itself." Zoltek Corporation v. United States (Fed. Cir. 2012) *En Banc Federal Circuit Decision Clarifies Contractor Immunity for Patent Infringement*. Retrieved from: https://www.wileyrein.com/newsroom-newsletters-item-4191.html#_ftnref2

Seventy-two of seventy-two infringement claims asserted by the Plaintiff in this case no. 13-307C involves "a product which is made by a process patented in the United States, [added: which] constitutes [added: Government] use of the invention without lawful right because the products embody the invention itself" *Zoltek Corporation v. United States* (Fed. Cir. 2012). In Judge Braden's Memorandum Opinion of March 29, 2018, the Judge has managed to rip apart Plaintiff's invention by fabricating reasons unrelated to determining if the products "used by" or "manufactured for" Government reads on every limitation of Plaintiff's invention. Instead, before we can reach that point, the Judge decided to tear away a part of the inventive process to ensure the products "used by" or "manufactured for" Government does not read on every limitation of Plaintiff's invention. The Judge states the Government "use" of Plaintiff's inventive process is purely coincidental:

> "d. Patent Infringement Allegations Concerning The Government's Alleged Use Of "Smartphones And Other Consumer Devices" Must Be Dismissed Under RCFC 12(b)(l) And 12(b)(6)... The Fifth Amended Complaint, however, does not allege that the Government's intent to "allow" or "approve" the use of "smartphones and other consumer devices" infringes Plaintiffs patents. Instead, the Fifth Amended Complaint alleges that the Government's use of these devices in combination with other "devices" or "programs," e.g., the "'Cell-All' initiative," infringes Plaintiffs patents... No factual allegations, however, support assuming that the Government used or authorized the use of these other "devices" or "programs" to infringe Plaintiffs patents. In sum, although the factual allegations of the Fifth Amended Complaint may support a conclusion that the Government "allowed" or "approved" the "use" of various "smartphones and other consumer devices," they do not support the conclusion that the Government used or authorized the use of these devices in an infringing manner. For these reasons, the court has determined that the patent infringement allegations... failed to satisfy Plaintiffs burden to establish jurisdiction under 28 U.S.C. § 1498(a)."
> "In the alternative, the Government argues that the same allegations should be dismissed under RCFC 12(b)(6), for "improperly alleg[ing] infringement by or for the [G]overnment in irreconcilably vague and omnibus fashion by repeatedly citing 'contracts, agreements, and procurements with various Government Agencies.'" The Government's position is correct, because the Fifth Amended Complaint does not contain

factual allegations supporting that, "[a]s a result of contracts, agreements, and procurements with various Government Agencies ... the United States has used, authorized the use, and manufactured ... Plaintiffs inventions[.]" The Fifth Amended Complaint fails to identify the "contracts, agreements, and procurements" at issue. Without more, the Fifth Amended Complaint has not met the requirements... Nor does the Fifth Amended Complaint provide anything other than conclusory allegations that the Government used or authorized the use of "smartphones and other consumer devices" in a manner that infringes Plaintiff's patents. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [however,] do not suffice." For these reasons, the court has determined that even if the August 10, 2017 Fifth Amended Complaint established jurisdiction as to the patent infringement allegations... of the Fifth Amended Complaint, the allegations contained therein failed to state a claim upon which relief may be granted and must be dismissed under RCFC 12(b)(6)."

When the Trial Court Judges decided to rip apart Plaintiff's CMDC device (i.e. smartphone, mobile device, etc.) from its detection device or detection capability, the Trial Court Judges thus rendered the Plaintiff's invention inoperable. The Trial Court Judges has authorized the Government to "use" the Plaintiff's invention without lawful right because the products [added: CMDC devices] embody the invention itself" *Zoltek Corporation v. United States* (Fed. Cir. 2012).

The Trial Court Judges has rendered the Plaintiff's "multi-sensor detection system" inoperable by "ripping away", "taking" the Plaintiff's CMDC device (i.e. smartphone, mobile device, etc.) from the inventive process in the following ways:

**Communication:** at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short range radio frequency (RF) connection, or GPS connection was "taken" for the benefit of the Government and for Government "use".

**Monitoring:** at least one of a viewing screen for monitoring in real time, viewing screen monitoring for CBRNE-H signal alerts, viewing screen monitoring for CBRNE-H color coded indicator lights, or viewing screen monitoring for tracking.

**Detecting:** at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the CMDC device.

**Controlling:** at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween,

7

for sending signals to at least lock or unlock doors, stall, stop, or slowdown vehicles, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems.

**Biometrics:** that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and or signature or a face recognition to at least gain access to the CMDC device or to prevent unauthorized use of the CMDC device.

**Lock, Unlock, Disabling Lock:** the CMDC device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks after a certain number of failed attempts to unlock.

**Stall, Stop, Slowdown:** the CMDC device being equipped to send signals to vehicles (i.e. driver, driverless, autonomous, unmanned aerial, unmanned land, boats, trucks, etc.) that engages the computer, electrical, fuel, and/or air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to vehicle brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

Upon information and belief, the United States has "taken" and continues to "take" the Plaintiff's personal and/or private property for the benefit of the public without paying just compensation for the "takings". Plaintiff believes the Government has manufactured and developed products, devices, methods, and systems that are significantly the same or equivalent to the claimed inventions of the Plaintiff. As a result of the "takings" as outline above:

1. the economic impact is a reduction in value of the Plaintiff's property and by virtue of the access, disclosure, manufacture, development or use, by or for the Government and its third party awardees, has destroyed the Plaintiff's competitive edge;

2. the use, disposal, and right of a government to take Plaintiff's private and/or personal property for public use, without paying just compensation, has had a substantial adverse impact (means unfavorable or harmful) on Plaintiff;

3. the "takings" is preventing success or development of Plaintiff's CMDC device in accordance with the "reasonable investment-backed expectations" of the Plaintiff;

4. the character of the Government's action was triggered when the "takings" caused a permanent physical invasion of the Plaintiff's property and eliminated all economically beneficial uses of such property;

8

5. the "takings" of Plaintiff's personal and/or private property in Case No. 13-307 was done without the Government paying just compensation to the Plaintiff.

## PLAINTIFF'S SUBSTANTIVE RIGHTS FOR MONEY DAMAGES IS CREATED WHEN THE GOVERNMENT VIOLATED AT LEAST ONE OF A MONEY-MANDATING CONSTITUTIONAL PROVISION, STATUTE OR REGULATION: FRIVOLOUS LITIGATION

**Judge Margaret Sweeney; Court of Federal Claims:** *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; **Case No. 12-774C; Contract Claims Against the United States Arising Under the Tucker Act.** "The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation" that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc)."

The Plaintiff is conceding the Government has the authority to take the Plaintiff's intellectual property subject matter, that once tested by way of intellectual property subject matter prosecution at the USPTO, or re-tested by way of intellectual property subject matter re-issue prosecution, post-grant reexamination, Petition for *Inter Partes Review* (IPR), or through Patent infringement litigation in the District Courts, to verify the validity of the Plaintiff's intellectual property subject matter by way of a Patent, Patent rights, Patent franchise, Patent private property, or Patent personal property. A Patent is only the results of testing mechanisms used to verify and validate the Plaintiff's intellectual property subject matter. Government has the right to take the Plaintiff's property, be it "rights or franchise", "private or personal", to "be used with the public or for the benefit of the public".

The Plaintiff has elected to sue in the Court of Federal Claims (Case No. 19-104C) for the uncompensated "takings" under the Fifth Amendment clause.

The Government has created liability for itself when the Government (DOJ and DHS) took away Plaintiff's patented independent claims 11, 74, and 81of the '990 patent and the

dependent claims of the '990 Patent that depends on independent claims of the 11, 74, and 81 of the '990 patent when the DOJ and DHS submitted a frivolous Petition for *Inter Partes Review* (IPR). The character of the Government's action was triggered when the "takings" caused a permanent invasion of the Plaintiff's property and eliminated all economically beneficial uses of such property by way of the Government's "takings" of Plaintiff's patented independent claims 11, 74, and 81 of the '990 patent.

> In the United States, Rule 11 of the Federal Rules of Civil Procedure and similar state rules require that an attorney perform a due diligence investigation concerning the factual basis for any claim or defense. Jurisdictions differ on whether a claim or defense can be frivolous if the attorney acted in good faith. Because such a defense or claim wastes the court's and the other parties' time, resources and legal fees, sanctions may be imposed by a court upon the party or the lawyer who presents the frivolous defense or claim. The law firm may also be sanctioned, or even held in contempt.

The PTAB (Government) decided to institute the frivolous litigation after a preliminary review of the validity of Plaintiff's independent claims 11, 74, and 81 of the '990 patent using unqualified prior art submitted by the DOJ and DHS, that did not antedate the Plaintiff's '990 Patent.

**Judge Margaret Sweeney; Court of Federal Claims:** *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; **Case No. 12-774C; Contract Claims against the United States Arising Under the Tucker Act.** "The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc)."

The Government has violated the constitutional provision, statute or regulation of "35 U.S.C. 102 (Pre-AIA) Conditions for patentability; novelty and loss of right to patent". The Government has "taken" the independent claims of Plaintiff's '990 Patent asserted in case no. 13-307C and made the claims "inoperable" and impractical for the Plaintiff's to pursue Government infringement of every limitation, process or method of the asserted independent claims of the '990 Patent. The Government has created liability for itself by allowing the alleged infringing devices to be used with or for the benefit of the public without paying the Plaintiff just compensation.

**35 U.S.C. 102 (pre-AIA)   Conditions for patentability; novelty and loss of right to patent.**

*[Editor Note: With the exception of subsection (g)\*), **not applicable** to any patent application subject to the first inventor to file provisions of the AIA*

A person shall be entitled to a patent unless —

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(e) the invention was described in — (1) an application for patent... by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent...

(g) (1)... [i]n determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

The Plaintiff submitted a Disclosure Document Deposit Request (Disclosure Document No. 565732) on Nov. 17, 2004 to the USPTO. The PTAB Court simply dismissed the document as being unimportant to the 18 months Plaintiff spent litigating a frivolous IPR petition; the 2 ½ years Plaintiff spent prosecuting the RE43,990 patent asserted in the IPR; the estimated $45,000 dollars the Patent Owner spent on prosecuting the RE43,990 patent asserted in the IPR; and, the independent and dependent claims that was taken from the Plaintiff as a result of the PTAB Court choosing not to accept the Patent Owner's Disclosure Document.

The PTAB dropped the Mostov reference during the institution review as being redundant. Without notice or a chance for the Plaintiff to argue or plead a defense on the Mostov reference, the PTAB re-asserted the Mostov reference and ruled the Plaintiff's '990 did not antedate the Mostov reference. On Appeal the Plaintiff submitted evidence of a Disclosure Receipt displaying a filing date of Nov. 17, 2004 with the PTAB. The PTAB's response to the Plaintiff was, "you should have presented the document in the beginning".

The Patent Owner's RE43,990 patent antedated Mostov's patent under 102(b) and 102(e) – Mostov's Provisional Application 60/648,260 was filed on 01-28-2005. Plaintiff believes the Government's action resulted in the "takings" of Plaintiff's three independent patent claims (11, 74, and 81) of the '990 patent and Plaintiff's three substitute independent claims (154, 155, and 156) introduced in the IPR.

It is the belief of the Plaintiff that the Claims Court ("Government") fail to adhere to the proper or accepted standard of proceedings when the Claims Court ("Government") stayed the Plaintiff's 28 U.S.C. § 1498(a), "Government Infringement" claims to allow the DOJ ("Government"), and the DHS ("Government") to litigate in the PTAB Court. The Government, in Case No. IPR2014-00714, introduced three prior art patents (Astrin, Breed, and Mostov) that the Government knew, or should have known, did not antedate the priority filings date of November 17, 2004[1] of the Plaintiff's inventions.

The Plaintiff believes the Government's action to introduce unqualified prior art references and the Government's decision to institute an *Inter Partes Review* based on the unqualified prior art references created liability under the "Takings" clause of the Fifth Amendment.

| Reference | Filing Date | Publication Date | Basis for anticipation |
|-----------|-------------|------------------|------------------------|
| U.S. Patent Application Publication No. 2006/0250235 ("Astrin") | | 11/09/2006 | 102(b) |
| U.S. Patent Application Publication No. 2006/0181413 ("Mostov") | 01/28/2005* | 08/17/2006 | 102(e) – 102(b) |
| U.S. Patent No. 7,961,094 ("Breed") | 11/29/2007 | | 102(e) |

* Mostov's Provisional Application [60/648,260] was filed on 01-28-2005. Plaintiff's Disclosure Document [565732] was filed on November 17, 2004.

[1] The Reissue U.S. Patent No. 43,990 patent ("'990 patent") is a reissue divisional of U.S. Patent No. 7,636,033 patent ("'033 patent") issued from U.S. Patent Application No. 12/155,573 ("'573 application") which is a continuation-in-part of the U.S. Patent Application No. 11/397,118 ("'118 application"), now U.S. Patent No. 7,385,497, ("'497 patent"). '118 application was filed on April 5, 2006 and a Disclosure Document Deposit Request (Disclosure Document No. 565732) was filed on November 17, 2004. The DOJ ("Government") and the DHS ("Government") alleged that the following references were available as prior art under 35 U.S.C. 102(b) and (e) and therefore anticipate claims 11, 71 and 81 of the '990 patent.

It is the belief of the Plaintiff that the DOJ ("Government"), the DHS ("Government"), the PTAB Court ("Government"), and the Claims Court ("Government"), has unfairly and unjustly "taken" the Plaintiff's use of dependent claims 12, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28, 29, 30, 31, 32, 35, 39, 41, 44, 55, 78, 79, 92, 97, 99, 104, 108, 113, 118, 119, 122, 124, 126, 132, 134, 135, 148 of the '990 patent asserted in Case No. 13-307 C which depends on independent claims 11, 74, and 81 of the '990 patent that was unfairly and unjustly "taken" by the "Government". The Claims Court ("Government") has "taken" the Plaintiff's use of the dependent claims of the ('990) patent asserted in Case No. 13-307 C which depends on the substitute independent claims 13, 14, 15, 22, and 23 of the asserted '439 patent and the independent claims 1, 2, and 3 of the asserted '189 patent, that are substantially and significantly the same as independent claim 11 of the '990 patent.

It is the belief of the Plaintiff that the DOJ ("Government"), the DHS ("Government"), the PTAB Court ("Government"), and the Claims Court ("Government"), has unfairly and unjustly "taken" the Plaintiff's use of the dependent claims of the '990 patent asserted in Case No. 13-307 C which depends on independent claims 11, 74, and 81 of the '990 patent that was unfairly and unjustly "taken" by the "government". The Claims Court ("Government") has "taken" the Plaintiff's use of the dependent claims of the '990 patent asserted in Case No. 13-307 C which depends on the substitute independent claims 16, 17, and 18 of the asserted '439 patent and the independent claims 4, 5, and 6 of the asserted '189 patent, that are substantially and significantly the same as independent claim 74 of the '990 patent.

It is the belief of the Plaintiff that the DOJ ("Government"), the DHS ("Government"), the PTAB Court ("Government"), and the Claims Court ("Government"), has unfairly and unjustly "taken" the Plaintiff's use of the dependent claims of the '990 patent asserted in Case No. 13-307 C which depends on independent claims 11, 74, and 81 of the '990 patent that was unfairly and unjustly "taken" by the "government". The Claims Court ("Government") has "taken" the Plaintiff's use of the dependent claims of the ('990) patent asserted in Case No. 13-307 C which depends on the substitute independent claims 19, 20, and 21 of the asserted '439 patent and the independent claims 7, 8, and 9 of the asserted '189 patent, that are substantially and significantly the same as independent claim 81 of the '990 patent.

Upon information and belief, the United States has "taken" and continues to "take" the Plaintiff's personal and/or private property for the benefit of the public without paying just compensation for the "takings". As a result of the "takings" as outline above:

1. the economic impact is a reduction in value of the Plaintiff's property and by virtue of the access, disclosure, manufacture, development or use, by or for the Government and its third party awardees, has destroyed the Plaintiff's competitive edge;

2. the use, disposal, and right of a government to take Plaintiff's private and/or personal property for public use, without paying just compensation, has had a substantial adverse impact (means unfavorable or harmful) on Plaintiff;

3. the "takings" is preventing success or development of Plaintiff's CMDC device in accordance with the "reasonable investment-backed expectations" of the Plaintiff;

4. the character of the Government's action was triggered when the "takings" caused a permanent physical invasion of the Plaintiff's property and eliminated all economically beneficial uses of such property;

5. the "takings" of Plaintiff's personal and/or private property as a result of the IPR and in Case No. 13-307 (claims dependent on the independent claims 11, 74, and 81 of the '990 Patent) was done without the Government paying just compensation to the Plaintiff.

## PLAINTIFF'S SUBSTANTIVE RIGHTS FOR MONEY DAMAGES IS CREATED WHEN THE GOVERNMENT VIOLATED AT LEAST ONE OF A MONEY-MANDATING CONSTITUTIONAL PROVISION, STATUTE OR REGULATION: PRE-ISSUANCE / ACTUAL NOTICE

**Judge Susan G. Braden;** *Linda Rosenberg, v. The United States*; **Memorandum Opinion and Final Order; Case No. No. 05-1272T; filed Aug 3, 2006:** "The United States Court of Federal Claims has jurisdiction over claims alleged under the Fifth Amendment Takings Clause. See *Murray v. United States*, 817 F.2d 1580, 1583-84 (Fed. Cir. 1987) ("Although the Claims Court has jurisdiction over a taking claim, the more difficult question is whether the [plaintiff] [has] stated such a claim[.]"). To invoke the court's jurisdiction over a takings claim, however, the plaintiff must admit that the Government had authority to take the property. See *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (explaining that "an

14

uncompensated [t]aking and an unlawful government action constitute 'two separate wrongs [that] give rise to two separate causes of action,' and that a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated [t]aking in the [United States] Court of Federal Claims" (quoting *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1346 (Fed. Cir. 1998); *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993) ("[C]laimant must concede the validity of the government action which is the basis of the [t]aking claim to bring suit under the Tucker Act.")."

    The Plaintiff is conceding the Government has the authority to take the Plaintiff's intellectual property subject matter, that once tested by way of intellectual property subject matter prosecution at the USPTO, or re-tested by way of intellectual property subject matter re-issue prosecution, post-grant reexamination, Petition for *Inter Partes Review* (IPR), or through Patent infringement litigation in the District Courts, to verify the validity of the Plaintiff's intellectual property subject matter by way of a Patent, Patent rights, Patent franchise, Patent private property, or Patent personal property. A Patent is only the results of testing mechanisms used to verify and validate the Plaintiff's intellectual property subject matter. Government has the right to take the Plaintiff's property, be it "rights or franchise", "private or personal", to "be used with the public or for the benefit of the public".

    The Government has violated the constitutional provision, statute or regulation under 35 U.S.C. § 154(d) and 35 U.S.C. § 284. The Government has "taken" the independent claims of Plaintiff's '439 Patent asserted in case no. 13-307C and made the claims "inoperable" and impractical for the Plaintiff to pursue Government infringement of every limitation, process or method of the asserted independent claims of the '439 Patent. The Government has created liability for itself by allowing the alleged infringing devices to be used with or for the benefit of the public without paying the Plaintiff just compensation.

        Provisional rights, or pre-issuance damages, grant to a patentee the potential of obtaining a reasonable royalty from a third party that infringes a patent claim that is substantially the same as a claim in the published application on which the patent was granted. Under 35 U.S.C. § 154(d), this right is provided if the third party (1) has actual notice of the application, and (2) the patent issues from the application with substantially identical claims.

        35 U.S.C. § 284 states that "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[1] Damages begin accruing after: (1) actual

notice of an issued patent; (2) after constructive notice of an issued patent; or, in limited circumstances, (3) after publication of a pending application which issues with substantially similar claims. Recovery of damages is statutorily limited to six years prior to the filing of the complaint or counterclaim for infringement in the action.

Judge Braden made the following statement in the Memorandum Opinion and Order (Dkt. No. 130; filed 03/29/2018).

"g. **Patent Infringement Allegations Concerning Unissued Patent Applications and Pre-Issuance Use or Manufacture Must Be Dismissed Under RCFC 12(b)(1)…**

"The Government argues that patent infringement allegations concerning… pre-issuance use or manufacture of the '439 Patent should be dismissed under RCFC 12(b)(1)… the '439 Patent issued on March 7, 2017, but the Fifth Amended Complaint alleges infringement of the '439 Patent, based on Government *"programs"* that were cancelled in April 2014, almost three years prior to issuance of the '439 Patent (a June 10, 2014 United States Government Accountability Office Report, explaining the DHS's decision to cancel the "Bio Watch Gen-3" program in April 2014)."

Judge Braden lied when she said the Plaintiff is basing his infringement claims on Government *programs*, "the Fifth Amended Complaint alleges infringement of the '439 Patent, based on Government *'programs'* that were cancelled", and when in fact the Plaintiff stated just the opposite. The Plaintiff claim the Government's infringing device is the PositiveID's (PSID) M-BAND, not the "Bio Watch Gen-3" *program*. Plaintiff's claim made in the Complaint:

"The PositiveID - Boeing / "M-Band"; Apple (iPhone) Smartphone: (page 132-133 of complaint). PositiveID's (PSID) M-BAND was developed by the Company's MicroFluidic Systems ("MFS") subsidiary, which received funding in excess of $30 million from the Department of Homeland Security (DHS). M-BAND is positioned to capitalize on BioWatch Generation 3, the U.S. Government's $3.1 billion program to detect the release of pathogens into the air as part of a defense against potential terrorist attacks on major American cities. In Dec. 2012, PSID entered into an exclusive license agreement with The Boeing Company ("Boeing"). Boeing paid PSID $2.5 million; exclusive distributor of M-BAND for BioWatch Gen-3. M-Band is a bio-aerosol monitor with fully integrated systems for sample collection, processing and detection modules that continuously analyze air samples for the detection of bacteria, viruses, and toxins and

transmit the results to smartphones (e.g. Apple iPhone), or other devices, every three hours."

Judge Braden: "In addition, the Fifth Amended Complaint alleges infringement of the '439 Patent, based on NSF *grants* that expired prior to issuance of the '439 Patent. Am. Comp. paras. 184-85, 199-200, 260-61, 275-76, 280-81, 295-96, and 305-06."

Judge Braden lied when she said "the Fifth Amended Complaint alleges infringement of the '439 Patent, based on NSF *grants* that expired prior to issuance of the '439 Patent". The Plaintiff is basing his infringement claims on the Government's infringing devices, not *grants*. Below are five separate devices, by name, that was developed because the National Science Foundation (NSF) made five separate awards to the same school (University of Illinois); the same project manager (Brian Cunningham); for the development of the same device (Smartphone Biosensor). The Plaintiff pleaded government infringement for each different, but the same, Smartphone Biosensor the NSF awarded the University of Illinois and Brian Cunningham to develop. Plaintiff shared his intellectual property subject matter with the NSF beginning in year 2006 at a "SWIFT" Tour in Colorado.

- iPhone "Biodetector" Smartphone: (page 96 of complaint). Pro. Brian T. Cunningham, University of Illinois has won a $300,000 National Science Foundation grant for research into turning smartphones into biodetectors. The biodetectors used in counterterrorism fall into three broad categories: biochemical systems detecting a DNA sequence or protein unique to the bioagent through interaction with a test molecule; tissue-based systems, in which a bioagent or toxic chemical affect living mammalian cells, causing them to undergo some measurable response; and chemical mass spectrometry systems, which break samples down into their chemical components whose weights are then compared to those of known biological or chemical agents.

- "Multimode Smartphone Biosensor": (page 117 of complaint). The National Science Foundation hereby awards a grant of $600,000 to the Board of Trustees of the University of Illinois at Urbana – Champaign…This project is under the direction of Brian Cunningham, Steven S. Lumetta …This award is effective June 1, 2013 and expires May 31, 2016…Award: 1264377…Pl Name: Cunningham, Brian…

17

- "EAGER: Lab-in-a-Smartphone": (page 119 of complaint). The National Science Foundation hereby awards a grant of $300,000 to the Board of Trustees of the University of Illinois at Urbana – Champaign...This project is under the direction of Brian Cunningham, John Dallesasse...This award starts September 1, 2014 and ends August 31, 2016...Award: 1447893...PI Name: Cunningham, Brian...Award Date: July 3, 2014

- "Multimode Smartphone Biosensor": (page 121 of complaint). The National Science Foundation hereby awards a grant of $600,000 to the Board of Trustees of the University of Illinois at Urbana – Champaign...This project is under the direction of Brian Cunningham, Steven S. Lumetta ...This award is effective June 1, 2013 and expires May 31, 2016...Award: 1264377...PI Name: Cunningham, Brian

- Smartphone (iPhone) Biosensor "Cradle": (page 128 of complaint). University of Illinois researchers developed a cradle and app for the iPhone to make a handheld biosensor that uses the phone's own camera and processing power to detect any kind of biological molecules or cells. At the heart of the iPhone biosensor is a photonic crystal. When anything biological attaches to the photonic crystal - such as protein, cells, pathogens or DNA - the reflected color will shift. The group received a grant from the National Science Foundation (NSF) to expand the range of biological experiments that can be performed with the iPhone.

Because the Government (NSF) fail to inform the USPTO in an Information Disclosure Statement (IDS) that they are aware of intellectual property subject matter that has been published and is now in the form of a patent(s), the USPTO granted Mr. Brian Cunningham and the University of Illinois a Patent No. US8947656 (Exhibit 5).

According to NSF policy on Patents:

"The grantee agrees to execute or to have executed and promptly deliver to NSF all instruments necessary to: (i) establish or confirm the rights the Government has throughout the world in those subject inventions for which the grantee retains title; and (ii) convey title to NSF when requested under paragraph d. above, and to enable the Government to obtain patent protection throughout the world in that subject invention."

Someday, someone is going to be very happy that this technology exists and was brought to market (they'll also be happy for the Bayh-Dole Act and its ability to allow the University of Illinois the chance to commercialize this technology. Retrieved from:

http://www.ipwatchdog.com/2015/03/17/smartphone-innovation-has-soared-because-of-patents/id=55667/

Judge Braden: "The court's jurisdiction under 28 U.S.C. § 1498(a) is limited to allegations 'against the [G]overnment arising out of post-issuance [G]overnment use [or manufacture] of an invention.'"

The Plaintiff has demonstrated he has a right to receive post-issuance damages for the ongoing and continuing use and manufacture of the seventy-two (72) alleged infringing products, devices, etc. Plaintiff never alleged infringement of a Government contract, solicitation, grant, or program (i.e. DNDO solicitation; NSF and NIH grants; Bio-Watch Gen 3 program). The Plaintiff is alleging the Government is infringing the numerous devices manufactured as a result of contracts, solicitations, grants, or programs; not the contracts, solicitations, grants, or programs themselves.

The Plaintiff has further demonstrated he has a right to receive pre-issuance damages because the Plaintiff has satisfied the "actual notice" requirement and the "substantially identical" requirement under Section 154(d).

As to damages, the jury awarded $1,405,708 in lost profit damages starting in September 2007, the time of the patent's issuance, and $167,455 in reasonable-royalty damages for the pre-issuance period starting in October 2006, the date the patent application was published. With respect to pre-issuance damages, the district court had already ruled, in denying a summary-judgment motion by MGA, that such damages would be permissible under 35 U.S.C. § 154(d) because the scope of the issued claims are substantially identical to the scope of the published application's claims. That case, *Innovention Toys, LLC v. MGA Entm't, Inc.*, 611 Fed. Appx. 693, 695 (Fed. Cir. 2015), explained that "[C]laims are 'identical' to their original counterparts if they are 'without substantive change.'"

As a result of the Government actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '287, '439', '189, '891, '990, and '497 intellectual property subject matter in the form of patents and has open the door for the continued use by the government of Plaintiff's inventions without paying just compensation.

In *Horne v. Department of Agriculture*, 2012, Chief Justice Roberts, writing for the Court, cited a Supreme Court opinion from the late nineteenth century: "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation..."

Upon information and belief, the United States has "taken" and continues to "take" the Plaintiff's personal and/or private property for the benefit of the public without paying just compensation for the "takings". Plaintiff believes the Government has manufactured and developed products, devices, methods, and systems that are significantly the same or equivalent to the claimed inventions of the Plaintiff. As a result of the "takings" as outline above:

1. the economic impact is a reduction in value of the Plaintiff's property and by virtue of the access, disclosure, manufacture, development or use, by or for the Government and its third party awardees, has destroyed the Plaintiff's competitive edge;

2. the use, disposal, and right of a government to take Plaintiff's private and/or personal property for public use, without paying just compensation, has had a substantial adverse impact (means unfavorable or harmful) on Plaintiff;

3. the "takings" is preventing success or development of Plaintiff's CMDC device in accordance with the "reasonable investment-backed expectations" of the Plaintiff;

4. the character of the Government's action was triggered when the "takings" caused a permanent physical invasion of the Plaintiff's property and eliminated all economically beneficial uses of such property;

5. the "takings" of Plaintiff's personal and/or private property in Case No. 13-307 was done without the Government paying just compensation to the Plaintiff.

## CONCLUSION

It's blatantly obvious what has taken place over the past 17 years. The Government ask for help and when I gave them help they were too cheap, selfish, and immature to pay me. The Government would rather believe there's no one that looks like me could ever do such a thing as this. I was two years in while Steve Jobs was still trying to decide what his device was going to look like. I was three years in before the DHS could come up with a solicitation:

**Design of Apple's "Electronic Device" (Cell-All request):** The Plaintiff's
Communicating, Monitoring, Detecting, and Controlling (CMDC) Device is commonly referred
to as a cell phone, smartphone, monitoring device, communication device, detection device,
mobile device, and an electronic device. Apple recognizes its smartphone in its patent
applications and patents as an "electronic device" (see Apple's first Design Patent—D580387;
filed in Jan. 2007). Plaintiff's CMDC device antedates Apple's first patent for the electronic
device (i.e. smartphone)

Below is an example of Apple's 1st Patent limitations or elements compared to Plaintiff's
specifications found in his Patents. Infringement in not being claimed here, only that the
limitations or elements of Apple's 1st Patent reads on the specifications found in Plaintiff's
Patents. Therefore, because Apple's 1st Patent is referred to as the first Patent for the
Smartphone; Plaintiff's specifications is referred to as the first Communicating, Monitoring,
Detecting, and Controlling (CMDC) Device (i.e. Smartphone). The difference is; Plaintiff's
Parent Patents priority date Communicating, Monitoring, Detecting, and Controlling (CMDC)
Device (i.e. Smartphone) antedates that of Apple's 1st Patent application for the smartphone:

| Apple's 1st Patent for the Smartphone (i.e. electronic device) ornamental design: First application filing date is January 5, 2007 (App. # D/270,887) | Plaintiff's Specifications for the Detector Case (i.e. electronic device) ornamental design: USPTO Disclosure Document filed Nov. 17, 2004; First application filing date is April 5, 2006 (App. # 11/397,118) |
|---|---|
| Electronic Device: "The device (i.e. electronic device) which controls the flow of electrons is called electronic device. These devices are the main building blocks of electronic circuits. The various electronic devices are computers, mobile phones, etc." Retrieved from: https://www.physics-and-radio-electronics.com/electronic-devices-and-circuits.html | Electronic Device: The detector case includes a power source (battery or electrical)... A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates |

| | |
|---|---|
| FIG. 1 is a front perspective view of an electronic device in accordance with the present design. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 2 is a rear perspective view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 3 is a front view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 4 is a rear view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 5 is a top view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 6 is a bottom view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 7 is a left side view for the electronic device; and, | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 8 is a right side view for the electronic device | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| The broken lines depicted in FIGS. 1, 2, and 6 of the inner rectangle, at the center bottom of the electronic device, represent the bounds of the claimed design, while the broken lines inside the rectangle, shown only in FIG. 6, are directed to environment and are for illustrative purposes only; the broken lines from no part of the claimed design. | Fig. 1 is an illustrative drawing of the rectangle design of the detector case; and, Fig. 17 are illustrative drawings of the rectangle design of the cell phone (i.e. smartphone) and the cell phone detector case |

| | |
|---|---|
| The article is not limited to the scale shown herein. As indicated in the title, the article of manufacture to which the ornamental design has been applied is an electronic device. *Examples of an electronic device are a computer, a portable or hand-held device, a personal digital assistant, a communication device (e.g., cellular phone), a novelty item, toy, and/or the like.* | FIG. 15 is a representative schematic view of... a monitoring PC or computer terminal. It is another objective of the present invention to provide... products grouped together by common features in several product groupings such as design similarity... product grouping strategy has been developed wherein products... having the same or similar design... [i]n addition to grouping products together by features, designs and materials... *FIG. 17 is a perspective view... of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case* |
| The first iPhone featured a two-tone back that was mostly made of aluminum — a design element that the company would return to this year with the release of the iPhone 5 with a predominantly metal back. Apple's interim devices opted for different materials: The iPhone 3G and 3GS had plastic backs, while the iPhone 4 and 4S backs were made of glass. Retrieved from: https://appleinsider.com/articles/12/12/18/apple-wins-patent-for-first-iphone-designed-by-jobs-ive | ... [P]roduct grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design... [i]n addition to grouping products together by features, designs and materials... the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted)... the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include... mobile communication devices... personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs)... handhelds |

**DHS Request for Plaintiff's CMDC Device:** BROAD AGENCY ANNOUCEMENT (BAA);

BAA07-10 *CELL-ALL* Ubiquitous Biological and Chemical Sensing; Published: 10/30/2007:

Today's biological and chemical sensing networks work effectively to cover limited and specific physical areas and environments with significant cost and overhead. In order to greatly expand coverage and realize greater WMD protection for the nation, a revolutionary breakthrough that provides for a much larger and lower cost sensing distributed network is required. For example, if biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors. Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) and a communication systems concept for large scale multi-sensor networks. This proof of concept should be capable of detecting hazardous biological and/or chemical materials with eventual expansion to the detection of explosive and eventually radiological materials (in future collaborations with other

organizations). In the first year, proposed work should lead to a minimum of a relevant laboratory demonstration of a proof of concept sensor, device and communications system for Cell-All. Optional second year work may be proposed to build upon success in year one and may include additional field experiments and characterizations.

The proposed concept should develop a miniaturized sensor, device and system that when integrated is capable of addressing the following performance characteristics:

• Integrated into a common domestic platform, such as a cell phone

• User enabled so that the device can be switched on or off at the discretion of an individual user.

• Low cost and easy to maintain at scale

• Capable of accurately and securely communicating the location, date, time and binary outcome of sample readings

• Capable of receiving and displaying warning information from operations centers

• Demonstrates significant potential to provide accurate readings in a wide variety of environments

• Provides adequate sample collection methods within the host device to enable accurate sensing

• Provides sensing capability for multiple samples and any required methodology to readily refresh consumables

• Provides a reasonable power profile that does not significantly degrade the performance of the host device

• Survives a variety of environmental conditions

• Demonstrates an effective lifetime of more than one year.

• Supported by developmental architectures and development environments that promote low cost experiments, spiral prototyping and wide scale implementation

The DHS S&T Directorate's BROAD AGENCY ANNOUCEMENT (BAA); BAA07-10 *CELL-ALL* Ubiquitous Biological and Chemical Sensing; Published: 10/30/2007 calls for a *new or improved* "cell phone" with miniaturized biological and chemical sensor integration. "A utility patent covers the creation of a new or improved—and useful—product, process, or machine".

The request reads on at least Claim 23 of Plaintiff's '439 Patent as illustrated below: The Chart is not used for proving infringement. Infringement is not the issue here. The chart is an illustration of the new and improved cell phone requested by the Department of Homeland Security (DHS), as being substantially the same as the new and improved cell phone the Plaintiff is claiming is his invention. The implied-in-fact contracts was breached when the DHS contracted with Apple, Samsung, LG, and Qualcomm for the development and commercialization of a new and improved cell phone.

| The DHS S&T Cell-All Initiative request for an improved cell phone with detection capability. *"A utility patent is a patent that covers the creation of a new or improved—and useful—product, process, or machine"*. | Plaintiff's Integrated CMDC Device is a Cell Phone and the Cell Phone Detection Device (Claim 23 of Patent Number 9,589,439) |
|---|---|
| A *new or improved cell phone* comprising: | A cell phone comprising: |
| a central processing unit (CPU) for executing and carrying out the instructions of a computer program for a *new or improved cell phone* | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; |
| a transmitter for transmitting signals and messages to a *Synkera MikroKera Ultra Detection Device*; a receiver for receiving signals from the; *Synkera MikroKera Ultra Detection Device* | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection for a *new or improved cell phone* | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; |
| the cell phone is at least a fixed, portable or mobile communication device interconnected to the *Synkera MikroKera Ultra Detection Device*, capable of wired or wireless communication therebetween; and | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and |

| | |
|---|---|
| whereupon the *new or improved cell phone* is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the *Synkera MikroKera Ultra Detection Device*; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; |
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the *new or improved cell phone* | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; |
| wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver of the *new or improved cell phone* | wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; |
| wherein the *new or improved cell phone* is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the *new or improved cell phone* is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and |
| whereupon a signal sent to the receiver of the *Synkera MikroKera Ultra Detection Device* from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the *new or improved cell phone.* | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. |

26

# EXHIBITS

**EXHIBIT 1:** The following "Independent Claims" Chart of Plaintiff's Patents illustrates how the Plaintiff's claim of a Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e. cell phone, smartphone, laptop, PC, handheld) goes back to Plaintiff's 1st Patent '497 and narrows forward to Plaintiff's 10th Patent '287 that covers more of the specifications of the current day cell phone, smartphone, laptop, PC, handheld (i.e. Plaintiff's CMDC Device)

**EXHIBIT 2:** DHS; S&T Directorate; "Cell-All" Request for LG Electronics, Apple Inc, Samsung Electronics, & Qualcomm Inc to Develop, Manufacture, and Commercialize a "WMD Electronic Detection Device"

**EXHIBIT 3:** DHS; S&T Directorate; "Cell-All" Request: Adding the 1st Ind. claim of the 1st Patent issued '497 (filed 04-05-06) to the Complainant, illustrates infringement of Complainant's claimed invention the same as: Ind. claim 1 of the '189 Patent; Ind. claim 22 of the '439 Patent; and, Ind. claim 5 of the '287 Patent. An example of the infringement is demonstrated below in a claim chart using the specifications of LG Electronics, Apple Inc., Samsung Electronics, and Qualcomm Inc., for the development, manufacture, and commercialization of a Cell-All "WMD Electronic Detection Device". The *Synkera "MikroKera Ultra"* integration with the Electronic Detection Device is also added.

**EXHIBIT 4:** Following are 11 (eleven), of Plaintiff's asserted infringement allegations the Government (Defendant) selected from a group of 72 (seventy-two). Judge Braden dismissed all infringement claims that included a "smartphone or other consumer products" which includes the "smartphone and other consumer products" that's a major component of the inventive process of the 11 (eleven) alleged infringing products. The Judge has made all 72 (seventy-two) of Plaintiff's patent claims asserted in this complaint (case no. 13-307C) inoperable. The Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device is at least one of "products grouped together by common features of design similarities of a cell phone, a smartphone, a PDA, a desktop PC, a laptop, a tablet, a handheld, a computer terminal at a monitoring site".

**EXHIBIT 5:** The Plaintiff's independent claims asserted against the NSF infringing products are left inoperable because Judge Braden falsely adjudicated the Plaintiff's claims of infringement was directed at the *"grants"*. As a result of the "takings", the University of Illinois, and Mr. Brian Cunningham was issued a patent on the Plaintiff's intellectual property invention, and the Government has the right to force a non-exclusive license to receive royalties.

Respectfully submitted,

S/ _____

Larry Golden

Plaintiff, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing "PLAINTIFF'S RESPONSE TO THE GOVERNMENT'S MOTION TO DISMISS PLAINTIFF'S GOVERNMENT "TAKINGS" CLAIMS UNDER THE FIFTH AMENDMENT CLAUSE: CASE NUMBER 19-104C" was sent on April 15, 2019 via U.S. Postal service "priority express mail", to:

> NICHOLAS J. KIM
> Trial Attorney
> Commercial Litigation Branch
> Civil Division
> Department of Justice
> Washington, DC 20530
> Email: *Nicholas.J.Kim@USDOJ.gov*
> Telephone: (202) 616-8116
> Facsimile: (202) 307-0345

# EXHIBIT 4

LARRY GOLDEN,

    Plaintiff,

      V.

UNITED STATES,

    Defendant.

Case No: 13-307C

Judge: Eric G. Bruggink

April 12, 2019

## PLAINTIFF'S RESPONSE TO THE GOVERNMENT'S MOTION TO DISMISS

## PLAINTIFF'S GOVERNMENT TAKINGS CLAIMS UNDER THE FIFTH

## AMENDMENT CLAUSE: CASE NUMBER 13-307C

    **Chief Judge Margaret Sweeney;** *Christy, Inc. v. The United States*; **Opinion and
Order; Case No. 18-657C; filed January 29, 2019: A. The Court of Federal Claims Has
Jurisdiction to Consider Christy's Takings Clause Claim.** "The Fifth Amendment prohibits
the federal government from taking private property for public use without paying just
compensation. U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth
Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction" in
the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir.
2008).

    **Chief Judge Margaret Sweeney;** *Christy, Inc. v. The United States*; **Opinion and
Order; Case No. 18-657C; filed January 29, 2019: B. RCFC 12(b)(6)** "[O]nce a claim has
been stated adequately, it may be supported by showing any set of facts consistent with the
allegations in the complaint." *Bell Atl. Corp.*, 550 U.S. at 546. Indeed, "[t]he issue is not whether
a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support
the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), overruled on other grounds by *Harlow
v. Fitzgerald*, 457 U.S. 800, 814-19 (1982)."

Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; **Opinion and Order; Case No. 18-657C; filed January 29, 2019:** C. Tucker Act "The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued. "*United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491 (2012). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc.* v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

## PLAINTIFF'S SUBSTANTIVE RIGHT: MONEY-MANDATING CONSTITUTIONAL PROVISION, STATUE OR REGULATION THAT HAS BEEN VIOLATED UNDER THE "INVENTION SECRECY ACT"

**The Government has to right to take Plaintiff's Intellectual Property without paying Just Compensation under the Invention Secrecy Act:**

### [u]spto.gov: 120 Secrecy Orders [R-07.2015]—Intellectual Property Subject Matter
### 37 CFR 5.2 Secrecy order.

> (a) When notified by the chief officer of a defense agency that publication or disclosure of the invention by the granting of a patent would be detrimental to the national security, an order that the invention be kept secret will be issued by the Commissioner for Patents.
> (c) An application disclosing any significant part of the subject matter of an application under a secrecy order pursuant to paragraph (a) of this section also falls within the scope of such secrecy order...
> 37 CFR 5.3 Prosecution of application under secrecy orders; withholding patent.

2

Unless specifically ordered otherwise, action on the application by the Office and prosecution by the applicant will proceed during the time an application is under secrecy order to the point indicated in this section:

(c) ... When the secrecy order is removed the Patent and Trademark Office will issue a notice of allowance under § 1.311 of this chapter, or take such other action as may then be warranted.

## I. SECRECY ORDER TYPES

Types of Secrecy Orders:

(A) Secrecy Order and Permit for Foreign Filing in Certain Countries (Type I secrecy order) — to be used for those patent applications that disclose critical technology with military or space application in accordance with DoD Directive 5230.25... (B) Secrecy Order and Permit for Disclosing Classified Information (Type II secrecy order) — to be used for those patent applications which contain data that is properly classified or classifiable under a security guideline...

(C) General Secrecy Order (Type III secrecy order)— to be used for those patent applications that contain data deemed detrimental to national security if published or disclosed, including that data properly classifiable under a security guideline where the patent application owner does not have a DoD Security Agreement...

## II. RELATED SUBJECT MATTER

The Secrecy Orders apply to the subject matter of the invention, not just to the patent application itself. Thus, the Secrecy Order restricts disclosure or publication of the invention in any form. Furthermore, other patent applications already filed or later filed which contain any significant part of the subject matter of the application also fall within the scope of the Order and must be brought to the attention of Licensing & Review if such applications are not already under Secrecy Order by the Commissioner. The effects of a Secrecy Order are detailed in the notifying letter and include restrictions on disclosure of the invention and delay of any patent grant until the Order is rescinded.

## VI. IMPROPER OR INADVERTENT DISCLOSURE

If, prior to or after the issuance of the Secrecy Order, any significant part of the subject matter or material information relevant to the application has been or is revealed to any U.S. citizen in the United States, the principals must promptly inform such person of the Secrecy Order and the penalties for improper disclosure. If such part of the subject matter was or is disclosed to any person in a foreign country or foreign national in the U.S., the principals must not inform such person of the Secrecy Order, but instead must promptly furnish to Mail Stop L&R...

**Plaintiff's Amended Complaint: Count I @ Para. 87 Pleadings; Claims the "Takings" of Plaintiff's "Intellectual Property Subject Matter" and acknowledges the Government's Right to Take Said Property for Public Use.**

"Upon information and belief, the United States has "taken" and continues to "take" the Plaintiff's personal property for the benefit of the public without paying just compensation for the "takings". Pursuant to the guidelines of a "Government Fifth

3

Amendment Takings of a Patent" through the power of "eminent domain": the Government has taken the private and personal property subject matter as outlined in the Plaintiff's U.S. Patent No. 7,385,497 ("'497 Patent"), U.S. Patent No. 7,636,033 ("'033 Patent"), U.S. Patent No. 8,106,752 ("'752 Patent"), U.S. Patent No. 8,334,761 ("'761" Patent"), U.S. Patent No. 8,531,280 ("'280 Patent"), U.S. Reissue Patent No. RE43,891 ("'891 Patent"), U.S. Reissue Patent No. RE43,990 ("'990 Patent"), U.S. Patent No. 9,096,189 ("'189 Patent"), and U.S. Patent No. 9,589,439 ("'439 Patent"), specifications and patent claims that are significantly the same or equivalent to the claimed inventions of the Plaintiff; the Government was given notice, made aware of, and told or signaled that the private and personal property subject matter as outlined in the Plaintiff's patent(s) specifications and patent claims that was taken by the Government are significantly the same or equivalent to the claimed inventions of the Plaintiff; the Government has taken and used for the benefit of the public, the private and personal property subject matter as outlined in the Plaintiff's patent(s) specifications and patent claims that are significantly the same or equivalent to the claimed inventions of the Plaintiff; resulting in the Government's manufacture and development of products, devices, methods, and systems that are significantly the same or equivalent to the claimed inventions of the Plaintiff; the resulting economic impact of the "Takings" is a reduction in value of the Plaintiff's property and by virtue of the access, disclosure, manufacture, development or use, by or for the Government and its third party awardees, has destroyed the Patent Owner's competitive edge; through the use, disposal, and right of a government to take private or personal property for public use, the "Takings" has had a substantial adverse impact (means unfavorable or harmful; preventing success or development) on "the reasonable investment-backed expectations" of the Plaintiff; the character of the Government's action was triggered when the "Takings" caused a permanent physical invasion of the Plaintiff's property and eliminated all economically beneficial uses of such property; without authorization and consent from the Patent Owner and without just compensation to the Plaintiff."

## Plaintiff's Amended Complaint: Seventy-Two Count I Pleadings Claims the "Takings" of Plaintiff's Intellectual Property "Subject Matter".

**Count I:** "Upon information and belief, the various Government Agencies (¶¶ 49-78), the Department of Homeland Security (DHS), and the Department of Defense (the United States), after several notices between the years 2006 -2012, has "taken" and continues to "take" the Plaintiff's personal property and used it for the benefit of the public without paying just compensation to the Plaintiff. Pursuant to the guidelines of a "Government Fifth Amendment Takings", the Government has taken the intangible private and personal property subject matter as outlined in the Plaintiff's '497, '033, '752, '761, '280, '891, '990, '189, and '439 U.S. patents specifications and patent claims that are significantly the same or equivalent to the claimed inventions of the Plaintiff. Significantly the same or equivalent to the specifications of the..."

The Government has the right to take Plaintiff's intellectual property subject matter, and the Government has had ample opportunities to take Plaintiff's intellectual property subject

matter for the benefit of the Public, but fail to do so. The Government chose NOT to enforce the Secrecy Order applied for against Plaintiff's intellectual property subject matter.



## DEPARTMENT OF DEFENSE
## ACCESS ACKNOWLEDGEMENT / SECRECY ORDER RECOMMENDATION
## FOR PATENT APPLICATION

Application Serial No: DP12155573          Filing Date:          Date Referred: 06/25/2008

I hereby acknowledge that the Department of Defense reviewers has inspected this application in administration of 35 USC 181 on behalf of the Agencies/Commands specified below. DoD reviewers will not divulge any information from this application for any purpose other than administration of 35 USC 181.

| Defense Agency | Recommendation | Reviewer Name | Date Reviewed |
|---|---|---|---|
| Army | NC - Refer to Homeland Security | Linda Lewis | 09/15/2008 |
| Air Force | NC - Refer to Homeland Security | Richard Jennings | 09/03/2008 |
| Navy | Secrecy Not Recommended | Lawana Brady | 09/19/2008 |

| Type of Recommendations: | SNR: Secrecy Not Recommended |
|---|---|
| | SR: Secrecy Recommended |
| | NC: No Comment |

**Instructions to Reviewers:**
1. All DoD personnel reviewing this application will be listed on this form regardless of whether they are making a secrecy order recommendation.

2. This form will be forwarded to USPTO once all assigned DoD entities have provided their secrecy order recommendation.

**Time for Completion of Review:**
Pursuant to 35 USC 184, the subject matter of this application may be filed in a foreign country for the purpose of filing a patent application without a license anytime after the expiration of six (6) months from filing date unless the application becomes the subject of a secrecy order.

*The USPTO publishes patent application at 18 months from the earliest claimed filing date. The USPTO will delay the publication of a patent application made available to a defense agency under 35 USC 181 until no earlier than 6 months from the filing date or 90 days from the date of referral to that agency. This application will be cleared for publication 6 months from the filing date or 90 days from the above Date Referred, whichever is later, unless a response is provided to the USPTO regarding the necessary recommendations as to the imposition of a secrecy order.*

DoD Completion of Review: **Final**
Forwarded to USPTO: 10/02/2008  By: Oksana Nesterczuk

**Chief Judge Young; Weiss v. United States, 146 F. Supp. 2d 113 (D. Mass. 2001)**
"Weiss argues also that Secrecy Orders I and II were a taking under the Fifth Amendment. Pls.' Mot. ¶ 2; *see also* Pls.' Reply at 2-3. This argument is without merit. It is settled that "the issuance of a secrecy order is not *per se* a taking and that diminution of [an] invention and inability to exploit [the] invention are compensable elements of a claim under section 183, not under the Fifth Amendment." *Constant v. United States*, 16 Cl.Ct. 629, 634-35 (1989), *aff'd*, 884 F.2d 1398, 1989 WL 90244 (Fed.Cir.1989). Thus, this Court's focus is on whether Weiss is entitled to compensation under section 183, interpreted consistently with the Fifth Amendment... Although the World War II version of the Voluntary Tender Act allowed an applicant to receive compensation for "damage accruing to him by reason of the order of secrecy," as well as for "the use of the invention by the Government," Act of July 1, 1940, ch. 501, 54 Stat. 710, 711 (repealed 1952), the original draft of the current Invention Secrecy Act only provided compensation for damages caused by *use* of the invention. *1950 Hearings* at 2. Both the Aircraft Industries Association of America, Inc. and the Department of Defense recommended redrafting the Invention Secrecy Act to allow compensation for damages caused by the order of secrecy itself."

**Farrand Optical Co., Inc., Plaintiff-appellant, v. the United States of America, Defendant-appellant; US Court of Appeals for the Second Circuit - 325 F.2d 328 (2d Cir. 1963)** "Plaintiff seeks compensation under the *Invention Secrecy Act* of 1951, 35 U.S.C. § 183, for the disclosure and use of its invention by the Government... When the United States condemns and takes possession of property, the owner is constitutionally entitled to just compensation, which includes an amount that will make the award the equivalent of his having received the value of the property at the date of the taking. *Seaboard Air Line Ry. v. United States*, 261 U.S. 299, 43 S. Ct. 354, 67 L. Ed. 664 (1923); *Shoshone Tribe of Indians v. United States*, 299 U.S. 476, 57 S. Ct. 244, 81 L. Ed. 360 (1937); *Phelps v. United States*, 274 U.S. 341, 47 S. Ct. 611, 71 L. Ed. 1083 (1927). This rule has been applied by the Supreme Court in suits against the United States for the unlicensed use of a patented invention. *Waite v. United States*, 282 U.S. 508, 51 S. Ct. 227, 75 L. Ed. 494 (1931)."

What follows is the perfect example of how the Department of Homeland Security (DHS) has taken Plaintiff's intellectual property (i.e. ideas) and used with the public. The results is a "new detection system [that] beams readings from the hot zone to scientists around the world".

The DHS strategies are the same as the Plaintiff's intellectual property (i.e. ideas) for product grouping.

The Plaintiff's objective was to develop and demonstrate a cost effective networked system of personal Integrated Chemical, Biological, Radiological, Nuclear and Explosive (ICBRNE) detection devices to be distributed across the vast number of areas vulnerable to terrorist activity.

The system would be useful to first responders, HAZMAT teams, search units, etc. for detecting, localizing, and identifying potential CBRNE hazards. The hardware integration concept is implementing standard communication and network protocols; leveraging "smart phones" (i.e. Plaintiff's CMDC device) for computation and communications; and, utilizes integrated differential GPS when possible. DHS release on March 24, 2009.

**U.S. Department of Homeland Security**          **2009-03-24 10:21:39**
C:\Users\Owner\Documents\Product Grouping U_S Department of Homeland Security.mht

A new detection system beams readings from the hot zone to scientists around the world. Good decisions are never more critical than in a crisis. For a HAZMAT squad, the time to start making them could be the instant a dock worker's eyes burn from a cargo container leak. Making the right decisions is no walk on the pier. Foggy face masks and full-body protective suits can obstruct the tiny display screens HAZMAT responders use to monitor and record the scene. The implications of what they can or cannot see are not always obvious. They are not walking encyclopedias and even if they were, security policies limit what could be said openly over the radio.

To help overcome these obstacles, the U.S. Department of Homeland Security Science and Technology Directorate (S&T) has helped build a device that can quickly beam data on chemical toxins, biological agents, and dirty bombs from the hot zone to the desktops of HAZMAT hotshots around the world. With a few clicks of the mouse, specialists and scene commanders can share information and collaborate on what they see. Decisions can be made better, faster. Meanwhile, evacuation calls can be sent out automatically to nearby homes and businesses.

The Los Angeles area program, known as the Integrated Chemical, Biological, Radiological, Nuclear and Explosive (ICBRNE) Detection Demonstration pilot, has brought together sensor manufacturers, application developers, communication companies, and system integrators to build this comprehensive detection system called the ICBRNE System.

S&T, in partnership with private companies Safe Environment Engineering, Vialogy, and Optimetrics, developed the system as a "true team," said Los Angeles Fire Department Battalion Chief Bob Cramer. (Watch Cramer and other first responders talk about ICBRNE in the video.)

The ICBRNE system uses standard, commercially available sensors to wirelessly relay live readings to experts. It's a form of tele-detection, where experts see a replica of the instrument's face plate and its location viewed on top of a map of the scene. The information can be shared though a simple Internet browser.

7

"ICBRNE meets our need to get real-time instrument readings to the right people at the right time no matter where they are, which is a critical part of any emergency response," said Kathleen Kaufman of Los Angeles County Radiation Management, whose office used the technology throughout the pilot project.

Already, the system has been deployed at major events like the Tournament of Roses parade, the Emmy awards, and most recently, the Academy awards.

What started as a telemetry system to check on employees and their instruments every 30 seconds in a potentially hazardous facility, the system now streams live sensor data across cities, counties and the nation, thanks to the Technical Support Working Group, a homeland security grant, and S&T's Chemical and Biological Division and the Office of Interoperability and Compatibility in the Command, Control and Interoperability Division.

A quarter century ago, a system like ICBRNE would not have been possible because of conflicting data requirements and federal standards for various chemical, biological, and radiological threats. Today, there is no limit on how many different substances can be integrated and transferred using the system.

In addition to its use in Los Angeles, ICBRNE is now spreading to others cities throughout the nation. "Our ultimate goal would be to establish ICBRNE capability in 30 cities over the next 10 years," said Teresa Lustig, ICBRNE's program manager at S&T.

The ICBRNE System continues to evolve and develop as more agencies either integrate their old equipment or buy new versions. While cost estimates have not been finalized, S&T expects that even small cities will benefit from better, broader detection, and big bucks worth of savings.

For more information contact:
U.S Department of Homeland Security
Science And Technology
Washington DC
20528
United States Of America Tel: +1 202-282-8000

I. **Networks:** The *new or improved* (i.e. Utility Patent) design, installation and maintenance of communication networks and technology infrastructure. GOVERNMENT USE: Infrastructures, Networks, and Systems for Mobile Devices and Portable Electronic Devices (PED) such as Smartphones, Laptops, PDAs and Handhelds

The Government improperly distributed Plaintiff's intellectual property subject matter covering networks that interconnects Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (e.g. smartphones and other mobile devices). Illustrations below:

**Navy Marine Corps Intranet (NMCI):** SUBTITLE F—INFORMATION TECHNOLOGY Section 351—Navy-Marine Corps Intranet Contract: This provision would authorize the Department of the Navy to expand the duration of the current contract for Navy Marine Corps Intranet services from the current five years to seven years... Congress granted Navy the authority to order 250,000 seats, over half the

8

program, before the operational testing of the original 15 percent was complete... The Department of the Navy has recently notified the committee that it needs authority to lengthen the duration of the original contract. The committee recognizes the *enormous infrastructure* the contractor has built and implemented in order for the Navy-Marine Corps Intranet to be successful... At this time, the primary concerns are cost and funding. The budget request for NMCI is $1.4 billion. This funding request, however, does not include the costs for maintaining legacy systems, being connected to the SIPRNET, or to fund a transition office... Good Technology, the leader in secure mobility, today announced that the U.S. Navy has implemented the HP Mobile Management Solution leveraging Good for Enterprise to secure official government data on *multiple mobile device platforms*. The Good Technology solution enables the Navy to offer more device choices to U.S. Navy personnel while securing their mission-critical data. The use of *mobile devices* is transforming how the U.S. Navy supports and connects personnel and its fleet. As the industry continues to transition to a broader range of *smartphones and tablets*, the Navy chose to adopt a model that would support a broader range of device choices, while ensuring the strictest levels of data security. In response, HP implemented Good for Enterprise (GFE) across the Navy Marine Corps Intranet (NMCI) *network* to securely mobilize content and apps on *DoD-issued smartphone devices* as part of the Navy's Next Generation Enterprise *Network* (NGEN) contract. Good Technology offers the market-leading secure container solution that securely separates government data from personal data.

### Page 84 Claim Chart; Page 67 Amended Complaint

| Navy Marine Corps Intranet (NMCI) Network - Apple iPad | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims (18, 118, 12, 28, 25, 20, 32, 30) |
|---|---|---|

### Page 124 Claim Chart; Page 67 Amended Complaint

| Navy Marine Corps Intranet (NMCI) Network - Samsung Galaxy s6 | Patent #: 9,589,439; Independent Claim 14 | Patents: 8,106,752; & RE 43,990; Dependent Claims (34); (18, 118, 12, 28, 25, 20, 124) |
|---|---|---|

### Page 148 Claim Chart; Page 67 Amended Complaint

| Navy Marine Corps Intranet (NMCI) Network - Samsung Galaxy s6 | Patent #: 9,589,439; Independent Claim 15 | Patent #: RE 43,990; Dependent Claims (18, 12, 28, 25, 20, 118) |
|---|---|---|

*Actual Notice: The Plaintiff is giving this Court and the Defendant "Actual Notice" of the filing of a Re-issue Patent application [16,350,874] for the 9,589,439 Patent asserted in Plaintiff's. The Re-issue application was submitted in response to Judge Eric G. Bruggink's untimely decision to dismiss the dependent claims of the '439 Patent. The dependent claims depend on the substitute independent claims asserted in Plaintiff's amended complaint. Plaintiff's intentions are to re-assert the dependent claims as re-issue dependent claims that depends on the independent claims of the '439 patent asserted in Plaintiff's amended complaint.*

The Federal Claims Court improperly dismiss the Plaintiff's claims alleging Government networks aren't interconnected to the Plaintiff's Communicating, Monitoring, Detecting, Controlling (CMDC) Device (e.g. smartphones and other mobile devices). Illustrated below:

**Nett Warrior:** The first increment of Nett Warrior was introduced at the *Network Integration Evaluation* 11.2 assessment in spring 2011. The system was essentially the Land Warrior ensemble with enhanced software, sharing its weight disadvantage of about 10 lb. (4.5 kg). After NIE 11.2, efforts were redirected to using simpler and lighter commercial off-the-shelf (COTS) *hand-held* solutions that integrated a *hand-held* screen device with the Rifleman radio transport mechanism. The new design weighed less than 3 lb. (1.4 kg) and participated in the NIE 12.1 assessment in November 2011. Nett Warrior is based on an "end user device," essentially an *Android or iPhone-like smartphone* tied to the Rifleman handheld radio, to link into command and control *networks* and use applications to call in fire support, plan and coordinate operations, and track friendly forces. In July 2013, the Army installed the *Samsung Galaxy Note II* into Nett Warrior as the system's end user device. Each Galaxy is bought at the commercial price of $700 per phone, substantially lower than if the Army had to procure devices from contractors who would develop their own original devices. Once acquired, the phones have their commercial features including cellular antennas, Wi-Fi, and Bluetooth wiped out by Army engineers, and the Nett Warrior software is installed on the *National Security Agency-approved Android operating system.*

### Page 168 Claim Chart; Page 99 Amended Complaint

| "VOCket System" / "Nett Warrior" Smartphone System | Patent #: 9,589,439; Independent Claim 17 | Patent #: RE 43,990; Dependent Claims (119, 17, 18, 124, 108) |
|---|---|---|

### Page 177 Claim Chart; Page 79 Amended Complaint

| "Biotouch System" / "Nett Warrior" Smartphone System | Patent #: 9,589,439; Independent Claim 17 | Patent #: RE 43,990; Dependent Claims (119, 17, 18, 124, 108) |
|---|---|---|

*Actual Notice: The Plaintiff is giving this Court and the Defendant "Actual Notice" of the filing of a Re-issue Patent application [16,350,874] for the 9,589,439 Patent asserted in Plaintiff's. The Re-issue application was submitted in response to Judge Eric G. Bruggink's untimely decision to dismiss the dependent claims of the '439 Patent. The dependent claims depend on the substitute independent claims asserted in Plaintiff's amended complaint. Plaintiff's intentions are to re-assert the dependent claims as re-issue dependent claims that depends on the independent claims of the '439 patent asserted in Plaintiff's amended complaint.*

# DoD Networks for Smartphone and Mobile Device Use

| ID | Severity | Title | Description |
|---|---|---|---|
| V-25007 | Low | Smartphones must be configured to require a password/passcode f or device unlock. | Sensitive DoD data could be compromised if a device unlock password/passcode is not set up on DoD smartphones. |
| V-25016 | Low | The device minimum password/ passcode length must be set. | Sensitive DoD data could be compromised if a device unlock password/passcode is not set to required length on DoD smartphones. |
| V-24986 | Low | All non-core applications on mo bile devices must be approved b y the DAA or Command IT Con figuration Control Board. | Non-approved applications can contain malware. Approved applications should be reviewed and tested by the approving authority to ensure they do not contain malware, spyware, or have unexpected ... |
| V-25010 | Low | The smartphone inactivity timeo ut must be set. | Sensitive DoD data could be compromised if the smartphone does not automatically lock after the required period of inactivity. |
| V-30418 | Low | Download of user owned data ( music files, picture files, etc.) on mobile devices must be based on the Command's Mobile Device Personal Use Policy. | The risk of installing user owned data (music files, picture files, etc.) on a non-DoD-network connected mobile device that does not contain sensitive or classified DoD data/information should be ... |
| V-30419 | Low | Connecting mobile devices to us er social media web accounts (F acebook, Twitter, etc.) must be b ased on the Command's Mobile Device Personal Use Policy | The risk of connecting to user social media web accounts on a non-DoD-network connected mobile device that does not contain sensitive or classified DoD data/information should be evaluated by the .. |
| V-30412 | Low | The installation of user owned a pplications on the mobile device must be based on the Command' s Mobile Device Personal Use P olicy. | The risk of installing personally owned or freeware apps on a DoD mobile device should be evaluated by the DAA against mission need and how the device is intended to be used. There is a risk that ... |
| V-30417 | Low | The use of the mobile device to view and/or download personal email must be based on the Com mand's Mobile Device Personal Use Policy. | The risk of viewing and downloading personal email on a non-DoD-network connected mobile device that does not contain sensitive or classified DoD data/information should be evaluated by the DAA ... |

It is the belief of the Plaintiff that the Government is in violation of the constitutional provision, statute and regulation that governs how to take intellectual property subject matter without paying just compensation (i.e. Invention Secrecy Act), creates a substantive right enforceable against the United States that is "money-mandating".

It is for this reason the Plaintiff is seeking just compensation, under the Tucker Act that allows for "money damages", from the Government. The Government chose not to take the Plaintiff's intellectual property subject matter under the provisions of the Invention Secrecy Act, which authorizes the Government to do so without paying just compensation, but instead, chose to take the Plaintiff's intellectual property subject matter under the eminent domain provision of the Fifth Amendment. The Government has the right to take the Plaintiff's intellectual property subject matter under the eminent domain provision of the Fifth Amendment, but only with just compensation paid to the Plaintiff.

**Judge Margaret Sweeney; Court of Federal Claims: *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; Case No. 12-774C; Contract Claims Against the United States Arising Under the Tucker Act.** "The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc)."

## PLAINTIFF'S IMPLIED-IN-FACT CONTRACTS

**Judge Margaret Sweeney; Court of Federal Claims: *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; Case No. 12-774C; Contract Claims Against the United States Arising Under the Tucker Act.** "An implied-in-fact contract is one of the government's waivers of sovereign immunity under the Tucker Act, see *Loveladies Harbor, Inc.*, 27 F.3d at 1554, and a plaintiff's allegation that one exists between itself and the United States "is enough to confer subject matter jurisdiction in this [c]ourt," *Penn. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 786 (2001) (noting that the "allegation in [the] complaint that [the] claim was based upon [the] contract was enough to confer subject matter jurisdiction in the Court of Federal Claims" (citing *Trauma Serv. Grp.*, 104 F.3d at 1324))."

*Baltimore & Ohio Railroad Co. v. United States*, 261 U.S. 592 (1923), is a US Supreme Court case on contract law. The Supreme Court held that an implied in fact contract exists as,

12

"an agreement ... founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."

In *Russell v. United States*, the judge found that ("To give the Court of Claims jurisdiction the demand sued on must be founded on a convention between the parties — 'a coming together of minds' ").

**Judge Margaret Sweeney; Court of Federal Claims: *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; Case No. 12-774C;** ("We have repeatedly held that [Tucker Act] jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law."); *Russell Corp. v. United States*, 210 Ct. Cl. 596, 537 (1976)

**Judge Margaret Sweeney; Court of Federal Claims: *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; Case No. 12-774C; Contract Claims Against the United States Arising Under the Tucker Act.** "An implied-in-fact contract is founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Maher v. United States*, 314 F.3d 600, 603 (Fed. Cir. 2002) (citing *Hercules v. United States*, 516 U.S. 417, 424 (1996) (citing *Balt. &.Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)))."

**Why the need for an Implied-in-Fact contract with the Plaintiff?** President George W. Bush first declared a national emergency just days after the Sept. 11, 2001 terrorist attacks. President Barack Obama extended a 15-year-old national emergency status that enables the U.S. global war on terror. (Exhibit 1; implied-in-fact contract; implementation; and results)

**What Is Breach of Implied Contract?** A legal complaint is created when one party to an implied contract breaches the agreement. A breach doesn't need to be defined in a verbal or written agreement. Instead, it can be any negligence of principal, law, or obligation. (Exhibit 1; implied-in-fact contract; implementation; and results)

Following is evidence of the Implied-in Fact (meeting of the minds) contract with the President; President's Cabinet; Federal Senators; and, Federal Congressman, that the implementation of Plaintiff's 'stimulus packages' will "increase jobs and create new business opportunities, increase taxable revenue to restore the Nation's Budget (an estimated $200 billion

over the next ten years), reduce the cost to manufacture, and open up a world market to current distributors, supplies, and manufacturers within the various industries."

The Implied-in Fact (meeting of the minds) contract with the President; President's Cabinet; Federal Senators; and, Federal Congressman include reasonable compensation to the Plaintiff for his "stimulus packages" (i.e. intellectual property) designed to restore the Nation's economy.

**Judge Wheeler; Court of Federal Claims:** *MOLINA HEALTHCARE INC. v. The United States*; **Case No. 17-97C**; "When Congress does not explicitly codify its intent to enter into a contract, this Court has used a two-step test to determine whether Congress intended to contract through legislation. First, "the provision must create a program that offers specified incentives in return for the voluntary performance of private parties." *Moda Health Plan*, 130 Fed. Cl. at 463 (citing *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 405-06 (Ct. Cl. 1957)). Second, "the provision must be promissory; in other words, it must give the agency officials administering the program no discretion to decide whether or not to award incentives to parties who perform." Id. (citing *Radium Mines*, 153 F. Supp. at 406). In short, absent some express declaration of an intent to contract, Congress's creation of a program in which it promises to pay a sum of money in exchange for some specified performance is evidence of an intent to contract.

The Implied-in Fact (meeting of the minds) contract with the President; President's Cabinet; Federal Senators; and, Federal Congressman also include "solutions to preventing terrorist attacks by developing new, innovative products..." The Implied-in Fact (meeting of the minds) contract includes compensation to the Plaintiff for the new and innovative products (i.e. intellectual property), and royalties for the development of Plaintiff's new and innovative products made for or used by the Government, for the benefit of the public.

Viewed from a Judicial point-of-view, the Implied-in Fact (meeting of the minds) contract has: (1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) "actual authority" on the part of the government to bind the government in contract. The President exercised his authority to bind the implied-in-fact contract.

Margo Graves; Contracting Officer for the DHS "SAFECON" and "Cell-All" projects, has the authority to bind the Government in contract (e-mail correspondence enclosed). (Exhibit 1; implied-in-fact contract; implementation; and results)

## Budget Solutions, LLC
Larry Golden, Co-owner
522 Peach Grove Place
Mauldin, SC 29662
Bus: 864.288.5605 / Cell: 864.992.7104
E-mail: lgolden5605@charter.net

May 23, 2005

President George W. Bush
1600 Pennsylvania Avenue NW
Washington, DC 20500

Dear Mr. President:

I need your help. My problem is with the Office of Senator Jim DeMint.

My name is Larry Golden. I am the co-owner of Budget Solutions, LLC. Budget Solutions is a Research and Development Company. Our mission is to identify and research those areas considered vulnerable to terrorist attacks and offer solutions to preventing terrorist attacks by developing new, innovative products, ideas, and strategies.

I am the author of three "Economic Stimulus and Terrorist Prevention Projects". The strategies behind each project is to increase jobs and create new business opportunities, increase taxable revenue to restore the Nation's Budget (an estimated $200 billion over the next ten years), reduce the cost to manufacture, and open up a world market to current distributors, suppliers, and manufacturers within the various industries.

I am the inventor of two anti-terrorist product devices and am credited with participating in the development of a third anti-terrorist product device.

"The V-Traffic Project": invention technology involves the prevention of car and vehicle bombings by using GPS, navigational systems, and a device designed to control certain functions of the vehicle.

"The ATPG Project": invention technology involves the prevention, detection and containment of chemical, biological, radiological and nuclear agents and compounds in vulnerable areas such as: cargo containers, cargo planes, cargo ships, warehouses, freight train cars, tractor trailers, mail carriers (ups, FedEx, for example), airport lockers, news racks, mail drop boxes, cluster mail boxes, keyed mail boxes, mini-storage houses, bicycle lockers, stadium lockers, school lockers, and shipping containers.

"THE SafeRack Project": invention technology involves preventing the storage of IED's, pipe bombs, and "dirty" bombs in news racks. The invention technology involves the detection and preventing the spread of chemical and biological agents and compounds onto newspapers. The invention technology involves preventing stolen papers. By

B10

preventing an estimated $995 million dollars annually in stolen papers we can turn the estimated $995 million dollars annually into a gain, which is taxable to the Federal Gov't. The estimated $400 million annually received as tax revenue can be used to fund other vulnerable areas subject to terrorist attacks.

I asked David Porter, Porter Technologies, the inventor of a container security lock in my area, what efforts he took to seek Federal funding. He suggested I contact my Congressman or Senator and ask them to put me in touch with a Portfolio Manager at the Dept. of Homeland Security. Senator DeMint forwarded a letter to DHS Undersecretary Asa Hutchinson dated September 30, 2003 in support of Mr. Porter's invention. Undersecretary Hutchinson traveled to South Carolina to validate Mr. Porter's invention. I cannot help but feel Senator DeMint's treatment toward me is because I am Black. It's difficult enough for Blacks to be recognized as being competent in the technology field without being discriminated against.

I contacted Senator DeMint's office. I communicated my request to Mr. Chris Socha. I asked Mr. Socha to help us secure $4 million dollars for R&D from the DHS by putting us in contact with a Portfolio Manager. Mr. Socha suggested I send him everything we are working on. In November 2004 I sent Mr. Socha 2 ½ years of technology and research material and made it very clear the material and the contents therein should be treated as personal and confidential.

Six months has past and for six months I have tried to contact Mr. Socha, his superiors Mr. Hoskins and Senator DeMint. For six months, every time I have called they were either out of the office, in a meeting, or currently unavailable. For six months I have sent e-mails, left messages in their mailboxes, and with the receptionist. I have also left telephone numbers, an e-mail address, and a mailing address for them to reach me. In my messages I asked for an update on any progress and asked them to return the material I forwarded to them if the Senator has decided the issues addressed in the Projects is of no concern of his.

I believe very strongly that Senator DeMint is using the inventions technology and economic strategies for personal gain and/or recognition. See (109th CONGRESS, 1st Session: S.3, January 24, 2005, A BILL, SECTION 1, SHORT TITLE, 'Protecting America in the War on Terror Act of 2005').

My fear is that Senator DeMint is sharing or has shared the inventions technology with others outside the United States for personal gain and/or recognition. In February 2005, Senator DeMint made an International trip to Iraq, Kuwait, and Germany. Senator DeMint met with U.S. and Iraqi officials, including the three leaders of the major political parties to discuss funds utilization. It's my understanding Mr. Socha has made a couple of trips out of the Country since November 2004. Sharing this information with others outside the United States could have a devastating impact on our Nation's economy and set us back years on the development and implementation of technology used to prevent terrorist activity.

16

Please help. You can help by opening an investigation into the actions of Senator DeMint. You can help by providing a contact person or entity that can better serve us. You can help by sending a copy of this letter back to Senator DeMint with some positive and constructive recommendations.

Please use the information in the letterhead to contact me.

Sincerely,

Larry Gaulden
Budget Solutions, LLC

cc:
President: George W. Bush

Date: Tuesday, March 6, 2007 9:10 AM

From: igolden5605@charter.net

To: margo.graves@dhs.gov

Subject: Question: BAA07-02A

Early in year 2004, I mailed out to all the Senators, Congresspersons, Homeland Security Advisory Committee, President's Cabinet and the Counsel of Economic Advisors an Economic Stimulus Proposal named the "ATPG Project". ATPG (Anti-Terrorism Product Grouping). Simply put, the proposal outlines how we as a Nation can group anti-terrorism systems and devices to reduce the cost of the Technology while securing vulnerable areas like "containers".

In November of 2004, I filed with the Patent and Trademark office a Disclosure for a "Multiple sensor-detector/disabling locking device"designed to integrate anti-terrorism devices and systems. The anti-terrorism devices and systems include but is not limited to: detectors, sensors and scanners for radiation/nuclear/chemical/ biological/biometric/motion/explosives/locking and tampering with communication features of GPS/telematics/telecommunications/internet and navigation.

In August of 2005, I filed with the Patent and Trademark office a Disclosure for a "stall-to-stop" device for vehicles and other transporters.This device works hand and hand with the "multiple sensor-detector/disabling locking device" to stall vehicles and other transporters once alert, alarm or contamination is detected. The device was developed because vehicles and other transporters are a part of the supply chain as well.

In April of 2006, I combined the two technologies and filed my Patent application with the Patent and Trademark office.

In September of 2006, I gave the Technology to the Program Managers for the DNS, CBD, and DARPA at a Road Show in Colorado.

In November of 2006, I contacted the unsolicited proposal division for the DHS and did not receive guidelines on how to submit an unsolicited proposal until January 23, 2007. Eight days before you released BAA07-02A.

How do I respond to let you know, "the technology you are requesting and are awarding other Companies for under BAA04-06 and BAA07-02A. I have Patent Pending".



Date: Friday, March 9, 2007 12:32 PM

From: lgolden5605@charter.net

To: Graves, Margo <Margo.Graves@dhs.gov>/-202- 254-6778

Subject: RE: Fwd: RE: RE: Larry Golden; ATPG Technology, LLC

*hbonazza @ ewa.com*
*rbailer @ ewa.com*

Ms. Graves:

We have decided to proceed with preparing a White Paper and Full Proposal for
Evaluation Period 2. The information I provided you, I trust will be forwarded
to the right people if need be and also trust they will contact me with
suggestions and comments they feel is vital to the submission process.

Thanks, Larry

---- "Graves wrote:
> Mr. Golden:
>
> As recommended during our telephone conversation, your organization is
> encouraged to submit a Full Proposal for Evaluation Period 1 or a White
> Paper and/or Full Proposal for Evaluation Period 2; as long as it
> registers to do so, and submits its Full Proposal for Round 1 and White
> Paper and/or Full Proposal for Evaluation Period 2 by the established
> due dates and times.
>
> Good Luck in your endeavors, and thank you for your interest in the DHS
> S&T SAFECOM Program.
>
> V/r,
> Margaret "Margo" Graves
> Team Lead/Contracting Officer
> Department of Homeland Security
> CPO/OPO/Science and Technology Acquisitions
> Command, Control & Labs Branch (5-120B)
> Washington, DC 20528
> Telephone:   (202) 254-6778
> Facsimile:   (202) 254-5398
> margo.graves@dhs.gov
>
> -----Original Message-----
> From: lgolden5405@charter.net [lgolden5405@charter.net]
> Sent: Thursday, March 08, 2007 9:38 AM
> To: Graves, Margaret
> Subject: Fwd: Fwd: RE: RE: Larry Golden; ATPG Technology, LLC
>
> Please acknowledge receipt of this e-mail.
> I need to know if I am corresponding with the right person and
> Department
> Thanks, Larry
>
> > Date: Wed, 7 Mar 2007 8:03:51 -0800
> > From: <lgolden56""@charter.net>
> > To: margo.graves@dhs.gov
> > Subject: Fwd: RE: RE: Larry Golden; ATPG Technology, LLC
> >
> > Ms. Graves,
> > After you spoke on yesterday I was left totally confused, but I do
> > remember you saying, " reference to BAA04-06 is not made in BAA07-02A",
> > and that I need to be more specific to the similarities of my technology
> > and the announcements. On page 5, under "10. Additional Background
> > Information". where reference is made to BAA04-06. Some key words and
> > phrases directly relates to my Technology. "Is a container mounted sensor
> > system", "to detect intrusions", "includes a standard interface
> > expansion bus", "yet-to-be developed WMD sensors", "could also include
> > commercial commodity-specific sensors", "Any additional sensors", "must
> > fit inside the container", "be self-powered", "interoperate with",
> > "communication systems".

**Date:** Thursday, January 3, 2008 9:31 AM

**From:** lgolden5605@charter.net

**To:** margo.graves@dhs.gov

**Cc:** daniel.nowak@us.army.mil, augustus.w.fountain@us.army.mil, pace@excelistron.com, hkimball@eti-web.com, stoudern1@ornl.gov, chris.tavitt@nrl.navy.mil, paul.charles@nrl.navy.mil, Theresa@homesecuritystore.com, jamest@sfgsc.com, rballer@ewa.com, tbonazza@ewa.com, ds@jenningscook.com

**Subject:** Follow-up

Ms. Graves,

Earlier this year, I spoke with you about technology I, Larry Golden, CEO of ATGP Technology, LLC have patent pending on multiple sensing for container security and other areas considered vulnerable targets for terrorist acts.

I am asking for an update on the BAA07-02 (SAFECON) that was converted to a RFI for multiple sensing for cargo containers. ATPG submitted a "white paper" RFI.

I am asking also for an update on the CELL-ALL BAA07-10 solicitation for which ATPG submitted a "white paper" on December 3, 2007.

ATPG has established collaborative agreements with several Companies, Agencies and Institutions we feel we have a responsibility to respond back too.

Thanks,

Larry Golden, CEO
ATPG Technology, LLC
522 Peach Grove Place
Meridian, SC 29662
864-288-5605 / 864-992-7134

**The Government was given Notice of Three Economic Stimulus and Terrorist Prevention Packages: "The Saferack Project", "The V-Tection Project", And the Anti-Terrorism Product Grouping (ATPG) Project:**

Six months after the DHS was established on Nov. 25, 2002, Petitioner receive a response letter on May 21, 2003 from the Honorable Senator Fritz Hollings: "I have contacted the Department of Justice and the Department of Homeland Security to try to be of assistance"; on June 3, 2003 from the Office of the Vice President, Dick Cheney: "[y]our correspondence has been forwarded to the Department of Homeland Security for review. You will hear back directly from the Department"; on October 1, 2003 from the Honorable Senator Fritz Hollings: "[t]hank you for contacting me regarding your difficulty with receiving a response from the Department of Homeland Security"; on October 21, 2003 from the Honorable Senator Lindsey Graham: "I have contacted the Department of Homeland Security on your behalf. I have asked that they review your request and respond directly to you"; on June 20, 2005 from the Office of the President, George Bush: "[t]hank you for your letter regarding homeland security technology procurement. Please know I have forwarded it to the Department of Homeland Security for review and response". (STATUS REPORT: CD of Petitioner's Discovery Documents: CFC Case No. 13-307C; Dkt. No. 101; filed 02/17/2017). Also, copies of the letters can be found on my website: atpg-tech.com; click on *Larry Golden v. The United States.*

### ADDITIONAL IMPLIED-IN-FACT CONTRACTS WITH THE UNITED STATES

I. 2006: DoD/DARPA/SPO; BAA06-02; A.1.4 Defense against Chemical Biological Radiological Weapons. Abstract for Review to the Attention of Deputy Director Brian Pierce, Dr. Wayne Bryden, Mr. Thomas P. McCreery

II. 2006: HSARPA/SBIR; 1.1 DHS S&T TOPICS; SBIR/STTR TOPIC NUMBER: H-SB06.2-001; TITLE: SYSTEM FOR DESIGNING AND EVALUATING CHEMICAL OR

BIOLOGICAL AGENT SENSOR NETWORKS. Abstract for Review to the Attention of: Mr. Mike McLoughlin

III. 2006: HSARPA/SBIR; 1.1 DHS S&T TOPICS; SBIR/STTR TOPIC NUMBER: H-SB06.2-003; TITLE: ADVANCED UNATTENDED GROUND SENSOR (UGS) TECHNOLOGIES. Abstract for Review to the Attention of: Ms. Leslee Shumway

IV. 2006: SBIR/STTR, SWIFT Tour September, 2006; Topic: Ten federal agencies collaborate to sponsor the 2006 SWIFT Tour; Executive Summary submitted to each Federal agency participating in the SWIFT Tour included NIH, DOT, NSF, DOE, Navy, Air Force, Army, DARPA, DoD, Chem-Bio Defense, NASA, and the DHS. Deborah Akwei at (202) 889-5064.

V. 2006: DHS/HSARPA/SBIR Science and Technology (S&T) Directorate Topic: High risk, high payoff R&D initiatives Executive Summary/Proposal submitted by E-mail correspondence to: Ms. Elissa (Lisa) Sobolewski; DHS/SBIR Program Manager

VI. 2007: DHS; S&T Directorate Borders and Maritime Division Topic: "White Paper" Submission for SAFECON (BAA07-02A); RFI Submitted to the attention of: Margo L. "Margo" Graves; Team Lead / Contracting Officer

VII. 2007: U.S. Army/ECBC; Topic: ECBC agreed to develop chemical, biological, and explosives detectors, under the SAFECON BAA. Collaborative Agreements with: Daniel M. Nowak; Program Manager. Contact: 410-436-5631; daniel.nowak@us.army.mil. Dr. Augustus W. Fountain III; Chief Scientist. Contact: 410-436-0683; augustus.w.fountain@us.army.mil

VIII. 2007: Senate Committee on Homeland Security and Governmental Affairs. Topic: Container Security: "White Paper" Submission for DHS; SAFECON Project; RFI Letter sent to the Attention of: Joe Lieberman; Chairman Senate Committee on Homeland Security and Governmental Affairs, 340 Dirksen Senate Office Building, Washington, D.C. 20510

IX. 2007: US Naval Research Laboratory (NRL); Topic: Biochemical, and logistical preparations to integrate a biosensor with an appropriate air collector. Collaborative Agreements with: Chris R. Taitt; Program Manager. Contact: 202-404-4208; chris.taitt@nrl.navy.mil; Paul T. Charles; Contact person. Contact: 202-404-6064; paul.charles@nrl.navy.mil

X. 2007: DOE/ORNL Topic: Oak Ridge National Laboratory agreed to develop Chemical, Explosive, Radiological, and Nuclear detectors. Collaborative Agreements with: Blair

Ross; Program Manager Contact: 865-576-1034; rossb@ornl.gov. Richard L. Stouder; Contact Person. Contact: 865-574-3053; stouderrl@ornl.gov

XI. 2007: DHS; S&T Directorate Office of Procurement Operations. Topic: "White Paper" Submission for *"CELL-ALL Ubiquitous Biological and Chemical Sensing"* (BAA07-10); RFP. Submitted to the attention of: Margo L. "Margo" Graves; Team Lead / Contracting Officer

XII. 2007: During the year 2007, several conversations were held with Jim Culbertson (On-Star); General Motors (i.e. a Government owned company) Global Process Leadership in Warren, MI; General Motors Research and Development (R&D) Center; and, General Motors Technology Portal, Silicon Valley, CA. A letter was also sent to the Chairman & CEO of General Motors, G. Richard Wagoner, informing Mr. Wagoner that the General Motors "Stolen Vehicle Slowdown System" the company announced in October, 2007, is in fact the same system I discussed with several of its employees during the year 2007. A copy of the letter written to the Chairman and CEO of General Motors:

**Judge Margaret Sweeney; Court of Federal Claims:** *XP VEHICLES, INC. and LIMNIA, INC. V. The United States***; Case No. 12-774C; Contract Claims Against the United States Arising Under the Tucker Act.** "When alleging that the federal government entered into a contract, a plaintiff must establish "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance[;] and (4) 'actual authority' on the part of the government's representative to bind the government." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc); accord *Anderson v. United States*, 85 Fed. Cl. 532, 542 (2009); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)."

The mutuality is that each party above has the intent to contract. The consideration is in award funding, royalties from a non-exclusive license, or purchase of Plaintiff's intellectual property. The Plaintiff made an offer and each Party accepted. Each Party above has the authority to bind the Government in contract.

**Judge Margaret Sweeney; Court of Federal Claims:** *XP VEHICLES, INC. and LIMNIA, INC. V. The United States***; Case No. 12-774C; Contract Claims Against the United States Arising Under the Tucker Act.** "Moreover, the Federal Circuit has instructed that "[o]ral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires; until then, there is no intent to be bound." *New Am. Shipbuilders, Inc.*, 871 F.2d at 1080."

23

The Chart that follows is a "Testing Mechanism" for deterring how the Implied-in-Fact contracts were breached by various Government Agencies and personnel:

| PRODUCT GROUPINGS | PATENT and PATENT CLAIMS: TEST MECHANISM | GOVERNMENT AGENCIES | GOVERNMENT SOLICITATIONS | PUBLIC USE: GOVERNMENT CONTRACTORS and PRODUCTS |
|---|---|---|---|---|
| Multi-Sensor Detection Device (System) grouped with Maritime Cargo Containers and also grouped with Remote/Automatic Lock Disablers | Pat. No.: 7,385,497; Ind. Claims 1 & 7, Dep. Claims 6 & 12 Pat. No.: RE43,990; Ind. Claims 56 & 125, Dep. Claims 57-63, 127-129 & 135 | Department of Homeland Security (DHS); Office of the Chief Procurement Officer | Time Recorded Ubiquitous Sensor Technologies, (TRUST); BROAD AGENCY ANNOUNCEMENT; (BAA) 09-17; Sol. No.: HSHQDC-09-BAA09-17 Lock: Single source funding basis; contracted using other than full and open competition | L-3 Communications' subsidiary L-3 Services, Inc.; "TRUST" device and iControl Inc. Marine Asset Tracking System Lock (M-Lock) |
| Multi-Sensor Detection Device (System) grouped with a Vehicle (boat) | Pat. No.: RE43,990; Ind. Claims 74, Dep. Claims 77-79 | Department of Homeland Security (DHS); FEMA | Single source funding basis; contracted using other than full and open competition. Funding from a Department of Homeland Security grant and FEMA's Assistance to Firefighters Grant Program | MetalCraft Marine Inc.'s FireStorm High-Speed CBRN Fireboat |
| Multi-Sensor Detection Device (System) grouped with Maritime Cargo Containers | Pat. No.: RE43,990; Ind. Claims 56, Dep. Claims 61, 62 & 68 | Department of Homeland Security (DHS); Office of the Chief Procurement Officer | Time Recorded Ubiquitous Sensor Technologies, (TRUST); BROAD AGENCY ANNOUNCEMENT; (BAA) 09-17; Sol. No.: HSHQDC-09-BAA09-17 | L-3 Communications' subsidiary L-3 Services, Inc.; "TRUST" device |

| | | | | |
|---|---|---|---|---|
| Multi-Sensor Detection Device (System) grouped with Maritime Cargo Container seaport cranes, harbor cranes, and/or straddle-carrier. | Pat. No.: RE43,990; Ind. Claims 135, Dep. Claims 139-142 | Department of Homeland Security (DHS); Office of the Chief Procurement Officer | SAFE Container (SAFECON) Program; BROAD AGENCY ANNOUNCEMENT; (BAA) 07-02A; Sol. No.: BAA07-02A | The Boeing Company's "Remote Vapor Inspection System for Maritime Shipping Containers" |
| Multi-Sensor Detection Device (System) grouped with Maritime Composite Cargo Containers | Pat. No.: RE43,990; Ind. Claims 74, Dep. Claims 75, 77-80 | Department of Homeland Security (DHS) Advanced Container Security Device Program and the Space and Naval Warfare Systems Center | Single source funding basis; contracted using other than full and open competition | Maine Secure Composites LLC's Composite Anti-tamper Containers and Hybrid Composite Containers |
| Multi-Sensor Detection Device (System) grouped with Watchtowers or Integrated Fixed Towers | Pat. No.: 7,385,497; Ind. Claim 13 Pat. No.: RE43,990; Ind. Claims 74, Dep. Claims 78-80 | Department of Homeland Security (DHS); Customs and Border Protection (CBP) | Border Technology Solutions, Sol. No.: HSBP0111RSWBTS; Integrated Fixed Towers (IFT) Program, Sol. No.: HSBP0111RIFT | Elbit Systems subsidiary EFW's Integrated Fixed Towers |
| Multi-Sensor Detection Device (System) grouped with Maritime Cargo Containers and also grouped with Interfaces for Communicating | Pat. No.: RE43,990; Ind. Claims 56, Dep. Claims 68-73 | Department of Homeland Security (DHS); Office of the Chief Procurement Officer | "Time Recorded Ubiquitous Sensor Technologies", (TRUST); BROAD AGENCY ANNOUNCEMENT; (BAA) 09-17; Sol. No.: HSHQDC-09-BAA09-17 Interface: MARINE ASSET TAG TRACKING SYSTEM; SBIR TOPIC NUMBER: H-SB04.1-005 | L-3 Communications' subsidiary L-3 Services, Inc.; "TRUST" device and iControl Inc. Marine Asset Tracking System (MATTS) |

| | | | | |
|---|---|---|---|---|
| Multi-Sensor Detection Device (System) grouped with Monitoring Equipment: (Smartphones, Cell phones, PDA's, Computers or Handhelds). | Pat. No.: RE43,990; Ind. Claims 81, Dep. Claims 103, 105, 108, 110, 111 & 117-121 | Department of Homeland Security (DHS); Domestic Nuclear Detection Office (DNDO) | Domestic Nuclear Detection Office (DNDO); DNDOSBIR12-03-FP-001-CEIN | Creative Electron's iRad Geiger and iRad Alpha to be used with Apple iOS devices |
| Multi-Sensor Detection Device (System) grouped with Unmanned Aerial, Sea or Ground Vehicles | Pat. No.: RE43,990; Ind. Claims 74, Dep. Claims 77 | U.S. Army Edgewood Chemical Biological Center, and other U.S. Department of Defense (DoD) laboratories. | A DoD program funded by the Joint Program Manager Nuclear, Biological and Chemical Contamination Avoidance, the Defense Threat Reduction Agency, and the U.S. Army Small UAS. | Smiths Detection, AeroVironment Chemical-Sensing UAV |
| A Communication Device grouped with Maritime Cargo Container devices and also Remote/Automatic Lock Disablers | Pat. No.: 8,106,752; Ind. Claims 10, Dep. Claims 11, 27 & 28-44 | The United States of America as represented by the Secretary of the Navy, the Sandia National Laboratories and the Department of Homeland Security | Single source funding basis; contracted using other than full and open competition | SPAWAR Systems Center Pacific Handheld Network Access Device (HNAD) and the DHS's Advanced Container Security Devices (ACSDs), Container Security Devices (CSDs) and Electronic Chain of Custody (ECoC) Lock Devices |
| A Communication Device grouped with a Remote/Automatic Lock Disabler | Pat. No.: RE43,990; Ind. Claims 11, Dep. Claims 12, 14-16, 22 & 25 | The United States Treasury Department that owns 61% of the new General Motors | Single source funding basis of a Government Bailout; contracted using other than full and open competition | The U. S. Treasury Department's General Motors Government Fleet and OnStars' "RemoteLink Mobile App" |

| | | | | |
|---|---|---|---|---|
| Stall-to-Stop or Vehicle Slow-down System grouped with a Remote Cellular and/or Satellite means of Stopping, Stalling or Slowing down a Vehicle | Pat. No.: 8,106,752; Ind. Claim 1, Dep. Claims 2 & 3 Pat. No.: 8,334,761; Ind. Claim 1, Dep. Claim 2 Pat. No.: RE43,891; Ind. Claims 1 & 63, Dep. Claims 4-6, 65-70 & 72 | The United States Treasury Department that owns 61% of the new General Motors | Single source funding basis of a Government Bailout; contracted using other than full and open competition | The U. S. Treasury Department's General Motors Government Fleet and OnStars' "Stolen Vehicle Slowdown System" |
| Stall-to-Stop or Vehicle Slow-down System grouped with a Preprogrammed Automated means of Stopping, Stalling or Slowing down a Vehicle | Pat. No.: 8,334,761; Ind. Claims 5, Dep. Claims 6-9 Pat. No.: RE43,891; Ind. Claims 23 & 44, Dep. Claims 27-29, 31, 35, 46 & 49 | The United States Treasury Department that owns 61% of the new General Motors | Single source funding basis of a Government Bailout; contracted using other than full and open competition | The U. S. Treasury Department's General Motors Government Fleet's "Virtual Bumpers" Automatic Front and Rear Braking |
| Stall-to-Stop or Vehicle Slow-down System grouped with an Electromagnetic Pulse, Electrostatic Discharge, Microwave Beam or Radio Frequency means of Stopping, Stalling or Slowing down a Vehicle | Pat. No.: RE43,891; Ind. Claims 11, Dep. Claims 12, 15, 17, 19 & 22 | The National Institute of Justice (NIJ) and The Department of Defense's (DoD) Joint Non-Lethal Weapons Directorate (JNLWP) | Single source funding basis; contracted using other than full and open competition | The U.S. Department of Justice (USDOJ) High Power Microwave (HPM) and Eureka Aerospace and Fiore Industries Inc.'s High-Power Electromatic System (HPEMS) |

*Note:* The Patents are NOT listed to assert infringement. They are list to show the "Testing Mechanism". Patent infringement is NOT a pre-requisite for a Government "Takings" under the Fifth Amendment Clause.

## IMPLIED-IN-FACT CONTRACT WITH THE "CELL-ALL" PROGRAM MANAGER & CONTRACTING OFFICER

Mr. Stephen Dennis, Program Manager for the BROAD AGENCY ANNOUCEMENT (BAA); BAA07-10; *CELL-ALL* Ubiquitous Biological and Chemical Sensing; Published: 10/30/2007 by the Department of Homeland Security (DHS); Science and Technology (S&T) Directorate, Washington DC, 20528 and Ms. Margaret L. "Margo" Graves, Office of Procurement Operations / Science & Technology Acquisitions Division; Team Lead / Contracting Officer for the BROAD AGENCY ANNOUCEMENT (BAA); BAA07-10; *CELL-ALL* Ubiquitous Biological and Chemical Sensing; Published: 10/30/2007 by the Department of Homeland Security (DHS); Science and Technology (S&T) Directorate, Washington DC, 20528; both having prior knowledge that the Plaintiff has a patent(s) that covers the development of the technology DHS requested in the Cell-All solicitation, entered into implied-in-fact contracts with the Plaintiff.

There was a meeting of the minds that the Plaintiff is compensated in at least one of; funding as an awardee; royalty payments; or the purchase of Plaintiff's intellectual property, to include Plaintiff's patent(s).

We had a meeting of the minds that any and all Government Agencies that issues a solicitation for the development of Plaintiff's claimed invention(s) will be notified of the Plaintiff's intellectual property and that arrangements needs be made for compensation in at least one of; funding as an awardee; royalty payments; or the purchase of Plaintiff's intellectual property, to include Plaintiff's patent(s).

We had a meeting of the minds that any and all third-party Government contractors that enters into an agreement (i.e. contracts, grants, cooperative agreements, etc.) for the development of Plaintiff's claimed invention(s) will be notified of the Plaintiff's intellectual property and that arrangements needs be made for compensation in at least one of royalty payments or the purchase of Plaintiff's intellectual property, to include Plaintiff's patent(s) should the third-party Government contractors decide to commercialize Plaintiff's claimed inventions covered by a Patent(s).

Mr. Stephen Dennis and Ms. Margaret L. "Margo" Graves breached the implied-in-fact contracts when they contracted with third-party Government contractors for the development of Plaintiff's claimed inventions covered by a Patent(s) without paying Plaintiff just compensation.

The Government was well within its rights to take the intellectual property of the Plaintiff for public use, but not without paying the Plaintiff just compensation. Three things to consider when adjudicating Plaintiff's claims are: Privity of Contract; Implied-in-fact contract; and, the Takings Clause of the Fifth Amendment:

**Breach of contract requires Privity of Contract:** Privity of contract refers to the relationship between the parties to a contract which allows them to sue each other but prevents a third party from doing so. It is a doctrine of contract law that prevents any person from seeking the enforcement of a contract, or suing on its terms, unless they are a party to that contract. As a general rule, a contract cannot confer rights or impose obligations arising under it on any person except the parties to it.

**An implied-in-fact contract:** An implied-in-fact contract consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words. Such contracts are implied from facts and circumstances showing a mutual intent to contract, and may arise by the conduct of the parties. A contract implied in fact is a true contract. A contractual relationship because the parties may create an implied contract by their acts and conduct. A contract may not be implied where an enforceable express contract exists between the parties as to the same subject matter. To establish the existence of an implied in fact contract, it is necessary to show: an unambiguous offer, unambiguous acceptance, mutual intent to be bound, and consideration. However, these elements may be established by the conduct of the parties rather than through express written or oral agreements.

**Fifth Amendment Takings Clause:** The Takings Clause, the last clause of the Fifth Amendment, limits the power of eminent domain by requiring that "just compensation" be paid if private property is taken for public use.

**Judge Margaret Sweeney; Court of Federal Claims:** *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; **Case No. 12-774C; Contract Claims Against the United States Arising Under the Tucker Act.** "[T]he Tucker Act waives the government's sovereign immunity from suit to allow, among other claims, claims against the United States founded on an express or implied contract with the United States. For a plaintiff to maintain a

29

claim for breach of contract under the Tucker Act, "there must be privity of contract between the plaintiff and the United States." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998); accord *First Annapolis Bancorp, Inc. v. United States*, 644 F.3d 1367, 1373 (Fed. Cir. 2011) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim."); *Flexfab v. United States*, 424 F.3d 1254, 1265 (Fed. Cir. 2005) (noting that as a general rule, the "government consents to be sued only by those with whom it has privity of contract"). The parties to that contract must be the plaintiff and the defendant. See *Silverman v. United States*, 679 F.2d 865, 870 (Ct. Cl. 1982). "A lack of privity deprives this court of jurisdiction." *Carter v. United States*, 98 Fed. Cl. 632, 636 (2011). There are some exceptions to this general rule. See *Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999); *First Nelson Constr. Co. v. United States*, 79 Fed. Cl. 81, 94-95 (2007). These exceptions include suits by intended third-party beneficiaries, suits by subcontractors "by means of a pass-through suit when the prime contractor is liable to the subcontractor for the subcontractor's damages," and suits by government contract sureties "for funds improperly disbursed to a prime contractor." *Hartford*, 194 F.3d at 1289; accord *Alpine Cnty., Cal. v. United States*, 417 F.3d 1366, 1368 (Fed. Cir. 2005). "[T]he common thread that unites these exceptions is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity." *Hartford*, 194 F.3d at 1289."

**Judge Margaret Sweeney; Court of Federal Claims: *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; Case No. 12-774C; Contract Claims Against the United States Arising Under the Tucker Act.** "In addition, **an implied-in-fact contract** is a "substitute [] for direct privity." Carter, 98 Fed. Cl. at 636. "An implied-in-fact contract requires a showing of the same contractual elements as an express contract." *Last Chance Mining Co. v. United States*, 12 Cl. Ct. 551, 555 (1987), aff'd, 846 F.2d 77 (Fed. Cir. 1988). When alleging that the federal government entered into a contract, a plaintiff must establish "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance[;] and (4) 'actual authority' on the part of the government's representative to bind the government." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc); accord *Anderson v. United States*, 85 Fed. Cl. 532, 542 (2009); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997). With respect to a representative's ability to bind the government, however, such created "approval must be within the approving official's authority in order to be operative." *New Am.*

*Shipbuilders, Inc. v. United States,* 871 F.2d 1077, 1080 (Fed. Cir. 1989); accord *Trauma Serv. Grp.,* 104 F.3d at 1327 (stating that a plaintiff "must allege facts sufficient to show that the Government representative who entered into its alleged implied-in-fact contract was a contracting officer or had implied actual authority to bind the Government"). "An implied-in-fact contract is founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Maher v. United States,* 314 F.3d 600, 603 (Fed. Cir. 2002) (citing *Hercules v. United States,* 516 U.S. 417, 424 (1996) (citing *Balt. & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597 (1923))). Ultimately, "[a] court will not . . . imply an agreement between parties when there was none, nor can a court imply privity when there was no meeting of the minds between the particular parties." *Carter,* 98 Fed. Cl. at 636."

**Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; Opinion and Order; Case No. 18-657C; filed January 29, 2019: A. The Court of Federal Claims Has Jurisdiction to Consider Christy's Takings Clause Claim.** "The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction" in the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA,* 525 F.3d 1299, 1309 (Fed. Cir. 2008). However, a plaintiff must still allege a nonfrivolous Takings Clause claim to invoke this court's Tucker Act jurisdiction. *Moden v. United States,* 404 F.3d 1335, 1341 (Fed. Cir. 2005)... In other words, Christy asserts that it had certain property rights that were taken by the federal government without just compensation. There is no indication (nor does defendant suggest) that such allegations are frivolous. Accordingly, the court has jurisdiction to consider Count I of Christy's complaint... "To prevail on a takings claim, a plaintiff must "identify[] a valid property interest" under the Fifth Amendment and show a "governmental action [that] amounted to a compensable taking of that property interest." *Air Pegasus of D.C., Inc. v. United States,* 424 F.3d 1206, 1212-13 (Fed. Cir. 2005); accord *Casitas Mun. Water Dist. v. United States,* 708 F.3d 1340, 1348 (Fed. Cir. 2013); *Hearts Bluff Game Ranch, Inc. v. United States,* 669 F.3d 1326, 1329 (Fed. Cir. 2012). In addition, a plaintiff must concede the legitimacy of the government action that effected the taking. Hearts Bluff, 669 F.3d at 1332 (citing *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed. Cir. 1993)).

Our SMD was designed to provide as much flexibility as possible and communicates with a variety of sensors through an array of built-in standard interfaces (SPI, A/D, Serial, Bluetooth, I2C etc). This existing open architecture design affords us the opportunity to collaborate with Iowa State University for sensor development and the U.S. Army Edgewood Chemical and Biological Center (ECBC) to evaluate, test and acquire the most appropriate miniaturized chemical, explosive, radiation, nuclear and biological sensors.

ATPG intends to utilize the hardware and software technology developed for a ubiquitous sensor network. The form factor of the SMD will be engineered so that it can initially be housed in cell phone cases allowing straightforward integration with existing cell phones. The SMD, housed in the cell phone cases will use a Bluetooth channel to communicate with ATPG software hosted on the cell phone. This software will provide bidirectional communication between the SMD and cell phone.

The cell phone software will additionally use email and SMS messaging services to communicate information to control centers. The software for managing the information from the sensor network will be architected in a way that provides a means to efficiently escalate information up the government hierarchy.

The software will employ a large database back-end and where practical message routing rules will be implemented to allow for effective and efficient routing of sensor message traffic.

When a person volunteers/joins for the program they would receive a cell phone case along with an adapter cord that would connect to their existing phone charger, allowing the SMD and phone to charge simultaneously. A switch on the case will allow the volunteer to enable the device at their discretion.

If a volunteer elects to participate in the program and their cell phone does not have an on board GPS, the SMD provided in the cell phone case will be equipped with one. The geographic position of the SMD/cell phone pair will be determined either by GPS, cell phone tower database and signal strength or by a Wi-Fi hotspot database. In the event current position cannot be determined, the device will use its last known good position fix for communications and the position will be flagged as such.

Housing the SMD and sensors in a cell phone case
provides a number of advantages. Since the SMD will draw all of its power from its own power source the only resources required from the cell phone will be for a dedicated Bluetooth channel and limited processing power to execute the cell phone software. Additionally the consumables in the cell phone case (battery, sensors etc.) can easily be switched out, or the entire case can be easily replaced.

From:      atpg-tech@charter.net
To:        "Dennis, Stephen" <Stephen.Dennis@dhs.gov>
Date:      09/28/2009 05:24:29 EDT
Subject:   Re: Fwd: Re: CellAll

Mr. Dennis:
Hope you haven't forgotten about me.
Larry

---- "Dennis wrote:
Larry,
I am out of the office and hope to answer your mail very soon.
Steve

----- Original Message -----
From:                          <                              >
To: Dennis, Stephen J <                              >
Sent: Thu Sep 10 14:13:45 2009
Subject: Fwd: Re: CellAll

I would love to hear back from you reguarding this e-mail. When we spoke last you mentioned the
possibility of getting additional funding  or maybe even posting a new BAA for the advancement of
the Cell-All Project.

If you think it will help, The U.S. Congressman for my District is willing to send a letter of support for
those ideas to your Director or Under Secretary.

Hope to hear from you soon.

Larry

Date: Fri, 4 Sep 2009 8:57:43 -0400
From: <                            >
To: "Dennis, Stephen" <                              >
Subject: Re: CellAll

Yes. I submitted a "white paper" in response to the CellAll solicitation.

At the time I must admit, we were not ready. We didn't have a Sensor developer and we didn't
have a patent issued.

Today, we have collaborative agreements with three sensor developers: Dr. Pandey at Iowa State
University (electronic sensors); Dr. Talit at the Navy Research Laboratory (fiber optic biosensors)
and Dr. Thundat at Oak Ridge National Laboratory (micro cantilever sensors). Dr. Fountain at
Edgewood Chemical and Biological Center has agreed to do testing and make a determination on
which scheme (or combination) is best for the sensing environment.

We also have Dr. Johnson at Johnson Research and Development to determine and provide the
power source and capabilities. Dr. Culhane at Torc Technologies to handle systems integration. Dr.
Bonazza at EWA to handle fabrication and design.

Currently I am in talks with Karen White at Purdue University because they are doing research in
cell phone detection. I am also in talks with Bob Belton at Quantum Research International, Inc. on
interoperable communication.

I was issued my first patent on June 10, 2008 and my second patent is being reviewed by the
patent and as he said, he will have an answer for me in a couple of weeks.

So you see, we have spent a lot of time preparing for this opportunity to re-submit our proposal

and capabilities to you.

Larry
---- "Dennis wrote:
Larry,
I think that now remember your company from one of the competitions. Did you submit to CellAll or the related SBIR?
Steve

----- Original Message -----
From:                          <                    >
To: Dennis, Stephen J <                       >
Cc:                            <                    >
Sent: Thu Sep 03 23:19:49 2009
Subject: CellAll

Mr. Dennis, I want to first thank you for the conversation this morning.

I have an alternative solution to the design that is and have been introduced to you by Gentag and others. ATPG's patented and patent pending technology grants us the opportunity to place or embed CBRNE sensors in the cell phone case and use the cell phone as a monitoring device.

Following this strategy we can place the case on robots and send them into suspected dangerios areas. We can place the case inside vehicles and use the case as a tracking device.

Please review the attachment. I feel you will agree that my approach to the solution is far less expensive, less complicated than trying to physically combine the sensors with the cell phone, easy to maintain because we can replace the cell phone without replacing the case; replace the case without replacing the cell phone.

My contact info:

Larry Golden, CEO
ATPG Technology, LLC
522 Peach Grove Place
Mauldin, SC 29662
864-288-5605 / 864-992-7104

**Design of Apple's "Electronic Device" (Cell-All request):** The Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device is commonly referred to as a cell phone, smartphone, monitoring device, communication device, detection device, mobile device, and an electronic device. Apple recognizes its smartphone in its patent applications and patents as an "electronic device" (see Apple's first Design Patent—D580387; filed in Jan. 2007). Plaintiff's CMDC device antedates Apple's first patent for the electronic device (i.e. smartphone)

Below is an example of Apple's 1st Patent limitations or elements compared to Plaintiff's specifications found in his Patents. Infringement in not being claimed here, only that the limitations or elements of Apple's 1st Patent reads on the specifications found in Plaintiff's Patents. Therefore, because Apple's 1st Patent is referred to as the first Patent for the Smartphone; Plaintiff's specifications is referred to as the first Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e. Smartphone). The difference is; Plaintiff's Parent Patents priority date Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e. Smartphone) antedates that of Apple's 1st Patent application for the smartphone:

| Apple's 1st Patent for the Smartphone (i.e. electronic device) ornamental design: First application filing date is January 5, 2007 (App. # D/270,887) | Plaintiff's Specifications for the Detector Case (i.e. electronic device) ornamental design: USPTO Disclosure Document filed Nov. 17, 2004; First application filing date is April 5, 2006 (App. # 11/397,118) |
|---|---|
| Electronic Device: "The device (i.e. electronic device) which controls the flow of electrons is called electronic device. These devices are the main building blocks of electronic circuits. The various electronic devices are computers, mobile phones, etc." Retrieved from: https://www.physics-and-radio-electronics.com/electronic-devices-and-circuits.html | Electronic Device: The detector case includes a power source (battery or electrical)... A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates |

| | |
|---|---|
| FIG. 1 is a front perspective view of an electronic device in accordance with the present design. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 2 is a rear perspective view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 3 is a front view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 4 is a rear view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 5 is a top view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 6 is a bottom view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 7 is a left side view for the electronic device; and, | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 8 is a right side view for the electronic device | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| The broken lines depicted in FIGS. 1, 2, and 6 of the inner rectangle, at the center bottom of the electronic device, represent the bounds of the claimed design, while the broken lines inside the rectangle, shown only in FIG. 6, are directed to environment and are for illustrative purposes only; the broken lines from no part of the claimed design. | Fig. 1 is an illustrative drawing of the rectangle design of the detector case; and, Fig. 17 are illustrative drawings of the rectangle design of the cell phone (i.e. smartphone) and the cell phone detector case |

| | |
|---|---|
| The article is not limited to the scale shown herein. As indicated in the title, the article of manufacture to which the ornamental design has been applied is an electronic device. *Examples of an electronic device are a computer, a portable or hand-held device, a personal digital assistant, a communication device (e.g., cellular phone), a novelty item, toy, and/or the like.* | FIG. 15 is a representative schematic view of... a monitoring PC or computer terminal. It is another objective of the present invention to provide... products grouped together by common features in several product groupings such as design similarity... product grouping strategy has been developed wherein products... having the same or similar design... [i]n addition to grouping products together by features, designs and materials... *FIG. 17 is a perspective view... of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case* |
| The first iPhone featured a two-tone back that was mostly made of aluminum — a design element that the company would return to this year with the release of the iPhone 5 with a predominantly metal back. Apple's interim devices opted for different materials: The iPhone 3G and 3GS had plastic backs, while the iPhone 4 and 4S backs were made of glass. Retrieved from: https://appleinsider.com/articles/12/12/18/apple-wins-patent-for-first-iphone-designed-by-jobs-ive | ... [P]roduct grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design... [i]n addition to grouping products together by features, designs and materials... the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted)... the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include... mobile communication devices... personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs)... handhelds |

**DHS Request for Plaintiff's CMDC Device:** BROAD AGENCY ANNOUCEMENT (BAA);

BAA07-10 *CELL-ALL* Ubiquitous Biological and Chemical Sensing; Published: 10/30/2007:

Today's biological and chemical sensing networks work effectively to cover limited and specific physical areas and environments with significant cost and overhead. In order to greatly expand coverage and realize greater WMD protection for the nation, a revolutionary breakthrough that provides for a much larger and lower cost sensing distributed network is required. For example, if biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors. Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) and a communication systems concept for large scale multi-sensor networks. This proof of concept should be capable of detecting hazardous biological and/or chemical materials with eventual expansion to the detection of explosive and eventually radiological materials (in future collaborations with other

organizations). In the first year, proposed work should lead to a minimum of a relevant laboratory demonstration of a proof of concept sensor, device and communications system for Cell-All. Optional second year work may be proposed to build upon success in year one and may include additional field experiments and characterizations.

The proposed concept should develop a miniaturized sensor, device and system that when integrated is capable of addressing the following performance characteristics:

• Integrated into a common domestic platform, such as a cell phone

• User enabled so that the device can be switched on or off at the discretion of an individual user.

• Low cost and easy to maintain at scale

• Capable of accurately and securely communicating the location, date, time and binary outcome of sample readings

• Capable of receiving and displaying warning information from operations centers

• Demonstrates significant potential to provide accurate readings in a wide variety of environments

• Provides adequate sample collection methods within the host device to enable accurate sensing

• Provides sensing capability for multiple samples and any required methodology to readily refresh consumables

• Provides a reasonable power profile that does not significantly degrade the performance of the host device

• Survives a variety of environmental conditions

• Demonstrates an effective lifetime of more than one year.

• Supported by developmental architectures and development environments that promote low cost experiments, spiral prototyping and wide scale implementation

The DHS S&T Directorate's BROAD AGENCY ANNOUCEMENT (BAA); BAA07-10 *CELL-ALL* Ubiquitous Biological and Chemical Sensing; Published: 10/30/2007 calls for a *new or improved* "cell phone" with miniaturized biological and chemical sensor integration. "A utility patent covers the creation of a new or improved—and useful—product, process, or machine".

The request reads on at least Claim 23 of Plaintiff's '439 Patent as illustrated below: The Chart is not used for proving infringement. Infringement is not the issue here. The chart is an illustration of the new and improved cell phone requested by the Department of Homeland Security (DHS), as being substantially the same as the new and improved cell phone the Plaintiff is claiming is his invention. The implied-in-fact contracts was breached when the DHS contracted with Apple, Samsung, LG, and Qualcomm for the development and commercialization of a new and improved cell phone.

| The DHS S&T Cell-All Initiative request for an improved cell phone with detection capability. *"A utility patent is a patent that covers the creation of a new or improved—and useful—product, process, or machine".* | Plaintiff's Integrated CMDC Device is a Cell Phone and the Cell Phone Detection Device (Claim 23 of Patent Number 9,589,439) |
|---|---|
| A *new or improved cell phone* comprising: | A cell phone comprising: |
| a central processing unit (CPU) for executing and carrying out the instructions of a computer program for a *new or improved cell phone* | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; |
| a transmitter for transmitting signals and messages to a *Synkera MikroKera Ultra Detection Device*; a receiver for receiving signals from the; *Synkera MikroKera Ultra Detection Device* | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection for a *new or improved cell phone* | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; |
| the cell phone is at least a fixed, portable or mobile communication device interconnected to the *Synkera MikroKera Ultra Detection Device*, capable of wired or wireless communication therebetween; and | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and |

| | |
|---|---|
| whereupon the *new or improved cell phone* is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the *Synkera MikroKera Ultra Detection Device*; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; |
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the *new or improved cell phone* | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; |
| wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver of the *new or improved cell phone* | wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; |
| wherein the *new or improved cell phone* is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the *new or improved cell phone* is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and |
| whereupon a signal sent to the receiver of the *Synkera MikroKera Ultra Detection Device* from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the *new or improved cell phone*. | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. |

**Government Breach of an Implied-in-Fact contract with Plaintiff: Chief Judge Margaret Sweeney;** *Christy, Inc. v. The United States*; **Opinion and Order; Case No. 18-657C; filed**

**January 29, 2019:**

"In contract disputes, the "money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract." 14 *Holmes*, 657 F.3d at 1314. Therefore, a "non-frivolous allegation of a contract with the government" is generally sufficient to invoke the court's Tucker Act jurisdiction. *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (emphasis added). The court's contract jurisdiction extends to claims involving implied-in-fact contracts, but not to claims involving implied-in-law contracts. *Hercules, Inc. v. United States*, 516 U.S. 417, 423 (1996). An implied-in-law contract is a "fiction of law where a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress." Id. at 424 (internal quotation marks omitted). In contrast, an implied-in-fact contract results from a "meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Id. (internal quotation marks omitted). The requirements for an implied-in-fact contract with the government "are the same as for an express contract":

(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) "actual authority" on the part of the government's representative to bind the government in contract.

*Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003). The only difference between express contracts and implied-in-fact contracts is the nature of the evidence required to establish their existence. Id."

**History:** The first Government request for a *new or improved* cell phone device that is substantially the same as the Plaintiff's Communicating, Monitoring, Detecting, Controlling (CMDC) Device, was published on October 20, 2007. The Department of Homeland Security published a presolicitation (Solicitation number BAA07-10), Cell-All Ubiquitous Biological and Chemical Sensing. ("Cell-All Solicitation"). The Cell-All Solicitation called for multiple miniaturized sensors to be integrated with common devices ("Cell-All Devices"). Cell-All Devices are *new or improved* cell phones equipped with multiple sensors used to identify and alert individuals and agencies of potential biological, chemical, radiological, or explosive threats

On November 28, 2007, the Plaintiff responded to the Cell-All Solicitation with a proposal, and in that proposal notified the agency that the Cell-All Solicitation called for a multi sensor detection system that incorporated the '497 Patent's technology: For years the Plaintiff shared the strategy and need behind having a CMDC device. The "CELL-ALL technical

approach & rational taken from the numerous personal visits, phone conversations, emails, abstracts, executive summaries, and proposals submitted as a response for RFI and RFP.

On September 28, 2011, the Department of Homeland Security gave a Cell-All Live Demonstration for Environmental Sensing. During this presentation the NASA Ames Research Center, Synkera Technologies, NC4, and Qualcomm gave a demonstration of prototype Cell All Devices. These prototypes utilized a separate sensor module, which communicates via Bluetooth with Qualcomm software to an Android phone. The cellphone, via a wireless network, sends the sensor data to a monitoring system. The monitoring system can send messages back to the phone to receive more or less information, and can contact emergency responders if necessary.

Attorney Ha Kung Wong at the law firm Fitzpatrick, Cella, Harper & Scinto provided the Plaintiff-Appellant with fifty-one (51) discovery document files. One of the files is a CD of the contract between DHS, NASA Ames Research Center, Synkera Technologies, NC4, and Qualcomm. Elements of the DHS, NASA Ames Research Center, Synkera Technologies, NC4, and Qualcomm's contract are listed below. The passages provides proof of a contract; authorization and consent; and, Government use (Fitzpatrick—Attorney Work Product—CD; 11-09-27-cellall-v-all.mp4). Below is a summary of the CD: (Submitted CD at least 3 time) Welcome and Introduction made by Stephen Dennis, DHS Program Manager for the "Cell-All Ubiquitous Chemical Sensing Project".

- 16 minutes in: diagram of Qualcomm's sensing device and the needed specifications for the Apple iPhone.
- 21 minutes in: Cell-All prototype demonstration begins.
- 32 minutes in: quote from Dr. Jing Lee, "we have many phones in the field".
- 37 minutes in: diagram featuring Qualcomm.
- 38 minutes in: quote from Doug Hoffman, Program Manager for Qualcomm, "use commercial cell phone ecosystem".
- 41 minutes in: diagram showing at least twenty-five (25) necessary stakeholders (far exceeds the four (4) stakeholders of Apple, Samsung, LG, and Qualcomm named in Plaintiff-Appellant's complaint).
- 1:19 minutes in: quote from the "DHS Program Manager for the "Cell-All Ubiquitous Chemical Sensing Project" Stephen Dennis, "already for sell this week".

- 1:44 minutes in: quote from the "DHS Program Manager for the "Cell-All Ubiquitous Chemical Sensing Project" Stephen Dennis, "cooperative agreements".

The Cell-All CD is Plaintiff's clear and convincing evidence and proof of a "Breach of an Implied-in-Fact" contract with the Plaintiff. The evidence on the CD is proof that the Cell-All devices is being "manufactured for and by the Government" and that the Government's is giving "authorization and consent" on the heightened standard of "clear and convincing evidence" to multi-billion dollar corporations to development Plaintiff's CMDC device.

In *Larson v. United States*, the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." The purpose behind permitting the government's authorization or consent to be implied is tied to the government's need to procure items without disruption, and avoid the need for government agencies to perform an exhaustive patent search for products or services they wish to procure. For example, in TVI Energy, the Federal Circuit found implied authorization or consent where the government required a contractor to demonstrate an allegedly infringing device as part of bidding requirements under a United States military solicitation for disposable thermal targets." The Government is using the Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device without a license. For that reason alone, the Plaintiff has stated a claim for which relief may be granted.

**Government Breach of Implied-in-Fact Contracts with Plaintiff that resulted in a Government "Takings" of Property under the Fifth Amendment Clause. Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; Opinion and Order; Case No. 18-657C; filed January 29, 2019:**

""The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). The waiver of immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right

enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 298 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc)."

Whenever the Government use with the public or contracts with other third party contractors for the development of Plaintiff's Intellectual Property (i.e ideas)—infringement is not a pre-requisite for this requirement—without just compensation, the Government has taken the Plaintiff's property; be it private or personal; be it a property or franchise; be it land or patent; be it a right or a contract.

Guide to determining a "Breach of Implied-in-Fact Contracts with Plaintiff that resulted in a Government "Takings" of Plaintiff's Property under the Fifth Amendment Clause."

1. The Plaintiff's Product Grouping Intellectual Property (i.e ideas) shared with multiple Government Officials and Government Agencies over multiple years;
2. The Plaintiff's Product Grouping Intellectual Property (i.e ideas) shared with a governing body or individual(s) with the authority to contract the Government;
3. Test Mechanisms (patent prosecution, re-issue, post grant, inter partes review, etc.) to verify the validity of Plaintiff's Intellectual Property (i.e ideas) in his patents and patent claims;
4. Government Agencies "Use" of Plaintiff's Intellectual Property (i.e ideas) in Solicitations and other Request for Proposals (RFP);
5. The third party Government contractors that received Government funding for the development of the plaintiff's intellectual property (i.e. ideas); and,
6. The "Takings" was made VOID of any just compensation. Just compensation for the Plaintiff under the implied-in-fact contracts include, but is not limited to, being compensated in contract awards, being compensated through royalty payments, or being compensation for the sale of Plaintiff's Intellectual Property (i.e. patents)

**Technical Rational for the New and Innovative Products of the Three Economic Stimulus and Terrorist Prevention Packages: "The Saferack Project", "The V-Tection Project", and the Anti-Terrorism Product Grouping (ATPG) Project:**

Judge Margaret Sweeney; Court of Federal Claims: *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; Case No. 12-774C; Contract Claims Against the United States Arising Under the Tucker Act. "The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).""

The Plaintiff entered into several Implied-in-Fact contracts with several Federal Agencies during the SWIFT Tour held in Colorado in year 2006. There was a meeting of the minds with the individuals authorized to contract the Government to take the Intellectual Property of the Plaintiff shared with them that covers the *"Technical Rational for the New and Innovative Products of the Three Economic Stimulus and Terrorist Prevention Packages: "The Saferack Project", "The V-Tection Project", and the Anti-Terrorism Product Grouping (ATPG) Project"*, and put out a mass number of request, i.e. solicitations, across a mass number of Government Agencies to create the demand for the development of the innovative products needed to fulfill the product grouping strategies for the three economic stimulus packages of "products grouped together by common features of design similarities" (Exhibit 1). The strategy creates the demand, competition, and rush to the development of quality products at a minimum cost to manufacture and commercialize.

The SBIR/STTR, SWIFT Tour September, 2006; Topic: Ten federal agencies collaborate to sponsor the 2006 SWIFT Tour; An Executive Summary was by the Plaintiff submitted to at least one of a Program Manager and/or a Contracting Officer of each of the Federal Agencies participating in the SWIFT Tour to include: the National Institute of Health (NIH); the Department of Transportation (DOT); the National Science Foundation (NSF); the Department of Energy (DOE); the Department of Navy (DON); the Department of Air Force (DOAF); the Department of Army (DOA); the Defense Advance Research Project Agency (DARPA); the Department of Defense (DoD); the Department of Homeland Security (DHS); the Department of Homeland Security (DHS) Science and Technology (S&T) Directorate Chemical and Biological

Defense Agency; and, the National Aeronautics and Space Agency (NASA). Contact Deborah Akwei at (202) 889-5064.

**Judge Wheeler; Court of Federal Claims:** *MOLINA HEALTHCARE INC. v. The United States*; **Case No. 17-97C; Intent** "When Congress does not explicitly codify its intent to enter into a contract, this Court has used a two-step test to determine whether Congress intended to contract through legislation. First, "the provision must create a program that offers specified incentives in return for the voluntary performance of private parties." *Moda Health Plan*, 130 Fed. Cl. at 463 (citing *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 405-06 (Ct. Cl. 1957)). Second, "the provision must be promissory; in other words, it must give the agency officials administering the program no discretion to decide whether or not to award incentives to parties who perform." Id. (citing *Radium Mines*, 153 F. Supp. at 406). In short, absent some express declaration of an intent to contract, Congress's creation of a program in which it promises to pay a sum of money in exchange for some specified performance is evidence of an intent to contract.

Exhibit 2 is a small example of the massive request made by the various Government Agencies. The Plaintiff has listed 420 synopsis of the Plaintiff's intellectual property subject matter that was requested by the Government. Sample below:

---

1(a) SOUTHWEST BORDER TECHNOLOGY SOLUTIONS
Solicitation Number: HSBP0111RSWBTS
Agency: Department of Homeland Security
Office: Customs and Border Protection
Added: Jan 27, 2011 9:27 pm

FOIA Request: DHS/CBP

Synopsis: The Integrated Fixed Towers (IFT) Program. The IFT system will assist agents in detecting, tracking, identifying and classifying items of interested along our Nation's borders through a series of fixed sensor towers. The acquisition will consist of surveillance equipment mounted on fixed tower(s).

---

**The Plaintiff's "Product Grouping" Intellectual Property subject matter is illustrated in Plaintiff's Patent(s) specifications.** Patent No. 11/397,118 – 7,385,497:

FIELD OF THE INVENTION:

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical, biological, radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

SUMMARY OF THE INVENTION:

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system 10 for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering

labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system 10 includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated.
CLAIMS:

6. The multi sensor detection and lock disabling system of claim 1 wherein the products to be monitored can be grouped into at least two product categories based on similarities of design, similarities of materials, and similarities of security problems.

12. The multi sensor detection and lock disabling system of claim 7 wherein the products to be monitored can be grouped into at least two anti-terrorist product groupings based on the categories of similarities of design, similarities of material composition, and similarities of security problems.

**Judge Wheeler; Court of Federal Claims:** *MOLINA HEALTHCARE INC. v. The United States*; **Case No. 17-97C; Consideration and Authority** "[T]he Government offered consideration in the form of risk corridor payments under Section 1342. In return, Moda offered performance under the contract by providing QHPs to consumers on the [] Exchanges. Therefore, there was consideration." *Moda Health Plan*, 130 Fed. Cl. at 465. Finally, the Secretary of HHS has actual authority to contract on the Government's behalf. Id. Section 1342 explicitly authorized the Secretary to "establish and administer" the risk corridor program and make risk corridor payments. Id. Moreover, the Secretary is responsible for administering the ACA generally. Id. (citing §§ 1301(a)(1)(C)(iv), 1302(a)-(b), 1311(c)-(d)). Given that Section 1342 represented an offer by the Government, and the Secretary was charged with overseeing the execution of that contract, the Secretary had authority to contract on the Government's behalf..." "For these reasons, the Court in Moda Health Plan found that "the ACA created an implied-in-fact contract with insurers like Moda" and "[t]he Government has breached the contract by failing to make full risk corridor payments as promised." Id. at 465-66."

When considering Judge Wheeler's opinion above in *MOLINA HEALTHCARE INC. v. The United States*; Case No. 17-97C on consideration and authority: Each of the Government Agencies offered consideration in the form of award funding, royalty payments, or the purchase of Plaintiff's patents. In return the Plaintiff offered performance under the contracts by providing the Government and consumers products developed that are covered by the Plaintiff's patents. Given that the solicitations represented an offer by the Government, and the Secretaries are charged with the execution of the contracts, the Secretaries had authority to contract the Gov't.

# PRODUCT GROUPING: (DETECTION SYSTEMS)



Stall-to-Stop System

Multi-Sensor
Detection System

Cell Phone Detection System

External Lock
Disabling System

Composite Cargo Container
Detection System

Internal Lock
Disabling System

**Illustration 1**

# PRODUCT GROUPING: (PRODUCTS & PERSONNEL)



1. Mail Carrier
2. Postman
3. Newspaper Vending Machine

1. Cargo Plane
2. Pilot
3. Captain
4. Cargo Ship

1. Cargo Train
2. Conductor
3. Subway Driver
4. Subway Train

1. Cargo Containers
2. Dock Worker
3. Truck Driver
4. Tractor Trailer

1. Warehouse
2. Security Guard
3. Utility Vehicle

1. Mini Storage Building
2. Bus Driver
3. Bus

**Illustration 2**

# PRODUCT GROUPING: (NETWORK)



MSDS - MULTI SENSOR DETECTION SYSTEM

STSS - STALL-TO-STOP SYSTEM

CCCDS - COMPOSITE CARGO CONTAINER DETECTION SYSTEM

ILDS - INTERNAL LOCK DISABLING SYSTEM

ELDS - EXTERNAL LOCK DISABLING SYSTEM

CPDS - CELL PHONE DETECTION SYSTEM

Illustration 3

# PRODUCT GROUPING: (NETWORK; WIRELESS NETWORK; WIRELESS MESH NETWORK)



**Illustration 4**

**Judge Margaret Sweeney; Court of Federal Claims:** *XP VEHICLES, INC. and LIMNIA, INC. V. The United States*; **Case No. 12-774C; Contract Claims Against the United States Arising Under the Tucker Act.** "When alleging that the federal government entered into a contract, a plaintiff must establish "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance[;] and (4) 'actual authority' on the part of the government's representative to bind the government." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc); accord *Anderson v. United States*, 85 Fed. Cl. 532, 542 (2009); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)."

The mutuality is that each party above has the intent to contract. The consideration is in award funding, royalties from a non-exclusive license, or purchase of Plaintiff's intellectual property. The Plaintiff made an offer and each Party accepted. Each Party above has the authority to bind the Government in contract.

**Government Breach of Implied-in-Fact Contracts with Plaintiff that resulted in a Government "Takings" of Property under the Fifth Amendment Clause. Chief Judge Margaret Sweeney;** *Christy, Inc. v. The United States*; **Opinion and Order; Case No. 18-657C; filed January 29, 2019:**

> ""The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 298 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc)."

Whenever the Government use with the public or contracts with other third party contractors for the development of Plaintiff's Intellectual Property Subject Matter—infringement is not a pre-requisite for this requirement—without just compensation, the Government has taken the Plaintiff's property; be it private or personal; be it a property or franchise; be it land or patent; be it a right or a contract.

# IMPLIED-IN-FACT CONTRACT & EXPRESS CONTRACT WITH DHS: EDWARD TURNER & DOUGLAS LANE FOR THE *"NEW & IMPROVE"* CELL PHONE

## Elements of an Expressed Contract

(1) Offer: An offer is a promise to act or refrain from acting, which is made in exchange for a return promise to do the same. Some offers anticipate not another promise being returned in exchange but the performance of an act or forbearance from taking action;

(2) Acceptance: An acceptance is only valid, however, if the offeree knows of the offer, the offeree manifests an intention to accept, and the acceptance is expressed as an unequivocal and unconditional agreement to the terms of the offer;

(3) Consideration: Each party to a contract must provide something of value that induces the other to enter the agreement. The law calls this exchange of values "consideration." The value exchanged need not consist of currency. Instead, it may consist of a promise to perform an act;

(4) Mutuality of obligation: Under this doctrine, both parties must be bound to perform their obligations and the law will treat the agreement as if neither party is bound to perform;

(5) Competency and Capacity: A natural person who enters a contract possesses complete legal capacity to be held liable for the duties he or she agrees to undertake, unless the person is a minor, mentally incapacitated, or intoxicated;

(6) A Written Instrument in Certain Circumstances: In many jurisdictions long term leases, insurance contracts, agreements for the sale of securities, and contracts for the sale of goods above a specified amount are unenforceable unless the terms of the parties' agreement are memorialized in writing; and,

(7) Contract Formation under the U.C.C.: The U.C.C. does not require a specific manner of expression in order for two parties to enter into an agreement. Under § 2-204, "A contract... may be made in any manner sufficient to show agreement, including offer and acceptance, conduct by both parties which recognizes the existence of a contract" and other means. The... U.C.C... also allows a contract to be formed through the interaction of "electronic agents," ...computer programs... initiate transaction without human review. Retrieved from: USLeagal .com. https://contracts.uslegal.com/elements-of-a-contract/contract-formation-under-the-u-c-c/

54

The Plaintiff and Mr. Douglas ("Doug") Lane, contractor for the Department of Homeland Security (DHS), had a meeting of the minds (i.e. an implied-in-fact contract) when Mr. Lane contacted the Plaintiff and asked the Plaintiff if he would be willing to travel to DC to meet with himself and Mr. Edward ("Ed") Turner program manager for the Department of Homeland Security (DHS).

The Plaintiff and Mr. Doug Lane had a meeting of the minds (i.e. an implied-in-fact contract) when the Plaintiff made an offer in a read-ahead document forwarded to Mr. Lane and Mr. Turner, and Mr. Lane and Mr. Turner accepted the strategies, subject matter, and technical rational as outlined to be of significant importance to the DHS.

Consideration was given when the Plaintiff provided the DHS with something of value. That value included strategies, subject matter, and the technical rational for securing our Nation. The Government's value was in the form of funding by means of a contract, royalties from a non-exclusive license, or the sale of the Plaintiff's intellectual property subject matter in the form of a Patent.

Both parties had a mutuality of obligation and intent to contract when the parties agreed that a "Sole Source" contract was the route to take: *"To be eligible for a "sole source" contract and to participate in the 8(a) Business Development Program, an applicant firm must be a small business that is at least 51% owned and controlled by a socially- and economically-disadvantaged individual (or individuals) who are of good character and citizen(s) of the United States. The firm, moreover, must show a potential for success."*

During the meeting the Plaintiff presented the "technical rational" for protecting our nation under the strategies of "dual-use technology" and "product grouping technology" (Exhibit 3). The Plaintiff's lead engineer, Mr. Harold Kimball, presented the "technical rational" for a more specialized area of cargo container tracking and border security integration with a "new and improve" cell phone (Exhibit 4). The Plaintiff demonstrated he and his team was capable of handling the contract.

Mr. Lane, Mr. Turner, and the Secretary of DHS, breached the implied-in-fact contract because they took the Plaintiff's intellectual property subject matter and used it for the benefit of the public without paying just compensation. Mr. Lane, Mr. Turner, and the Secretary of DHS, breached the implied-in-fact contract because the "sole source", the Plaintiff agreed too, never matured into a contract. The DHS directed my attention to an alternate "venue".

# ATPG Technology, LLC

### *Anti-Terrorism Product Grouping*

**Larry Golden, CEO**
**522 Peach Grove Place, Mauldin, SC 29662**
**E-mail: lgolden5605@charter.net**
**Bus. 864-288-5605 / Mobile: 864-320-0012**

January 17, 2008

Edward Turner
Program Manager
Department of Homeland Security
Science & Technology Directorate

Re: "Multi sensing detection and disabling locking device"

Dear Mr. Turner:

### "Dual-Use" Technologies and the "Product Grouping" Strategies:

**"Dual-Use" Technologies:** ....Dual-use technologies offer dual economies in the war on terrorism. They reduce costs by increasing production volume. But just as important, they expand the base of designers, testers and users, thus greatly expanding the number of smart people evaluating and improving them. Cheaper products and more brainpower--a powerful one-two punch.... Saving lives, saving money and saving the environment in one program...

**"Product Grouping" Strategies:** The strategy is to group anti-terrorism systems devices, detectors, and scanners with communication methods like GPS, RF, cell phones and cell towers, navigation, internet, wireless, telematics, satellite, alarms, and electronic communication to deter and/or prevent terrorist acts, activities or threats while making it economically feasible for commercialization...The advantages of "Product Grouping" are: products uniform, greater specialization, optimum utilization of workers and machinery, low production cost per unit, low stock-piling cost, production control is simplified, high sales turnover, and equipment standardized.

**Biometric Cell Phone with Keypad:** Can be used as a SCD for the detectors and sensors embedded in a dock worker or inspector's cell phone case, belt etc... The biometric cell phone can also be used to receive codes for unlocking and resetting the lock disabling device once an authorized person is identified. If the driver of a truck carrying a cargo container across country is stalled-to-stopped, the driver can use the biometric cell phone to identify himself and a signal is sent to open the doors.

**Targeted Area:** Project Manager and Patent-pending technology for a (CPU) that handles multiple sensors, devices, systems, detectors and scanners to protect and secure containers.
**Company Name:** ATPG Technology, LLC (Lead Company for this Project)

**Targeted Area:** Laboratory for Testing.
**Company Name:** U.S. Army Edgewood Chemical Biological Center (ECBC)

**Targeted Area:** Chemical, Explosive, Radiological, and Nuclear detection
**Company Name:** Oak Ridge National Laboratory

# Container Tracking and Detection Technology Design and Implementation

ATPG – Larry Golden
and
ETI – Harold Kimball

## *Cell Phone Device* Design

*Smart Phone* – roving SCD

Bluetooth allows communication with SMDs

Uses cell network to relay communications between SMD and base station/control center

## Port System Design

Containers equipped with SMD/SCD network

Port employees equipped with *Cell Phone device*

Port Control Center equipped with base station/control center software

## Transport Truck System Design

Container equipped with SMD/SCD network

Truck driver equipped with *cell phone device*

Container can communicate with control centers

*Cell network*

RF modems

Satellite phone

Truck driver's *cell phone device* can communicate with container network and control center

From: "Lane, Douglas <CTR>" <doug.lane@associates.dhs.gov>
To: lgolden5605@charter.net, atpg-tech@charter.net
Cc: doug.lane@associates.dhs.gov

Mon. Jan. 28, 2008 2:27 PM

Mr. Golden;

It was a pleasure meeting with you last week. We look forward to having
future discussions with you.

Doug Lane
DHS(S&T)

---

From: "Lane, Douglas <CTR>" <doug.lane@associates.dhs.gov>
To: lgolden5605@charter.net, atpg-tech@charter.net
Cc: doug.lane@associates.dhs.gov

Wed. Dec. 3, 2008 8:35 AM

You should have received another email notifying you that we are in the
process of identifying an alternate venue.

Please let me know if you do not.

Doug Lane
SETA Support
DHS(S&T)

---- "Lane wrote:
Sent on behalf of Mr. David Masters:

To Whom It May Concern:

Thank you for your prior interest in the Department of Homeland Security Science and Technology Safe Container (SAFECON) program. This email is to inform you of a similar effort recently initiated here at DHS S&T nicknamed project TRUST. In short, the TRUST project is similar to SAFECON in its goal of detecting dangerous cargo in maritime shipping containers. However, rather than detecting the dangerous cargo in 45 seconds while the container is being lifted off of or onto the ship (SAFECON), TRUST utilizes long dwell technology to take advantage of the time the container is in transit aboard the container carrying ship.

Details of the program are described in a recently posted Request for Information (RFI) (link provided below). As part of the RFI, we are sponsoring a workshop scheduled for 11-12 December 2008 where we intend to provide additional detail on project TRUST and allow you to ask questions. We have just recently decided to hold the workshop at the California Maritime Academy in Vallejo, CA. For more details on the workshop, look for an amendment to be posted to the RFI on the website (www.fbo.gov <http://www.fbo.gov/).

Link to FedBizOps announcement:
https://www.fbo.gov/index?s=opportunity&mode=form&id=1c530b9ec981437b62c
/d37034f63d9c9&tab=core&_cview=0

We look forward to meeting with you and discussing ways in which we can work together to make our nation safer.
Sincerely,

David Masters,
Program Manager

Department of Homeland Security (DHS); Science & Technology Directorate

58

## IMPLIED-IN-FACT CONTRACT & EXPRESS CONTRACT WITH DHS: EDWARD TURNER & DOUGLAS LANE FOR THE *NEW & IMPROVE*" CELL PHONE

The Plaintiff and Mr. David Masters, program manager for the Department of Homeland Security (DHS), had a meeting of the minds (i.e. an implied-in-fact contract) when Mr. Masters (by way of Mr. Lane) sent an email out inviting the Plaintiff to attend a Department of Homeland Security (DHS) S&T "TRUST" Industry Day Workshop (Exhibit 5) that was held in Sacramento, CA on Dec. 11-12, 2008. In the email Mr. Masters writes: "We look forward to meeting with you and discussing ways in which we can work together to make our nation safer".

The Plaintiff, Mr. David Masters and Mr. Masters Board of Evaluators had a meeting of the minds (i.e. an implied-in-fact contract) when the Plaintiff made an offer in a "TRUST" RFI document presented to Mr. Masters at the Industry Day, and Mr. Masters accepted the strategies, subject matter, and technical rational as outlined to be of significant importance to the DHS.

Consideration was given when the Plaintiff provided the DHS with something of value. That value included strategies, subject matter, and the technical rational for securing our Nation. The Government's value was in the form of funding by means of a contract, royalties from a non-exclusive license, or the sale of the Plaintiff's intellectual property subject matter in the form of a Patent.

Both parties had a mutuality of obligation and intent to contract when the parties agreed that the contract will be awarded to the Plaintiff. Mr. Masters walked the Plaintiff out to his vehicle after the meeting and stated, *"You have the patents for the technology we are seeking and a qualified team to perform the work; we have no other choice but to award you the contract."*

Nine months after the Industry Day Workshop the DHS S&T and Mr. Masters released the "TRUST" solicitation (Exhibit 6). The Plaintiff's demonstrated he and his team was capable of handling the contract in a response (Exhibit 7) to the "TRUST" solicitation.

Mr. Davis, and the Secretary of DHS, breached the implied-in-fact contract because they took the Plaintiff's intellectual property subject matter and used it for the benefit of the public without paying just compensation. Mr. Davis, and the Secretary of DHS, breached the express contract because iControl Inc., L-3 Services Inc., and MIT (Exhibit 8) was awarded contracts for the development of a cargo container detection device, an interface or gateway device, a locking device, and a *"new and improve"* cell phone for connecting all of the devices.

# DHS Science & Technology Directorate

# TRUST

(Time Recorded Ubiquitous Sensor Technologies)

## Industry Day Workshop
## Sacramento, CA.
## December 11-12, 2008

David Masters
TRUST Program Manager
Science and Technology Directorate



Time Recorded Ubiquitous
Sensor Technologies (TRUST)
Solicitation Number: HSHQDC-09-BAA09-17
Agency: Department of Homeland Security
Office: Office of the Chief Procurement Officer
Location: Office of Procurement Operations

## BROAD AGENCY ANNOUNCEMENT; (BAA) 09-17
## "Time Recorded Ubiquitous Sensor Technologies"; (TRUST)
### Posted: September 23, 2009

### Includes the

## "Marine Asset Tag Tracking System"; (MATTS)
### and the
## "Marine Asset Tag Tracking System Lock"; (M-Lock)

**Introduction**

DHS and several other agencies have identified the need to detect and identify weapons of mass destruction (WMD), other threats, and contraband materials being transported in cargo shipping containers. Such a system could be used to interdict and deter the transportation of these materials to greatly improve the security of the maritime supply chain. Agency components such as Customs and Border Protection (CBP), United States Coast Guard (USCG), Transportation Security Administration (TSA), and others share a mission to secure our borders and transportation systems, not only from a devastating attack using WMD materials, but also in the discovery and capture of smuggled narcotics, weapons, agricultural products, humans, and other contraband materials. In order to meet these challenges, a new, more capable detection system is needed...

This solicitation is focused on the development and demonstration of a small, portable system prototype installed and operating inside a maritime shipping container while in transit to detect WMD, contraband, and anomalous substances... DHS-S&T has designated the "Time Recorded Ubiquitous Sensor Technologies (TRUST)" Project...

- The TRUST device is envisioned to be packaged as a single "brick".
- operate without intervention as an in-situ device to detect and identify WMD threats, contraband, and substances contained within a sealed maritime shipping container; (pg. 4)
- a single system installed and operating internal to the container...; (pg. 4)
- capable of collecting and monitoring a sample that characterizes all the atmosphere; (pg. 4)
- capable of alerting a positive detection during transit... a maximum of 21 days); (pg. 4)
- capable of communicating with a physical interface mounted outside the container, such as the Marine Asset Tag Tracking System (MATTS), GPS and M-Lock; (pg. 4)

Note 1: For the purpose of the TRUST Project, WMD substances are defined as chemical and biological mass casualty agents, radiological and nuclear materials, explosives, and human cargo (CBRNE & P). Contraband is defined as any illegal commerce, not limited to illicit drugs and agricultural threats.

# "TRANSMITTAL LETTER"

## Broad Agency Announcement
## (BAA) 09-17
## "Time Recorded Ubiquitous Sensor Technologies" (TRUST)

The Homeland Security Act of 2002 (Public Law 107-296) states that DHS S&T will "support basic and applied homeland security research to promote revolutionary changes in technologies; advance the development, testing and evaluation, and deployment of critical homeland security technologies; and accelerate the prototyping and deployment of technologies that would address homeland security vulnerabilities."

# ATPG
# Technology, LLC
*(Anti-Terrorism Product Grouping)*

**Larry Golden, CEO**
**522 Peach Grove Place, Mauldin, SC 29662**
**E-mail: atpg-tech@charter.net**
**Bus. 864-288-5605 / Mobile: 864-992-7104**
**Facsimile: 864-288-5605**

Date: 11/07/09

To: Director of Innovation

From: Larry Golden
      Larry Golden CEO, ATPG Technology, LLC

Dear Sir:

I want to first thank you for offering this solicitation in an effort to secure our sea shores and borders from the potential threat of someone placing a WMD inside a cargo container. This proposal includes 7 years of research, patents and discussions with DHS. I hope and pray you are pleased with my work.

This proposal has not been submitted to any other Government Agency.

Proposal prepared and submitted by:        Larry Golden
                                                Authorized Signature



# Homeland Security

JAN 1 9 2010

ATPG Technology, LLC
Attn: Larry Golden
522 Peach Grove Place
Mauldin, SC 29662-3407
atpg-616@charter.net

Dear Mr. Golden:

This letter is in reference to your Full Proposal, submitted in response to the U. S. Department of Homeland Security (DHS) – Science & Technology Directorate's (S&T) Broad Agency Announcement (BAA) 09-17, "Time Recorded Ubiquitous Sensor Technologies (TRUST)," which was posted on the Federal Business Opportunities and DHS BAA websites.

Your Full Proposal was reviewed by a panel of federal evaluators in accordance with the evaluation factors set forth in the announcement. Based on this peer review, your organization was not selected for award under this BAA.

Pursuant to the competitive selection under Federal Acquisition Regulation (FAR) Subpart 35.016, the following award information is being provided:

> Number of Offers: 23
> Name of Awardee: L-3 Services, Inc.

We appreciate your participation in response to this BAA, and hope that your organization will seek other opportunities to compete on future DHS announcements. We encourage you to continue monitoring the Federal Business Opportunities website (https://www.fbo.gov) and the DHS BAA website (https://www.baa.st.dhs.gov) for future DHS-S&T business opportunities. Your efforts to propose potential technology solutions towards meeting DHS requirements are very much appreciated.

Should you require feedback on your Full Proposal, please send your written request to the BAA09-17 mailbox (baa09-17@dhs.gov) following the guidance contained in FAR Subpart 35.008 (d).

Sincerely,

Joseph F. Wolfinger
Contracting Officer
Office of Procurement Operations
S&T Acquisition Division

Respectfully submitted,

S/ _____

Larry Golden

Plaintiff, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing "PLAINTIFF'S RESPONSE

TO THE GOVERNMENT'S MOTION DISMISS PLAINTIFF'S GOVERNMENT TAKINGS

CLAIMS UNDER THE FIFTH AMENDMENT CLAUSE: CASE NUMBER 13-307C" was

sent on April 12, 2019 via U.S. Postal service "priority express mail", to:

NICHOLAS J. KIM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Email: *Nicholas.J.Kim@USDOJ.gov*
Telephone: (202) 616-8116
Facsimile: (202) 307-0345

# EXHIBIT 5

## THE "ATPG" PROJECT

# THE "ATPG PROJECT"

The Plaintiff-Appellant's Intellectual Property Subject Matter for the
Communicating, Monitoring, Detecting, and Controlling (CMDC) Device

*antedates*

Apple's First Patent for a CMDC Device and the Department of Homeland
Security's (the United States) First Solicitation (the DHS S&T Cell-All
Initiative) for a CMDC Device. The First Government Contracts for the
Development, Manufacture, and Commercialization of a CMDC Device that is
substantially the same as the Plaintiff-Appellant's CMDC Device was Awarded
to Apple, Samsung, LG, and Qualcomm in the year 2008.

| Apple's 1st Patent for the Smartphone (i.e. electronic device) ornamental design: First application filing date is January 5, 2007 (App. # D/270,887) | Plaintiff's Specifications for the Detector Case (i.e. electronic device) ornamental design: USPTO Disclosure Document filed Nov. 17, 2004; First application filing date is April 5, 2006 (App. # 11/397,118) |
|---|---|
| Electronic Device: "The device (i.e. electronic device) which controls the flow of electrons is called electronic device. These devices are the main building blocks of electronic circuits. The various electronic devices are computers, mobile phones, etc." Retrieved from: https://www.physics-and-radio-electronics.com/electronic-devices-and-circuits.html | Electronic Device: The detector case includes a power source (battery or electrical)… A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates |
| FIG. 1 is a front perspective view of an electronic device in accordance with the present design. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 2 is a rear perspective view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 3 is a front view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |

| | |
|---|---|
| FIG. 4 is a rear view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 5 is a top view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 6 is a bottom view for the electronic device. | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 7 is a left side view for the electronic device; and, | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 8 is a right side view for the electronic device | The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| The broken lines depicted in FIGS. 1, 2, and 6 of the inner rectangle, at the center bottom of the electronic device, represent the bounds of the claimed design, while the broken lines inside the rectangle, shown only in FIG. 6, are directed to environment and are for illustrative purposes only; the broken lines from no part of the... design. | Fig. 1 is an illustrative drawing of the rectangle design of the detector case; and, Fig. 17 are illustrative drawings of the rectangle design of the cell phone (i.e. smartphone) and the cell phone detector case |

3

| | |
|---|---|
| The article is not limited to the scale shown herein. As indicated in the title, the article of manufacture to which the ornamental design has been applied is an electronic device. *Examples of an electronic device are a computer, a portable or hand-held device, a personal digital assistant, a communication device (e.g., cellular phone), a novelty item, toy, and/or the like*. | FIG. 15 is a representative schematic view of... a monitoring PC or computer terminal. It is another objective of the present invention to provide... products grouped together by common features in several product groupings such as design similarity... product grouping strategy has been developed wherein products... having the same or similar design... [i]n addition to grouping products together by features, designs and materials... *FIG. 17 is a perspective view... of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case* |
| The first iPhone featured a two-tone back that was mostly made of aluminum — a design element that the company would return to this year with the release of the iPhone 5 with a predominantly metal back. Apple's interim devices opted for different materials: The iPhone 3G and 3GS had plastic backs, while the iPhone 4 and 4S backs were made of glass. Retrieved from: https://appleinsider.com/articles/12/12/18/apple-wins-patent-for-first-iphone-designed-by-jobs-ive | ... [P]roduct grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design... [i]n addition to grouping products together by features, designs and materials... the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted)... the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include... mobile communication devices... personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs)... handhelds |

4

| The DHS S&T Cell-All Initiative request for an improved cell phone with detection capability. *"A utility patent is a patent that covers the creation of a new or improved—and useful—product, process, or machine"*. | Plaintiff's Integrated CMDC Device is a Cell Phone and the Cell Phone Detection Device (Claim 23 of Patent Number 9,589,439) |
|---|---|
| A *new or improved cell phone* comprising: | A cell phone comprising: |
| a central processing unit (CPU) for executing and carrying out the instructions of a computer program for a *new or improved cell phone* | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; |
| a transmitter for transmitting signals and messages to a *Synkera MikroKera Ultra Detection Device*; a receiver for receiving signals from the; *Synkera MikroKera Ultra Detection Device* | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection for a *new or improved cell phone* | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; |

| | |
|---|---|
| the cell phone is at least a fixed, portable or mobile communication device interconnected to the *Synkera MikroKera Ultra Detection Device*, capable of wired or wireless communication therebetween; and | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and |
| whereupon the *new or improved cell phone* is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the *Synkera MikroKera Ultra Detection Device*; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; |
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the *new or improved cell phone* | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; |
| wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver of the *new or improved cell phone* | wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; |

| | |
|---|---|
| wherein the *new or improved cell phone* is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the *new or improved cell phone* is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and |
| whereupon a signal sent to the receiver of the *Synkera MikroKera Ultra Detection Device* from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the *new or improved cell phone*. | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. |

7

DHS; S&T Directorate; "Cell-All" Request: Adding the 1st Ind. claim of the 1st Patent issued '497 to the Complainant (filed 04-05-06), illustrates infringement of Complainant's claimed invention the same as: Ind. claim 1 of the '189 Patent; Ind. claim 22 of the '439 Patent; and, Ind. claim 5 of the '287 Patent. An example of the infringement is demonstrated below in a claim chart using the specifications of LG Electronics (i.e. LG is representative of the specifications of Apple, Samsung, and Qualcomm) for the development, manufacture, and commercialization of a Cell-All "WMD Electronic Detection Device". The *Synkera "MikroKera Ultra"* integration with the Electronic Detection Device is also added.

| LG Electronics: Electronic Detection Device | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,589,439; Independent Claim 22 | Patent #: 9,096,189; Independent Claim 1 | Patent #: 7,385,497; Independent Claim 1 |
|---|---|---|---|---|---|
| DHS; S&T "Cell-All" initiative. Develop detection device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million electronic devices (i.e. cell phones) | A monitoring device, comprising: | A cell phone comprising: *Note: This claim 23 of the '439 patent covers the 'new and improved' cell phone (utility patent requirement) the DHS requested in its Cell-All solicitation* | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: |
| The performance of LG's electronic detection devices: CPU that's at the core of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between a host computer and other devices; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | a detector case including a front side, a rear side, a power source and a Central Processing Unit (cpu); *Note: Golden's Patents for the Detector Case (i.e. CMDC device; electronic device) ornamental design that antedates Apple's 1st Patent for the Smartphone (i.e. electronic device) ornamental design is illustrated in a chart included in this document* |

| | | | | | |
|---|---|---|---|---|---|
| LG electronic detection devices has an internal temperature sensor which monitors the CPU and battery temperature of device | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X | X | X |
| LG electronic detection devices, starting with LG G2, you can calibrate the motion sensor by going to Settings > General tab > Motion. | at least one motion sensor in communication with the at least one CPU; | X | X | X | X |
| LG's electronic detection devices: Thin Q has "the brightest" screen of any smartphone, thanks to its Super Bright Display technology. | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X | X | each detector including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor |
| LG's electronic detection devices: GPS with A-GPS, GLONASS, and BDS | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | whereupon a signal sent to the receiver of at least one of… a cell phone detection device… from a satellite or a cell phone tower or… a GPS connection… causes a signal that includes at least one of location data or sensor data to be sent to the communication device… | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection, or GPS connection; | an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; |

| | | | | |
|---|---|---|---|---|
| LG's electronic detection devices: Wi-Fi, Wi-Fi Direct | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein at least one of a… WiFi connection, internet connection… capable of signal communication with… the communication device, the receiver of the communication device, or the central processing unit (CPU). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi…   X |
| LG's electronic detection devices: cellular connection; Bluetooth | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short range radio frequency (RF) connection, or GPS connection;   X | X |
| After multiple unsuccessful attempts, the LG electronic detection will automatically perform a factory data reset and all of the personal files will be erased. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks;   X | an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and |

4

| | | | | | |
|---|---|---|---|---|---|
| Battery Charging Specification, is power drawn from a USB port for charging. Three different sources of power: Standard downstream port (SDP), charging downstream port (CDP), and dedicated charging port (DCP). Wireless charging | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X | X | an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; |
| LG's electronic detection device features include sensors for face/smile detection, iris scanner, and fingerprint recognition. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use; | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use | X |

5

| | | | | | |
|---|---|---|---|---|---|
| *Cell-All:* A wireless, wearable, mobile, device detects and identify chemicals in the air and sends detection data to another phone or a computer<br><br>LG Watch Sport Smartwatch wireless, wearable, mobile, electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans; | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween... | a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector case; |
| *Cell-All:* The device detects and identify chemicals in the air and sends detection data to another phone (e.g. LG Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of one specific chemical, biological and radiological agent and compound; |

| The LG electronic detection device, NFC is a short-range high frequency wireless communication technology; enables the exchange of data between devices; share content between digital devices. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU... | X | the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device; | X | X |
|---|---|---|---|---|---|
| Voice Mate (i.e. Quick Voice; Q Voice) built-in application for various LG electronic detection devices (i.e. smartphone); automatic activation features; when car engine is started; lock and unlock doors, activate and deactivate security systems. LG SmartThinQ® app for smart home appliances built on an open platform, so it will work with evolving smart technologies and devices for years to come. *Cell-All*: The device detects and identify chemicals sends to another phone | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or... detect at least one of a chemical biological... agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and initiates signal transmission from the cpu to the automatic/mechanical lock disabler to lock or disable the lock of the product thereby preventing further contamination about the product and denying access to the product by unauthorized, untrained and unequipped individuals. |

| | | | | |
|---|---|---|---|---|
| Voice Mate (i.e. Quick Voice; Q Voice) built-in application for various LG electronic detection devices (i.e. smartphone); automatic activation features; when car engine is started; lock and unlock doors, activate and deactivate security systems. LG SmartThinQ® app for smart home appliances built on an open platform, so it will work with evolving smart technologies and devices… | X | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | X |
| LG's electronic detection devices (i.e. at least LG G5 & LG V10 smartphones, and LG Watch Sport Smartwatch | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | X | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | X |

8

| | | | | | |
|---|---|---|---|---|---|
| *Cell-All:* The device detects and identify chemicals in the air and sends detection data to another phone (e.g. LG Smartphone) or a computer "How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X | X | X |

DHS; S&T Directorate; "Cell-All" Request: Adding the 1st Ind. claim of the 1st Patent '497 issued to the Complainant (filed 04-05-06), illustrates infringement of Complainant's claimed invention the same as: Ind. claim 1 of the '189 Patent; Ind. claim 22 of the '439 Patent; and, Ind. claim 5 of the '287 Patent. An example of the infringement is demonstrated below in a claim chart using the specifications of Apple Inc. (i.e. Apple is representative of the specifications of LG, Samsung, and Qualcomm) for the development, manufacture, and commercialization of a Cell-All "WMD Electronic Detection Device". The *Synkera "MikroKera Ultra"* integration with the Electronic Detection Device is also added.

| Apple Inc.: Electronic Detection Device | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,589,439; Independent Claim 22 | Patent #: 9,096,189; Independent Claim 1 | Patent #: 7,385,497; Independent Claim 1 |
|---|---|---|---|---|---|
| DHS; S&T "Cell-All" initiative. Develop detection device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million electronic devices (i.e. cell phones) | A monitoring device, comprising: | A cell phone comprising:<br><br>*Note: This claim 23 of the '439 patent covers the 'new and improved' cell phone (utility patent requirement) the DHS requested in its Cell-All solicitation* | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: |
| The performance of Apple's electronic detection devices: CPU that's a part of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between a host computer and other devices; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | a detector case including a front side, a rear side, a power source and a Central Processing Unit (cpu);<br><br>*Note: Golden's Patents for the Detector Case (i.e. CMDC device; electronic device) ornamental design that antedates Apple's 1st Patent for the Smartphone (i.e. electronic device) ornamental design is illustrated in a chart included in this document* |

| | | | | | |
|---|---|---|---|---|---|
| Apple Files Patent for a new Temperature Sensor tied to a new Interactive Battery Indicator | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X | X | X |
| Apple's electronic detection devices: Apple M-series coprocessors are motion coprocessors used by Apple Inc. in their mobile devices. | at least one motion sensor in communication with the at least one CPU; | X | X | X | X |
| Apple's electronic detection devices: Highest absolute color accuracy; full screen brightness; full screen contrast; contrast ratio; lowest screen reflectance; smallest brightness variation | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X | X | each detector including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor |
| Apple's electronic detection device: GPS with A-GPS, GLONASS | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | whereupon a signal sent to the receiver of at least one of… a cell phone detection device… from a satellite or a cell phone connection… causes a signal that includes at least one of location data or sensor data to be sent to the communication device… | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection, or GPS connection; | an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; |

| | | | | |
|---|---|---|---|---|
| Apple's electronic detection device: Wi-Fi, dual-band, hotspot | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein at least one of a… WiFi connection, internet connection… capable of signal communication with… the communication device, the receiver of the communication device, or the central processing unit (CPU). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi… | X |
| Apple's electronic detection device: cellular connection; Bluetooth | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short range radio frequency (RF) connection, or GPS connection; | X | X |
| Apple's electronic detection device includes a feature on that disables and erases all of the devices data after 10 failed passcode attempts. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; | X | an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and |

| | | | | | |
|---|---|---|---|---|---|
| Apple's electronic detection device batteries and wall chargers which employ USB PD have the ability to charge devices up to 100W output using a USB-C connector | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X | X | an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; |
| Apple's electronic detection device features include sensors for face/smile detection, and fingerprint recognition. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use; | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use | X |

| | | | | | |
|---|---|---|---|---|---|
| **Cell-All:** A wireless, wearable, mobile, device detects and identify chemicals in the air and sends detection data to another phone or a computer<br><br>Apple Watch Series 3 electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans; | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween... | a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector case; |
| **Cell-All:** The device detects and identify chemicals in the air and sends detection data to another phone (e.g. Apple iPhone) or a computer<br>"How does it work?"<br>Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center.<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of one specific chemical, biological and radiological agent and compound; |

| | | | | | |
|---|---|---|---|---|---|
| The Apple electronic detection device, NFC is a short-range high frequency wireless communication technology; enables the exchange of data between devices; share content between digital devices. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device; | X | X |
| Apple's Viper SmartStart: Start, locate and control your car with your iPhone, or Apple Watch. "Nice": Manages the gate and garage door from your iPhone or Apple Watch using the Home app (i.e. voice) Siri. Apple HomeKit is a system that controls smart home devices. Viper system in your car so you can start, lock and unlock your car<br><br>*Cell-All*: The device detects and identify chemicals in the air sends detection data to another phone | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and initiates signal transmission from the cpu to the automatic/mechanical lock disabler to lock or disable the lock of the product thereby preventing further contamination about the product and denying access to the product by unauthorized, untrained and unequipped individuals. |

16

| | | | | |
|---|---|---|---|---|
| Apple's Viper SmartStart: Start, locate and control your car with your iPhone, or Apple Watch. "Nice": Manages the gate and garage door from your iPhone or Apple Watch using the Home app (i.e. voice) Siri. Apple HomeKit is a system that controls smart home devices. Viper system in your car so you can start, lock and unlock your car | X | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | X |
| Apple electronic detection devices (i.e. at least iPhone 7 & iPhone 8 smartphones, and Apple Watch Series 3 | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | X | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection... short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | X |

| | | | | | |
|---|---|---|---|---|---|
| **Cell-All:** The device detects and identify chemicals in the air and sends detection data to another phone (e.g. Apple Smartphone) or a computer "How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X | X | X |

DHS; S&T Directorate; "Cell-All" Request: Adding the 1st Ind. claim of the 1st Patent '497 issued to the Complainant (filed 04-05-06), illustrates infringement of Complainant's claimed invention the same as: Ind. claim 1 of the '189 Patent; Ind. claim 22 of the '439 Patent; and, Ind. claim 5 of the '287 Patent. An example of the infringement is demonstrated below in a claim chart using the specifications of Samsung Electronics (i.e. Samsung is representative of the specifications of LG, Apple, and Qualcomm) for the development, manufacture, and commercialization of a Cell-All "WMD Electronic Detection Device". The *Synkera "MikroKera Ultra"* integration with the Electronic Detection Device is also added.

| Samsung: Electronic Detection Device | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,589,439; Independent Claim 22 | Patent #: 9,096,189; Independent Claim 1 | Patent #: 7,385,497; Independent Claim 1 |
|---|---|---|---|---|---|
| DHS; S&T "Cell-All" initiative. Develop detection device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million electronic devices (i.e. cell phones) | A monitoring device, comprising: | A cell phone comprising:<br><br>*Note: This claim 23 of the '439 patent covers the 'new and improved' cell phone (utility patent requirement) the DHS requested in its Cell-All solicitation* | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: |
| The performance of Samsung's electronic detection devices: CPU that's a part of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between a host computer and other devices; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | a detector case including a front side, a rear side, a power source and a Central Processing Unit (cpu);<br><br>*Note: Golden's Patents for the Detector Case (i.e. CMDC device; electronic device) ornamental design that antedates Apple's 1st Patent for the Smartphone (i.e. electronic device) ornamental design is illustrated in a chart included in this document* |

| | | | | | |
|---|---|---|---|---|---|
| Samsung's electronic detection devices has various sensors like the temperature sensor for the battery and the CPU or processor. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X | X | X |
| Samsung's electronic detection devices accelerometers handle axis-based motion sensing—reason why the smartphone can track steps without a separate wearable. | at least one motion sensor in communication with the at least one CPU; | X | X | X | X |
| Samsung's electronic detection device has set the bar with the highest-rated smartphone displays. With a panel produced by Samsung, and optimized by Apple | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X | X | each detector including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor |
| Samsung's electronic detection device: GPS with A-GPS, GLONASS, BDS, GALILEO | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | whereupon a signal sent to the receiver of at least one of… a cell phone detection device… from a satellite or a cell phone tower or… a GPS connection… causes a signal that includes at least one of location data or sensor data to be sent to the communication device… | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection, or GPS connection; | an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; |

21

| | | | | | |
|---|---|---|---|---|---|
| Samsung's electronic detection device: Wi-Fi, dual-band, Wi-Fi Direct, hotspot | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein at least one of a… WiFi connection, internet connection… capable of signal communication with… the communication device, the receiver of the communication device, or the central processing unit (CPU). | wherein the only type or types of communication with the transmitter and the receiver of the… device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi… | X |
| Samsung's electronic detection device: cellular connection; Bluetooth | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short range radio frequency (RF) connection, or GPS connection; | X | X |
| Samsung's electronic detection device: After several unsuccessful log-in attempts using a passcode or fingerprint, a Samsung device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; | X | an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and |

22

| | | | | | |
|---|---|---|---|---|---|
| Samsung's electronic detection devices Fast Charge power bank has a capacity of 5,100mAh and can provide up to 1.5 charges for the majority of smartphones. The power bank has an LED power indicator; comes with a micro USB cable and a micro USB to USB Type-C adapter. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X | X | an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; |
| Samsung's electronic detection devices allows fingerprints to set-up the fingerprint scanner for easy log-in and lock-out. Face unlock uses the front-facing camera to identify the user and unlock the device. Iris scanning uses special sensors on front of phone to identify and unlock the device. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use; | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop… is locked by the biometric lock disabler to prevent unauthorized use | X |

23

| | | | | | |
|---|---|---|---|---|---|
| ***Cell-All***: wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Samsung S3 Classic electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans; | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween... | a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector case; |
| ***Cell-All***: The device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone (e.g. Samsung Smartphone) or a computer "How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center.<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of one specific chemical, biological and radiological agent and compound; |

| | | | | | |
|---|---|---|---|---|---|
| Samsung's electronic detection device, near-field communication (NFC) Ring can unlock the device. The NFC Ring has two NFC tag inlays inside the ring and can be used to unlock & control mobile devices | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device; | X | X |
| The Samsung SmartThings contains: one SmartThings Hub, two SmartThings Multipurpose Sensors, one SmartThings Motion Sensor, and one SmartThings Outlet. Connects to appliances, lights, locks, cameras, thermostats, sensors. Get alerts on smartphone if motion in the home. BMW Digital Key to lock/unlock; and start it up with Samsung phones only. **Cell-All:** The device detects and identify chemicals in the air using a "sample jet" sends detection data to another phone | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and initiates signal transmission from the cpu to the automatic/mechanical lock disabler to lock or disable the lock of the product thereby preventing further contamination about the product and denying access to the product by unauthorized, untrained and unequipped individuals. |

| | | | | |
|---|---|---|---|---|
| The Samsung SmartThings Home Monitoring Kit contains: one SmartThings Hub, two SmartThings Multipurpose Sensors, one SmartThings Motion Sensor, and one SmartThings Outlet. Connects to appliances, lights, speakers, locks, cameras, thermostats, sensors. Get alerts on smartphone if there's unexpected entry or motion in the home. | X | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | X |
| Samsung electronic detection devices (i.e. at least the Galaxy Note 8 & Galaxy S8 smartphones, and Samsung Gear S3 Classic | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | X | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | X |

| | | | | | |
|---|---|---|---|---|---|
| **Cell-All**: The device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone (e.g. Samsung Smartphone) or a computer "How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center.<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X | X | X |

DHS; S&T Directorate; "Cell-All" Request: Adding the 1st Ind. claim of the 1st Patent '497 issued to the Complainant (filed 04-05-06), illustrates infringement of Complainant's claimed invention the same as: Ind. claim 1 of the '189 Patent; Ind. claim 22 of the '439 Patent; and, Ind. claim 5 of the '287 Patent. An example of the infringement is demonstrated below in a claim chart using the specifications of Qualcomm Inc. (i.e. Qualcomm is representative of the specifications of LG, Apple, and Samsung) for the development, manufacture, and commercialization of a Cell-All "WMD Electronic Detection Device". The *Synkera "MikroKera Ultra"* integration with the Electronic Detection Device is also added.

| Qualcomm: Electronic Detection Device | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,589,439; Independent Claim 22 | Patent #: 9,096,189; Independent Claim 1 | Patent #: 7,385,497; Independent Claim 1 |
|---|---|---|---|---|---|
| DHS; S&T "Cell-All" initiative. Develop detection device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million electronic devices (i.e. cell phones) | A monitoring device, comprising: | A cell phone comprising:<br><br>*Note: This claim 23 of the '439 patent covers the 'new and improved' cell phone (utility patent requirement) the DHS requested in its Cell-All solicitation* | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: |
| The Snapdragon central processing unit (CPU) uses a single SoC that may include multiple CPU cores, a wireless modem, and other software and hardware to support a smartphone's global positioning system (GPS), camera, gesture recognition and video. The Snapdragon system on chip (SoC) was announced in Nov. 2006. | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between a host computer and other devices; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | a detector case including a front side, a rear side, a power source and a Central Processing Unit (cpu);<br><br>*Note: Golden's Patents for the Detector Case (i.e. CMDC device; electronic device) ornamental design that antedates Apple's 1st Patent for the Smartphone (i.e. electronic device) ornamental design is illustrated in a chart included in this document* |

| | | | | | |
|---|---|---|---|---|---|
| Qualcomm® Bluetooth® Low Energy Solutions Environmental Sensor Board Sensors: Accelerometer sensor, Temperature sensor, Pressure sensor, Magnetometer sensor, Humidity sensor, Gyro/angular sensor | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X | X | X |
| Snapdragon sensor engine supports course motion classification, which determines standing, resting, walking, running, driving, or parking. | at least one motion sensor in communication with the at least one CPU; | X | X | X | X |
| Qualcomm TruPalette display tech is supported by Qualcomm Snapdragon processors | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X | X | each detector including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor |

| | | | | | |
|---|---|---|---|---|---|
| The Snapdragon central processing unit (CPU) uses a single SoC that may include multiple CPU cores, a wireless modem, and other software and hardware to support a smartphone's global positioning system (GPS), camera, gesture recognition and video | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | whereupon a signal sent to the receiver of at least one of… a cell phone detection device… from a satellite or a cell phone tower or… a GPS connection… causes a signal that includes at least one of location data or sensor data to be sent to the communication device… | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection, or GPS connection; | an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; |
| Apple iPhone 8; Qualcomm Modem Model A1663; 802.11ac Wi Fi with MIMO; Bluetooth 5.0 wireless technology; NFC with reader mode. | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein at least one of a… WiFi connection, internet connection… capable of signal communication with… the communication device, the receiver of the communication device, or the central processing unit (CPU). | wherein the only type or types of communication with the transmitter and the receiver of the… device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi… | X |
| Apple iPhone 7; Qualcomm Modem Model A1660; 802.11ac Wi Fi with MIMO; Bluetooth 4.2 wireless cellular technology; NFC with reader mode. | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short range radio frequency (RF) connection, or GPS connection; | X | X |

| | | | | | |
|---|---|---|---|---|---|
| Qualcomm Technologies SafeSwitch is available through its Qualcomm Snapdragon processors. SafeSwitch technology - addresses mobile security threat with a kill switch solution designed to remotely disable the devices in the event they're lost or stolen - then re-enable when found. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; | X | an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and |
| Qualcomm Quick Charge: Qualcomm's Snapdragon SoCs is used in a number of popular smartphones and tablets, has its own fast-charging standard. Quick Charge is a technology found in Qualcomm SoCs, used in devices such as mobile phones, for managing power delivered over USB. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X | X | an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; |

| | | | | | |
|---|---|---|---|---|---|
| Authenticating beyond secure fingerprint identification, a Snapdragon 835 Mobile Platform provides safety using Camera Security—a camera-based biometric solution for iris and facial recognition. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use; | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop… is locked by the biometric lock disabler to prevent unauthorized use | X |

| | | | | | |
|---|---|---|---|---|---|
| **Cell-All**: wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Samsung Gear S2 3G Watch & Samsung Gear S Watch (Qualcomm Snapdragon 400 Processor); LG Watch Sport & LG G Watch R & LG Watch Urban (Qualcomm Snapdragon 400 Processor) for chem / bio / human heart rate detection and monitoring | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans; | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween... | a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector case; |

| | | | | | |
|---|---|---|---|---|---|
| **Cell-All**: The device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone (e.g. Apple, Samsung, LG, Smartphone) or a computer "How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center.<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of one specific chemical, biological and radiological agent and compound; |
| Qualcomm include NXP's near-field communication (NFC) solution in the Snapdragon processor platform that powers mobile devices (e.g. smartphones), wearables (e.g. smartwatches), and automobiles. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device; | X | X |

35

| | | | | | |
|---|---|---|---|---|---|
| Qualcomm Technologies developed the QCA4020 tri-mode connectivity system-on-chip (SoC), the IoT industry's first commercially sampling connectivity solution that integrates three major radios in one low-power, cost-optimized chip. Connecting IoT devices like Refrigerators, TVs, security systems, thermostats, door locks. The Snapdragon 820A enables the driver attention-sensing cameras and autonomous controls to fingerprint-based door locks. *Cell-All*: The device detects and identify chemicals in the air using a "sample jet" sends detection data to another phone | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or... detect at least one of a chemical biological... agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and initiates signal transmission from the cpu to the automatic/mechanical lock disabler to lock or disable the lock of the product thereby preventing further contamination about the product and denying access to the product by unauthorized, untrained and unequipped individuals. |

| | | | | |
|---|---|---|---|---|
| Qualcomm Technologies developed the QCA4020 tri-mode connectivity system-on-chip (SoC), the IoT industry's first commercially sampling connectivity solution that integrates three major radios in one low-power, cost-optimized chip. Connecting IoT devices like Refrigerators, TVs, counter top appliances, security systems, thermostats, door locks. | X | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | X |
| Qualcomm's IoT include: Qualcomm® Snapdragon™ processors and LTE modems, Bluetooth, Wi-Fi, GNSS and NFC. Qualcomm Technologies RF solutions includes multimode and multiband RF transceivers. Qualcomm's Qualcomm RF360 Front End Solution, addresses cellular radio frequency band fragmentation and enables a single, global 4G LTE design for mobile devices. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | X | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | X |

| | | | | | |
|---|---|---|---|---|---|
| **Cell-All**: The device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone (e.g. Apple, Samsung, LG, Smartphone) or a computer "How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center.<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X | X | X |

| "Cell-All": Samsung Galaxy s6 | Patent #: 9,589,439; Independent Claim 14 | Patents: 8,106,752; & RE 43,990; Dependent Claims |
|---|---|---|
| Synkera presented the MikroKera Ultra Module at the DHS-S&T "Cell-All" demonstration in Los Angeles on Sept. 28, 2011. Synkera offers a digital module for use of MikroKera Ultra chemical sensors. Synkera has been funded by DHS S&T "Cell-All" project to develop sensors suitable for integration into cell phones (e.g. Samsung Galaxy s6). The Ultra is available with or without case. The MikroKera Ultra Module is interconnected to monitoring equipment through Bluetooth communications. The monitoring equipment is a Samsung Galaxy s6 smartphone with Android (O/S). | Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: | 18. The communication device [of claim 11] wherein the communication device having a basic monitoring terminal can be adapted and incorporated to include desktop computers, notebook, PC's, laptops, cell phones, smart phones, LCD monitors, and satellite monitoring. |
| MIT: A Samsung Galaxy smartphone-based sensing strategy can use chemiresponsive nanomaterials integrated into the circuitry of near-field communication tags to achieve portable detection and discrimination of gas phase chemicals (e.g., ammonia, hydrogen peroxide, cyclohexanone, and water). The galaxy's smartphone heart rate monitor is known as a Biosensor – Pulse/Oxy IC. The heart rate monitor shines a red/infrared light through the finger and measures the pulse as the heart beats. The fingerprint scanner: a touch sensor incorporated into the home button. | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment; | 118. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of sensors for detecting at least one of a chemical, biological, radiological, nuclear, explosive and contraband agents and compounds which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case. |

| | | |
|---|---|---|
| Samsung Galaxy s6 CPU (Central Processing Unit) - otherwise known as a processor - is an electronic circuit that can execute computer programs. Modern microprocessors appear in everything from automobiles to mobile phones. Quad-core 1.5 GHz Cortex-A53 & Quad-core 2.1 GHz Cortex-A57 | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | 12. The communication device [of claim 11] wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). |
| The Samsung Galaxy S6 capable of receiving a signal from the factory to reset (unlock) the phone. Indicator icons: Shows the information needed to operate the device, such as the received or transmitted signal strength, device battery level, time, unread Emails, missed calls, etc. Infrared Blaster: Emits infrared signals used for controlling external devices. | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |
| The Samsung Galaxy S6 capable of receiving a signal from the factory to reset (unlock) the phone. Indicator icons: Shows the information needed to operate the device, such as the received or transmitted signal strength, device battery level, time, unread Emails, missed calls, etc. Infrared Blaster: Emits infrared signals used for controlling external devices. | a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| The Samsung Galaxy S6 Edge is smart lock enabled, meaning you won't need to offer up a fingerprint, pin or password to unlock the handset if a trusted Bluetooth device is near. The S6 instantly registers a fingerprint and unlocks. Samsung Galaxy's "Find My Mobile" remotely locate the phone via its onboard GPS chip, remotely lock the device with a passcode and remotely cause the device to emit a loud ring. The Samsung Galaxy S6 capable of automatically transmitting a signal to lock after several failed log-in attempts. | a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | 34. The automatic/mechanical lock disabler system [of claim 33] wherein the automatic/mechanical lock disabler is designed to be used with or without biometrics for authentication and identification, thereby allowing access to the product by authorized, trained and equipped individuals and preventing access to the product by unauthorized, untrained, and equipped individuals. (8,106,752) |
| The Samsung Galaxy S6 can determine location using its built-in Global Positioning System (GPS) transmitter, Wi-Fi networks, and mobile networks. WLAN: Wi-Fi 802.11 a/b/g/n/ac, dual-band, Wi-Fi Direct, hotspot. Bluetooth: v4.1, A2DP, LE, apt-X | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| | | |
|---|---|---|
| Seven wireless interfaces now found in the Samsung Galaxy S6 high-end smartphone - Frequency Division Duplex Cellular, Time Division Duplex Cellular, Wi-Fi, Bluetooth, GNSS (Global Navigation Satellite System), Near-Field Communication, and Wireless Charging | monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | 20. The communication device [of claim 11] wherein the communication device can be interconnected through wire or wireless for communication, signals, commands and transmission of data. |
| The Samsung Galaxy S6 Edge is smart lock enabled, meaning you won't need to offer up a fingerprint, pin or password to unlock the handset if a trusted Bluetooth device is near. The S6 instantly registers a fingerprint and unlocks. Samsung Galaxy's "Find My Mobile" remotely locate the phone via its onboard GPS chip, remotely lock the device with a passcode and remotely cause the device to emit a loud ring. The Samsung Galaxy S6 capable of automatically transmitting a signal to lock after several failed log-in attempts. | whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | 34. The automatic/mechanical lock disabler system [of claim 33] wherein the automatic/mechanical lock disabler is designed to be used with or without biometrics for authentication and identification, thereby allowing access to the product by authorized, trained and equipped individuals and preventing access to the product by unauthorized, untrained, and equipped individuals. (8,106,752) |

| | | |
|---|---|---|
| Seven wireless interfaces now found in the high-end Samsung Galaxy s6 smartphone - Frequency Division Duplex Cellular, Time Division Duplex Cellular, Wi-Fi, Bluetooth, GNSS (Global Navigation Satellite System), Near-Field Communication, and Wireless Charging. The Samsung Galaxy s6 include receivers for GPS. The Samsung Galaxy S6 Edge is smart lock enabled, meaning you won't need to offer up a fingerprint, pin or password to unlock the handset if a trusted Bluetooth device is near. The S6 instantly registers a fingerprint and unlocks. The Samsung Galaxy s6 heart rate monitor also known as a Biosensor - Pulse/Oxy IC. | wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | 124. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have products to be monitored, the devices that are monitoring, communication devices, communication equipment can be grouped into anti-terrorist product groupings based on the categories of similarities of design of at least one of: sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices...; similarities in material composition..., similarities in security problems of at least one of: theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents, detection for weapons of mass destruction, biometrics for identifying terrorist...; grouping security devices to form a network of ubiquitous sensing and detecting. |
| The Samsung Galaxy S6 can determine location using its built-in Global Positioning System (GPS) transmitter, Wi-Fi networks, and mobile networks. WLAN: Wi-Fi 802.11 a/b/g/n/ac, dual-band, Wi-Fi Direct, hotspot. Bluetooth: v4.1, A2DP, LE, apt-X | wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is in signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products. | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| "Cell-All": Apple iPhone | Patent #: 9,589,439; Independent Claim 20 | Patents: 8,106,752; & RE 43,990; Dependent Claims |
|---|---|---|
| The "Cell-All" initiative. The Department of Homeland Security's (DHS) Science and Technology Directorate (S&T), Cell-All aims "to equip your cell phone with a sensor capable of detecting deadly chemicals", says Stephen Dennis, Cell-All's program manager. S&T pursued cooperative agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. Jing Li, a physical scientist at NASA's Ames Research Center, developed new technology that would bring compact, low-cost, low-power, high-speed nanosensor-based chemical sensing chip which consists of 64 nanosensors and plugs into an Apple iTouch 30-pin dock connector. The device is designed to be plugged in to an Apple iPhone to collect, process and transmit sensor data. The new device is able to detect and identify chemicals in the air using a "sample jet" and a multiple-channel silicon-based sensing chip, which consists of 64 nanosensors, and sends detection data to another phone (e.g. Apple iPhone) or a computer via telephone communication network or Wi-Fi. | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: | 118. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of sensors for detecting at least one of a chemical, biological, radiological, nuclear, explosive and contraband agents and compounds which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case. Patent # RE43,990 specifications: Illustrated in FIGS. 1-19 is a multi-sensor detection and lock disabling system 10 for preventing terrorist activity by monitoring, detecting, and securing those critical areas, sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities... As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product, such as... sitting upon a seaport dock or pier 20... The detector case 12 can be modified and adapted... Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case 12 are shown as being incorporated into cell phone detector case. |

| | | |
|---|---|---|
| Jing Li, a physical scientist at NASA's Ames Research Center, developed new technology that would bring compact, low-cost, low-power, high-speed nanosensor-based chemical sensing chip which consists of 64 nanosensors and plugs into an iTouch 30-pin dock connector. The device is about the size of a postage stamp and to be plugged in to an Apple iPhone to collect, process and transmit sensor data. | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | 118. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of sensors for detecting at least one of a chemical, biological, radiological, nuclear, explosive and contraband agents and compounds which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case. |
| The device is about the size of a postage stamp and is designed to be plugged in to an iPhone to collect, process and transmit sensor data. The new device is able to detect and identify chemicals in the air using a "sample jet" and a multiple-channel silicon-based sensing chip, which consists of 64 nanosensors, and sends detection data to another phone (e.g. iPhone) or a computer via telephone communication network or Wi-Fi. | monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween; | 18. The communication device [of claim 11] wherein the communication device having a basic monitoring terminal can be adapted and incorporated to include desktop computers, notebook, PC's, laptops, cell phones, smart phones, LCD monitors, and satellite monitoring. |

| | | |
|---|---|---|
| If the Apple Touch ID doesn't recognize your finger, you'll be asked to try again. After five failed attempts, you'll be given the option of entering your Apple ID password. In addition, you will need to enter your Apple ID password after: (1) Restarting your device, and (2) Enrolling or deleting fingers. If your device is lost or stolen, you can immediately disable Touch ID from being used to unlock your device with Find My iPhone Lost Mode. iOS 7 (or later) offers additional protection against theft with Activation Lock, which requires an Apple ID and password to turn off Find My iPhone, erase data, or reactivate your device. | wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | 34. The automatic/mechanical lock disabler system [of claim 33] wherein the automatic/mechanical lock disabler is designed to be used with or without biometrics for authentication and identification, thereby allowing access to the product by authorized, trained and equipped individuals and preventing access to the product by unauthorized, untrained, and equipped individuals. (8,106,752) |
| Cellular carriers have extremely precise GPS measurements of the locations of all their towers. With a database of such towers, you can take measurements of the signal strength of those within range—which may be dozens—and trilateration to find an area that overlaps among them. Apple uses AGPS for native GPS-lock improvements, and Wi-Fi network and cell tower locations are additional factors in providing a fast initial connection along with improving GPS accuracy. | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment; | 92. The multi-sensor detection system [of claim 81], further comprising a global positioning system (GPS) receiver adapted for communication with at least one satellite. |

| | | |
|---|---|---|
| Apple iPhone to collect, process and transmit sensor data. The new device is able to detect and identify chemicals in the air using a "sample jet" and a multiple-channel silicon-based sensing chip, which consists of 64 nanosensors, and sends detection data to another phone (e.g. Apple iPhone, Apple Satellite Phone) or a computer via telephone communication network or Wi-Fi. | at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |
| The Apple iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPhone to connect to the internet anywhere cell phone works, to check emails. | at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; and | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |
| Cellular carriers have precise GPS measurements of locations of all their towers. With a database of such towers, you can take measurements of the signal strength of those within range and trilateration to find an area that overlaps among them. Apple uses AGPS for native GPS-lock improvements, and Wi-Fi network and cell tower locations are additional factors in providing a fast connection along with improving GPS accuracy. | whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short range radio frequency or a long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data; | 92. The multi-sensor detection system [of claim 81], further comprising a global positioning system (GPS) receiver adapted for communication with at least one satellite. |

| | | |
|---|---|---|
| The Apple iPhone is implemented: "Similarly, S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes. As a result, Dennis hopes to have 40 prototypes in about a year, the first of which will sniff out carbon monoxide and fire. | wherein the multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity; | 124. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have products to be monitored, the devices that are monitoring, communication devices, communication equipment can be grouped into anti-terrorist product groupings based on the categories of similarities of design of at least one of: sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices...; similarities in material composition..., similarities in security problems of at least one of: theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents, detection for weapons of mass destruction, biometrics for identifying terrorist...; grouping security devices to form a network of ubiquitous sensing and detecting. |

| | | |
|---|---|---|
| The device is about the size of a postage stamp and is designed to be plugged in to an iPhone to collect, process and transmit sensor data. The new device is able to detect and identify chemicals in the air using a "sample jet" and a multiple-channel silicon-based sensing chip, which consists of 64 nanosensors, and sends detection data to another phone (iPhone) or computer via telephone communication network or Wi-Fi. | wherein the multi-sensor detection device is for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | 118. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of sensors for detecting at least one of a chemical, biological, radiological, nuclear, explosive and contraband agents and compounds which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case. |
| Apple iPhone to collect, process and transmit sensor data. The new device is able to detect and identify chemicals in the air using a "sample jet" and a multiple-channel silicon-based sensing chip, which consists of 64 nanosensors, and sends detection data to another phone (e.g. Apple iPhone, Apple Satellite Phone) or a computer via telephone communication network or Wi-Fi. | wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short range radio frequency connection is in signal communication with a transmitter and a receiver of the monitoring equipment or multi-sensor detection device and transceivers of the products. | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| "Cell-All": Synkera MikroKera Ultra | Patent #: 7,385,497; Independent Claim 1 | Patents: 7,385,497; 8,106,752; & RE 43,990; Dependent Claims |
|---|---|---|
| Synkera presented the MikroKera Ultra Module at the Department of Homeland Security S&T "Cell-All" demonstration in Los Angeles on September 28, 2011. Synkera offers a general purpose digital module for evaluation and use of MikroKera Ultra chemical sensors. Synkera Technologies has been funded by DHS to develop sensors that are suitable for integration into cell phones and other ubiquitous electronic devices carried by first responders and the public at large. The DHS S&T "Cell-All" project goal is to develop sensors that can detect life-threatening gases to be incorporated into cell phones. One feature of the Synkera MikroKera Ultra is: available with or without case. | A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: | 2. The multi sensor detection and lock disabling system [of claim 1] wherein each detector is capable of being utilized as a stand-alone scanner for detecting the chemical, biological and radiological agents and compounds. (7,385,497) |
| Synkera MikroKera Ultra module (detector case) includes a front side, a rear side, a Central Processing Unit (cpu), and a power source that is battery, USB or AC adapter. | a detector case including a front side, a rear side, a power source and a Central Processing Unit (cpu); | 4. The multi sensor detection and lock disabling system [of claim 1] wherein the power source for the detector case can be a battery source. (7,385,497) |

| | | |
|---|---|---|
| Light-emitting diode (LED) indicators for sensor status and state of battery charge | a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of one specific chemical, biological and radiological agent and compound; | 119. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of indicator lights with each indicator light corresponding to one chemical, biological, radiological, nuclear explosive and contraband agent or compound which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case and lighting up upon detection of that specific agent or compound for providing visual confirmation of the detection. (RE 43,990) |
| The Samsung Galaxy s6, GPS and internet capabilities as leverage for the Synkera MikroKera Ultra module (detector case) GPS connection and internet connection. Synkera MikroKera Ultra module (detector case) includes a power connection that is USB or AC adapter. | an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; | 2. The multi sensor detection and lock disabling system [of claim 1] wherein each detector is capable of being utilized as a stand-alone scanner for detecting the chemical, biological and radiological agents and compounds. (7,385,497) |

| | | |
|---|---|---|
| Synkera is now engineering new packaging solutions that take advantage of the extremely small active area of the MikroKera Ultra sensor. We have already demonstrated a 2-sensor array on a SMT-style package (an 8-pin SOIC), and have designs for a 3-sensor array in an even smaller 3x3x1mm package. Co-packaging this design with integrated circuitry (required to capture the sensor signal) will allow for this sensor to be embedded in modern smartphones. One feature of the Synkera MikroKera Ultra is: available with or without case. | a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector case; | 2. The multi sensor detection and lock disabling system [of claim 1] wherein each detector is capable of being utilized as a stand-alone scanner for detecting the chemical, biological and radiological agents and compounds. (7,385,497) |
| The Samsung Galaxy s6, sound alarm indicator capabilities as leverage for the Synkera MikroKera Ultra module (detector case) sound alarm indicator. Synkera MikroKera Ultra module (detector case) includes Light-emitting diode (LED) indicators for sensor status. | each detector including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor; | 29. The communication device [of claim 11] wherein the communication device has a display or LCD screen for visualization of the status of the sensors and other data reporting information. (RE 43,990) |

| | | |
|---|---|---|
| The Samsung Galaxy s6, automatic lock disabler capabilities as leverage for the Synkera MikroKera Ultra module (detector case) automatic lock disabler. After several unsuccessful log-in attempts using a passcode or fingerprint, a Samsung device automatically locks itself up as a security feature. If the user is unable to log in to the phone after doing all the available security layers, there's no other option left for the user to do but to have the phone unlocked. | an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and | 34. The automatic/mechanical lock disabler system [of claim 33] wherein the automatic/mechanical lock disabler is designed to be used with or without biometrics for authentication and identification, thereby allowing access to the product by authorized, trained and equipped individuals and preventing access to the product by unauthorized, untrained, and equipped individuals. (8,106,752) |
| The Samsung Galaxy s6, sound alarm indicator capabilities as leverage for the Synkera MikroKera Ultra module (detector case) sound alarm indicator. Synkera MikroKera Ultra module (detector case) includes Light-emitting diode (LED) indicators for sensor status. The Samsung Galaxy s6, automatic lock disabler capabilities as leverage for the Synkera MikroKera Ultra module (detector case) automatic lock disabler. After several unsuccessful log-in attempts, a Samsung device automatically locks itself up as a security feature. | whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and initiates signal transmission from the cpu to the automatic/mechanical lock disabler to lock or disable the lock of the product thereby preventing further contamination about the product and denying access to the product by unauthorized, untrained and unequipped individuals. | 37. The automatic/mechanical lock disabler system [of claim 36] wherein the automatic/mechanical lock disabler has a plurality of indicator lights with each indicator light corresponding to one chemical, biological, radiological, nuclear, explosive, and contraband agent or compound to include indicator lights corresponding to detecting humans, motion, temperature, shock and tampering which is capable of being disposed within the detector case and lighting up upon detection of that specific agent or compound for providing visual confirmation of the detection. (8,106,752) |



COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE

- 2 CELLULAR
- 3 WIRELESS/CELLULAR MODEM
- 6 OPERATING SYSTEM (OS)
- 8 GATEWAY - INTERFACE
- 1 COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)
- 4 SATELLITES
- 5 GLOBAL POSITIONING SYSTEM (GPS)
- 7 INTERNET WiFi
- 9 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
- 10 BIOMETRIC FINGERPRINT FACIAL IRIS
- 11 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

INTERCONNECTION CAPABILITIES
- 12
- 13 CBRN-E DETECTION DEVICE
- 14 INFRARED DETECTION OF HUMANS
- 15 BIOMETRIC IDENTIFICATION DEVICE
- 16 WEARABLE MEDICAL DEVICE - CHEM/BIO MONITORING
- 17 SMARTWATCH DETECTION CHEM/BIO/HUMAN+HEARTRATE
- 18 VEHICLE STALL-STOP-SLOWDOWN, LOCKS, IGNITION, TEMPERATURE
- 19 UNMANNED VEHICLES; LAND, AIR, WATER AUTONOMOUS VEHICLES
- HOME BUILDING MONITORING LOCK, UNLOCK DOOR, ETC

RESPONDENT'S MOBILE DEVICE LG V30
- 22 CELLULAR
- 26 OPERATING SYSTEM (OS)
- 23 WIRELESS/CELLULAR MODEM
- 20 GATEWAY - INTERFACE
- 21 RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)
- 24 SATELLITES
- 25 GLOBAL POSITIONING SYSTEM (GPS)
- 27 INTERNET WiFi
- 28 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
- 29 BIOMETRIC FINGERPRINT FACIAL IRIS
- 30 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS



COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE

2 — CELLULAR

3 — WIRELESS/ CELLULAR MODEM

6 — OPERATING SYSTEM (OS)

8 — GATEWAY - INTERFACE

1 — COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)

4 — SATELLITES

5 — GLOBAL POSITIONING SYSTEM (GPS)

7 — INTERNET WiFi

9 — DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS

10 — BIOMETRIC FINGERPRINT FACIAL IRIS

11 — RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

INTERCONNECTION CAPABILITIES

12 —

13 — CBRN-E DETECTION DEVICE

14 — INFRARED DETECTION OF HUMANS

15 — BIOMETRIC IDENTIFICATION DEVICE

16 — WEARABLE MEDICAL DEVICE - CHEM/BIO MONITORING

17 — SMARTWATCH DETECTION CHEM/BIO/HUMAN+HEARTRATE

18 — VEHICLE STALL-STOP-SLOWDOWN, LOCKS, IGNITION, TEMPERATURE

19 — UNMANNED VEHICLES; LAND, AIR, WATER AUTONOMOUS VEHICLES

HOME BUILDING MONITORING LOCK, UNLOCK DOOR, ETC

RESPONDENT'S MOBILE DEVICE LG G6

22 — CELLULAR

26 — OPERATING SYSTEM (OS)

23 — WIRELESS/ CELLULAR MODEM

20 — GATEWAY - INTERFACE

21 — RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)

24 — SATELLITES

27 — INTERNET WiFi

25 — GLOBAL POSITIONING SYSTEM (GPS)

28 — RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

29 — BIOMETRIC FINGERPRINT FACIAL IRIS

30 — DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS



COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE

2 — CELLULAR

3 — WIRELESS/ CELLULAR MODEM
6 — OPERATING SYSTEM (OS)

1 — COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)

8 — GATEWAY - INTERFACE

4 — SATELLITES

5 — GLOBAL POSITIONING SYSTEM (GPS)
7 — INTERNET WiFi

9 — DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
10 — BIOMETRIC FINGERPRINT FACIAL IRIS
11 — RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

INTERCONNECTION CAPABILITIES

12 —
13 — CBRN-E DETECTION DEVICE
14 — INFRARED DETECTION OF HUMANS
15 — BIOMETRIC IDENTIFICATION DEVICE
16 — WEARABLE MEDICAL DEVICE - CHEM/BIO MONITORING
17 — SMARTWATCH DETECTION CHEM/BIO/HUMAN+HEARTRATE
18 — VEHICLE STALL-STOP-SLOWDOWN, LOCKS, IGNITION, TEMPERATURE
19 — UNMANNED VEHICLES; LAND, AIR, WATER AUTONOMOUS VEHICLES

HOME BUILDING MONITORING LOCK, UNLOCK DOOR, ETC

RESPONDENT'S MOBILE DEVICE GALAXY S8

22 — CELLULAR

26 — OPERATING SYSTEM (OS)
23 — WIRELESS/ CELLULAR MODEM

20 — GATEWAY - INTERFACE

21 — RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)

27 — INTERNET WiFi
25 — GLOBAL POSITIONING SYSTEM (GPS)

24 — SATELLITES

28 — RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
29 — BIOMETRIC FINGERPRINT FACIAL IRIS
30 — DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS



COMPLIANANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE

- WIRELESS/CELLULAR MODEM — 3
- OPERATING SYSTEM (OS) — 6
- COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU) — 1
- GLOBAL POSITIONING SYSTEM (GPS) — 5
- INTERNET WiFi — 7
- GATEWAY - INTERFACE — 8

2 — CELLULAR
4 — SATELLITES

9 — DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
10 — BIOMETRIC FINGERPRINT FACIAL IRIS
11 — RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

INTERCONNECTION CAPABILITIES — 12

- CBRN-E DETECTION DEVICE — 13
- INFRARED DETECTION OF HUMANS — 14
- BIOMETRIC IDENTIFICATION DEVICE — 15
- WEARABLE MEDICAL DEVICE - CHEM/BIO MONITORING — 16
- SMARTWATCH DETECTION CHEM/BIO/HUMAN+HEARTRATE — 17
- VEHICLE STALL-STOP-SLOWDOWN, LOCKS, IGNITION, TEMPERATURE — 18
- UNMANNED VEHICLES; LAND, AIR, WATER AUTONOMOUS VEHICLES — 19
- HOME BUILDING MONITORING LOCK, UNLOCK DOOR, ETC

RESPONDENT'S MOBILE DEVICE GALAXY NOTE 8

- OPERATING SYSTEM (OS) — 26
- WIRELESS/CELLULAR MODEM — 23
- RESPONDENT'S CENTRAL PROCESSING UNIT (CPU) — 21
- INTERNET WiFi — 27
- GLOBAL POSITIONING SYSTEM (GPS) — 25
- GATEWAY - INTERFACE — 20

22 — CELLULAR
24 — SATELLITES

28 — RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
29 — BIOMETRIC FINGERPRINT FACIAL IRIS
30 — DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS



COMPLAINANT'S
COMMUNICATION, MONITORING
DETECTING, CONTROLLING (CMDC) DEVICE

2 CELLULAR

3 WIRELESS/CELLULAR MODEM

6 OPERATING SYSTEM (OS)

1 COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)

8 GATEWAY - INTERFACE

4 SATELLITES

5 GLOBAL POSITIONING SYSTEM (GPS)

7 INTERNET WiFi

9 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS

10 BIOMETRIC FINGERPRINT FACIAL IRIS

11 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

INTERCONNECTION CAPABILITIES

12

13 CBRN-E DETECTION DEVICE

14 INFRARED DETECTION OF HUMANS

15 BIOMETRIC IDENTIFICATION DEVICE

16 WEARABLE MEDICAL DEVICE - CHEM/BIO MONITORING

17 SMARTWATCH DETECTION CHEM/BIO/HUMAN+HEARTRATE

18 VEHICLE STALL-STOP-SLOWDOWN, LOCKS, IGNITION, TEMPERATURE

UNMANNED VEHICLES; LAND, AIR, WATER AUTONOMOUS VEHICLES

19 HOME BUILDING MONITORING LOCK, UNLOCK DOOR, ETC

RESPONDENT'S MOBILE DEVICE
iPHONE 7

22 CELLULAR

26 OPERATING SYSTEM (OS)

23 WIRELESS/CELLULAR MODEM

20 GATEWAY - INTERFACE

21 RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)

24 SATELLITES

27 INTERNET WiFi

25 GLOBAL POSITIONING SYSTEM (GPS)

28 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

29 BIOMETRIC FINGERPRINT FACIAL IRIS

30 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS



COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE

3 WIRELESS/CELLULAR MODEM
6 OPERATING SYSTEM (OS)
8 GATEWAY - INTERFACE
1 COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)
5 GLOBAL POSITIONING SYSTEM (GPS)
7 INTERNET WiFi
2 CELLULAR
4 SATELLITES

9 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
10 BIOMETRIC FINGERPRINT FACIAL IRIS
11 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

12 INTERCONNECTION CAPABILITIES
13 CBRN-E DETECTION DEVICE
14 INFRARED DETECTION OF HUMANS
15 BIOMETRIC IDENTIFICATION DEVICE
16 WEARABLE MEDICAL DEVICE - CHEM/BIO MONITORING
17 SMARTWATCH DETECTION CHEM/BIO/HUMAN+HEARTRATE
18 VEHICLE STALL-STOP-SLOWDOWN, LOCKS, IGNITION, TEMPERATURE
19 UNMANNED VEHICLES; LAND, AIR, WATER AUTONOMOUS VEHICLES
HOME BUILDING MONITORING LOCK, UNLOCK DOOR, ETC

RESPONDENT'S MOBILE DEVICE iPhone 8

26 OPERATING SYSTEM (OS)
23 WIRELESS/CELLULAR MODEM
20 GATEWAY - INTERFACE
21 RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)
27 INTERNET WiFi
25 GLOBAL POSITIONING SYSTEM (GPS)
22 CELLULAR
24 SATELLITES

28 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
29 BIOMETRIC FINGERPRINT FACIAL IRIS
30 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS





COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE
2
WIRELESS/ CELLULAR MODEM
4
OPERATING SYSTEM (OS)
1
COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)
6
GATEWAY - INTERFACE
3
GLOBAL POSITIONING SYSTEM (GPS)
5
INTERNET WiFi
DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
7
BIOMETRIC FINGERPRINT FACIAL IRIS
8
RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
9
12
CELLULAR
CBRNE - H DETECTION DEVICE:
PLACED IN, ON, UPON OR ADJACENT THE COMMUNICATION MONITORING, DETECTING CONTROLLING (CMDC) DEVICE
13
LOCATION CAPABILITY
15
LOCATION CAPABILITY
10
INTERFACE
11
CPU
16
SENSORS
17
C
18
R
19
E
20
B
21
N
22
H
24
INTERFACE
POWER SOURCE
23
14
SATELLITE
RESPONDENT'S MOBILE DEVICE LG V30
OPERATING SYSTEM (OS)
WIRELESS/ CELLULAR MODEM
25
26
27
29
GATEWAY - INTERFACE
RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)
28
30
INTERNET WiFi
GLOBAL POSITIONING SYSTEM (GPS)
RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
31
BIOMETRIC FINGERPRINT FACIAL IRIS
32
DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
33

**COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE**

2 WIRELESS/ CELLULAR MODEM

4 OPERATING SYSTEM (OS)

1 COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)

3 GLOBAL POSITIONING SYSTEM (GPS)

5 INTERNET WiFi

6 GATEWAY - INTERFACE

7 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS

8 BIOMETRIC FINGERPRINT FACIAL IRIS

9 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

12 CELLULAR

**CBRNE - H DETECTION DEVICE:**

PLACED IN, ON, UPON OR ADJACENT THE COMMUNICATION MONITORING, DETECTING CONTROLLING (CMDC) DEVICE

13 LOCATION CAPABILITY

15 LOCATION CAPABILITY

14 SATELLITE

10 INTERFACE

11 CPU

16 SENSORS

17 C
18 R
19 E
20 B
21 N
22 H

24 INTERFACE

23 POWER SOURCE

**RESPONDENT'S MOBILE DEVICE LG G6**

OPERATING SYSTEM (OS)

WIRELESS/ CELLULAR MODEM

26 RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)

27

29

25 GATEWAY - INTERFACE

28 INTERNET WiFi

30 GLOBAL POSITIONING SYSTEM (GPS)

31 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

32 BIOMETRIC FINGERPRINT FACIAL IRIS

33 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS





COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE
2
WIRELESS/ CELLULAR MODEM
4
OPERATING SYSTEM (OS)
1
COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)
6
GATEWAY - INTERFACE
3
GLOBAL POSITIONING SYSTEM (GPS)
5
INTERNET WiFi
DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
7
BIOMETRIC FINGERPRINT FACIAL IRIS
8
RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
9
12
CELLULAR
CBRNE - H DETECTION DEVICE:
PLACED IN, ON, UPON OR ADJACENT THE COMMUNICATION MONITORING, DETECTING CONTROLLING (CMDC) DEVICE
13
LOCATION CAPABILITY
15
LOCATION CAPABILITY
10
INTERFACE
11
CPU
16
SENSORS
17
C
18
R
19
E
20
B
21
N
22
H
24
INTERFACE
POWER SOURCE
23
14
SATELLITE
RESPONDENT'S MOBILE DEVICE GALAXY S8
OPERATING SYSTEM (OS)
WIRELESS/ CELLULAR MODEM
25
GATEWAY - INTERFACE
26
27
29
RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)
28
30
INTERNET WiFi
GLOBAL POSITIONING SYSTEM (GPS)
RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
31
BIOMETRIC FINGERPRINT FACIAL IRIS
32
DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
33

COMPLAINANT'S
COMMUNICATION, MONITORING
DETECTING, CONTROLLING (CMDC) DEVICE

2 WIRELESS/CELLULAR MODEM

4 OPERATING SYSTEM (OS)

1 COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)

3 GLOBAL POSITIONING SYSTEM (GPS)

5 INTERNET WiFi

6 GATEWAY - INTERFACE

12 CELLULAR

CBRNE - H
DETECTION DEVICE:

PLACED IN, ON, UPON OR ADJACENT THE COMMUNICATION MONITORING, DETECTING CONTROLLING (CMDC) DEVICE

14 SATELLITE

13 LOCATION CAPABILITY

15 LOCATION CAPABILITY

10 INTERFACE

11 CPU

16 SENSORS

17 C

18 R

19 E

20 B

21 N

22 H

24 INTERFACE

23 POWER SOURCE

RESPONDENT'S MOBILE DEVICE
GALAXY NOTE 8

OPERATING SYSTEM (OS)

WIRELESS/CELLULAR MODEM

25 GATEWAY - INTERFACE

26 RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)

27

29

28 INTERNET WiFi

30 GLOBAL POSITIONING SYSTEM (GPS)

7 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS

8 BIOMETRIC FINGERPRINT FACIAL IRIS

9 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

31 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

32 BIOMETRIC FINGERPRINT FACIAL IRIS

33 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS



**COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE**

2 WIRELESS/CELLULAR MODEM

4 OPERATING SYSTEM (OS)

1 COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)

3 GLOBAL POSITIONING SYSTEM (GPS)

5 INTERNET WiFi

6 GATEWAY - INTERFACE

12 CELLULAR

10 INTERFACE

**CBRNE - H DETECTION DEVICE:**

PLACED IN, ON, UPON OR ADJACENT THE COMMUNICATION MONITORING, DETECTING CONTROLLING (CMDC) DEVICE

13 LOCATION CAPABILITY

15 LOCATION CAPABILITY

11 CPU

16 SENSORS

17 C
18 R
19 E

20 B
21 N
22 H

23 POWER SOURCE

14 SATELLITE

24 INTERFACE

25 GATEWAY - INTERFACE

**RESPONDENT'S MOBILE DEVICE iPhone 7**

26 OPERATING SYSTEM (OS)

27 WIRELESS/CELLULAR MODEM

29 RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)

28 INTERNET WiFi

30 GLOBAL POSITIONING SYSTEM (GPS)

7 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS

8 BIOMETRIC FINGERPRINT FACIAL IRIS

9 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

31 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

32 BIOMETRIC FINGERPRINT FACIAL IRIS

33 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS



**COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE**

2 — WIRELESS/ CELLULAR MODEM
4 — OPERATING SYSTEM (OS)

12 — CELLULAR

**CBRNE - H DETECTION DEVICE:**

PLACED IN, ON, UPON OR ADJACENT THE COMMUNICATION MONITORING, DETECTING CONTROLLING (CMDC) DEVICE

14 — SATELLITE

**RESPONDENT'S MOBILE DEVICE iPhone 8**

OPERATING SYSTEM (OS)
WIRELESS/ CELLULAR MODEM

1 — COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)

6 — GATEWAY - INTERFACE

13 — LOCATION CAPABILITY
15 — LOCATION CAPABILITY

10 — INTERFACE
11 — CPU
16 — SENSORS
17 — C
18 — R
19 — E
20 — B
21 — N
22 — H

24 — INTERFACE
25 — GATEWAY - INTERFACE

26
27
29

RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)

3 — GLOBAL POSITIONING SYSTEM (GPS)
5 — INTERNET WiFi

23 — POWER SOURCE

28 — INTERNET WiFi
30 — GLOBAL POSITIONING SYSTEM (GPS)

7 — DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
8 — BIOMETRIC FINGERPRINT FACIAL IRIS
9 — RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

31 — RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
32 — BIOMETRIC FINGERPRINT FACIAL IRIS
33 — DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS





COMPLAINANT'S
COMMUNICATION, MONITORING
DETECTING, CONTROLLING (CMDC) DEVICE
2
WIRELESS/
CELLULAR
MODEM
4
OPERATING
SYSTEM
(OS)
6
1
COMPLAINANT'S
CENTRAL PROCESSING UNIT
(CPU)
GATEWAY - INTERFACE
3
GLOBAL
POSITIONING
SYSTEM
(GPS)
5
INTERNET
WiFi
DISABLING
LOCK MECHANISM
AFTER MULTIPLE
FAILED ATTEMPTS
7
BIOMETRIC
FINGERPRINT
FACIAL
IRIS
8
RADIO FREQUENCY
(RF) NEAR FIELD
COMMUNICATION
(NFC)
9
12
CELLULAR
LG WATCH SPORT
14
SATELLITE
10
INTERFACE
13
CELLULAR
GPS
15
11
CPU
16
OS
17
WiFi
20
INTERFACE
NFC
18
19
CHEM/BIO
HEARTRATE
SENSORS
RESPONDENT'S MOBILE DEVICE
LG V30
OPERATING
SYSTEM
(OS)
WIRELESS/
CELLULAR
MODEM
21
22
23
25
GATEWAY - INTERFACE
RESPONDENT'S
CENTRAL PROCESSING UNIT
(CPU)
24
26
INTERNET
WiFi
GLOBAL
POSITIONING
SYSTEM
(GPS)
RADIO FREQUENCY
(RF) NEAR FIELD
COMMUNICATION
(NFC)
27
BIOMETRIC
FINGERPRINT
FACIAL
IRIS
28
DISABLING
LOCK MECHANISM
AFTER MULTIPLE
FAILED ATTEMPTS
29

COMPLAINANT'S
COMMUNICATION, MONITORING
DETECTING, CONTROLLING (CMDC) DEVICE

LG WATCH SPORT

RESPONDENT'S MOBILE DEVICE
LG G6

2 WIRELESS/ CELLULAR MODEM

4 OPERATING SYSTEM (OS)

12 CELLULAR

14 SATELLITE

13 CELLULAR

GPS

OPERATING SYSTEM (OS)

WIRELESS/ CELLULAR MODEM

6 GATEWAY - INTERFACE

10 INTERFACE

11 CPU

15

20 INTERFACE

21 GATEWAY - INTERFACE

1 COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)

16 OS

17 WiFi

22 RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)

23

25

3 GLOBAL POSITIONING SYSTEM (GPS)

5 INTERNET WiFi

24 INTERNET WiFi

26 GLOBAL POSITIONING SYSTEM (GPS)

NFC 18

19 CHEM/BIO HEARTRATE SENSORS

7 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS

8 BIOMETRIC FINGERPRINT FACIAL IRIS

9 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

27 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

28 BIOMETRIC FINGERPRINT FACIAL IRIS

29 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS



**COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE**

2 — WIRELESS/ CELLULAR MODEM

4 — OPERATING SYSTEM (OS)

1 — COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)

3 — GLOBAL POSITIONING SYSTEM (GPS)

5 — INTERNET WiFi

6 — GATEWAY - INTERFACE

7 — DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS

8 — BIOMETRIC FINGERPRINT FACIAL IRIS

9 — RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

12 — CELLULAR

**SAMSUNG GEAR S3 CLASSIC**

14 — SATELLITE

10 — INTERFACE

13 — CELLULAR

GPS

11 — CPU

15

16 — OS

17 — WiFi

20

21 — INTERFACE

18 — NFC

19 — CHEM/BIO HEARTRATE SENSORS

**RESPONDENT'S MOBILE DEVICE GALAXY S8**

OPERATING SYSTEM (OS)

WIRELESS/ CELLULAR MODEM

22 — RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)

23

24 — INTERNET WiFi

26 — GLOBAL POSITIONING SYSTEM (GPS)

25

GATEWAY - INTERFACE

27 — RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

28 — BIOMETRIC FINGERPRINT FACIAL IRIS

29 — DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS





COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE
WIRELESS/ CELLULAR MODEM
OPERATING SYSTEM (OS)
COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)
GLOBAL POSITIONING SYSTEM (GPS)
INTERNET WiFi
GATEWAY - INTERFACE
DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
BIOMETRIC FINGERPRINT FACIAL IRIS
RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
CELLULAR
SAMSUNG GEAR S3 CLASSIC
SATELLITE
INTERFACE
CELLULAR
GPS
CPU
OS
WiFi
NFC
CHEM/BIO HEARTRATE SENSORS
INTERFACE
RESPONDENT'S MOBILE DEVICE GALAXY NOTE 8
OPERATING SYSTEM (OS)
WIRELESS/ CELLULAR MODEM
RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)
INTERNET WiFi
GLOBAL POSITIONING SYSTEM (GPS)
GATEWAY - INTERFACE
RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
BIOMETRIC FINGERPRINT FACIAL IRIS
DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

**COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE**

2 WIRELESS/CELLULAR MODEM

4 OPERATING SYSTEM (OS)

1 COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)

3 GLOBAL POSITIONING SYSTEM (GPS)

5 INTERNET WiFi

6 GATEWAY - INTERFACE

7 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS

8 BIOMETRIC FINGERPRINT FACIAL IRIS

9 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

12 CELLULAR

**APPLE WATCH SERIES 3**

14 SATELLITE

10 INTERFACE

13 CELLULAR

GPS

11 CPU

16 OS

17 WiFi

15

18 NFC

19 CHEM/BIO HEARTRATE SENSORS

20 INTERFACE

21 GATEWAY - INTERFACE

**RESPONDENT'S MOBILE DEVICE iPhone 7**

22 OPERATING SYSTEM (OS)

23 WIRELESS/CELLULAR MODEM

25

RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)

24 INTERNET WiFi

26 GLOBAL POSITIONING SYSTEM (GPS)

27 RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)

28 BIOMETRIC FINGERPRINT FACIAL IRIS

29 DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS



COMPLAINANT'S
COMMUNICATION, MONITORING
DETECTING, CONTROLLING (CMDC) DEVICE

2 WIRELESS/
CELLULAR
MODEM

4 OPERATING
SYSTEM
(OS)

1 COMPLAINANT'S
CENTRAL PROCESSING UNIT
(CPU)

3 GLOBAL
POSITIONING
SYSTEM
(GPS)

5 INTERNET
WiFi

6 GATEWAY - INTERFACE

7 DISABLING
LOCK MECHANISM
AFTER MULTIPLE
FAILED ATTEMPTS

8 BIOMETRIC
FINGERPRINT
FACIAL
IRIS

9 RADIO FREQUENCY
(RF) NEAR FIELD
COMMUNICATION
(NFC)

12 CELLULAR

10 INTERFACE

APPLE WATCH
SERIES 3

13 CELLULAR

GPS

11 CPU

15

16 OS

17 WiFi

20 INTERFACE

18 NFC

19 CHEM/BIO
HEARTRATE
SENSORS

14 SATELLITE

RESPONDENT'S MOBILE DEVICE
iPhone 8

OPERATING
SYSTEM
(OS)

WIRELESS/
CELLULAR
MODEM

21 GATEWAY - INTERFACE

22 RESPONDENT'S
CENTRAL PROCESSING UNIT
(CPU)

23

25

24 INTERNET
WiFi

26 GLOBAL
POSITIONING
SYSTEM
(GPS)

27 RADIO FREQUENCY
(RF) NEAR FIELD
COMMUNICATION
(NFC)

28 BIOMETRIC
FINGERPRINT
FACIAL
IRIS

29 DISABLING
LOCK MECHANISM
AFTER MULTIPLE
FAILED ATTEMPTS

# EXHIBIT 6

## THE "SAFERACK" PROJECT

| Smartphone-Based Rapid Diagnostic Tests | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims |
|---|---|---|
| The chemical and biomolecular engineering department at the UH Cullen College of Engineering won the National Science Foundation's Innovation Corps (I-Corps) award to develop sensitive rapid medical diagnostic tests that use "glow-in-the-dark" nanoparticles. A user would add a fingerprick quantity of blood, to a test cartridge and then insert it into the smartphone attachment. The flash from the camera will excite the luminescent particles, and the smartphone camera will capture the light emitted by them," Raja said, a smartphone attachment, designed like a phone case | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | 18. The communication device [of claim 11] wherein the communication device having a basic monitoring terminal can be adapted and incorporated to include desktop computers, notebook, PC's, laptops, cell phones, smart phones, LCD monitors, and satellite monitoring. |
| A new iPad and iPhone app turns the device's camera into a biosensor to measure heart rate. The app from Rock Health accelerator program is called Cardiio. Cardiio is powered by cutting-edge research and science conducted at the MIT Media Lab. After a user downloads the app, they hold the iPhone or iPad up to their face, hold steady for a few seconds, and receive their resting heart rate. | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | 118. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of sensors for detecting at least one of a chemical, biological, radiological, nuclear, explosive and contraband agents and compounds which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case. |

| | | |
|---|---|---|
| Apple chip A8X delivers better CPU and graphics performance than its predecessor. With its 64-bit desktop-class architecture, iPad Air 2 is as powerful as many personal computers. The first version released runs at 1 GHz for the iPad and contains an ARM Cortex-A8 CPU core. Apple states that the iPhone Apple A9 has 70% more CPU performance than the Apple A8. | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | 12. The communication device [of claim 11] wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). |
| If your iPhone, iPad, or iPod touch is lost or stolen. Turn on Lost Mode. Using Lost Mode, a person can remotely lock the device with a four-digit passcode, and display a custom message with your phone number on your missing device's Lock screen | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |
| Many devices are commonly controlled by infrared remote controls these days – televisions, video recorders, air conditioners, and more. Using your iPhone, iPad or iPod Touch as a universal remote control gives you many accessibility advantages. You can make use of whatever accessibility features your iDevice has – VoiceOver, Zoom, Switch Control, etc. | a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | 20. The communication device [of claim 11] wherein the communication device can be interconnected through wire or wireless for communication, signals, commands and transmission of data. |
| If your iPhone, iPad, or iPod touch is lost or stolen. Turn on Lost Mode. Using Lost Mode, a person can remotely lock the device with a four-digit passcode, and display a custom message with your phone number on your missing device's Lock screen | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

91

| | | |
|---|---|---|
| Using your iPhone, iPad or iPod Touch as a universal remote control gives you many accessibility advantages. The Apple iPad communication device receives signals from the products to be monitored. Using Lost Mode, a person can remotely lock the device with a four-digit passcode. A new iPhone app turns your device's camera into a biosensor to measure your heart rate. | wherein the communication device receives a signal via any of one or more products in any product grouping categories; | 32. The communication device [of claim 11] wherein the communication device having products to be monitored, the devices that are monitoring, communication devices, communication equipment can be grouped into anti-terrorist product groupings based on the categories of similarities of design of at least one of; sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices, vehicle slowing and stopping devices, specification... similarities in material composition... ; similarities in security problems of at least one of; theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents, detection for weapons of mass destruction, biometrics for identifying terrorist, scanning to identify a terrorist threat; grouping security devices to form a network of ubiquitous sensing... |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails. | wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| | | |
|---|---|---|
| Apple's "Touch ID"; a fingerprint identity sensor that makes it easy to get into the iPad device. The biometric "Touch ID" is used with the iPhone 5s or later, iPad Pro, iPad Air 2, or iPad mini 3 or later. | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | 30. The communication device [of claim 11] wherein the communication device is designed to be used with or without biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals and preventing access to the product by unauthorized, untrained, and unequipped individuals. |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short range radio frequency (RF). | 25. The communication device of [claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| Variable's "NODE+Oxa" for the Apple (iPhone) Smartphone | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims |
|---|---|---|
| Variable's "NODE+Oxa" for Apple (iPhone) Smartphone. In 2007, the DHS issued call for sensor that equip a smartphone with ability to detect dangerous gases and chemicals, NASA's Jing Li proposal to DHS's Cell-All initiative was awarded funding through interagency agreement in 2008. Li approached George Yu of Genel Systems Inc. Li convinced DHS; sensor attach to outside of phone. The NODE+Oxa measures carbon monoxide, nitric oxide, nitrogen dioxide, chlorine gas, sulfur dioxide, or hydrogen sulfide. Store data or transmit it to smartphone using Bluetooth wireless. | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | 18. The communication device [of claim 11] wherein the communication device having a basic monitoring terminal can be adapted and incorporated to include desktop computers, notebook, PC's, laptops, cell phones, smart phones, LCD monitors, and satellite monitoring. |
| A new iPad and iPhone app turns the device's camera into a biosensor to measure heart rate. The app from Rock Health accelerator program is called Cardiio. Cardiio is powered by cutting-edge research and science conducted at the MIT Media Lab. After a user downloads the app, they hold the iPhone or iPad up to their face, hold steady for a few seconds, and receive their resting heart rate. | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | 118. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of sensors for detecting at least one of a chemical, biological, radiological, nuclear, explosive and contraband agents and compounds which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case. |

| | | |
|---|---|---|
| Apple chip A8X delivers better CPU and graphics performance than its predecessor. With its 64-bit desktop-class architecture, iPad Air 2 is as powerful as many personal computers. The first version released runs at 1 GHz for the iPad and contains an ARM Cortex-A8 CPU core. Apple states that the iPhone Apple A9 has 70% more CPU performance than the Apple A8. | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | 12. The communication device [of claim 11] wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). |
| If your iPhone, iPad, or iPod touch is lost or stolen. Turn on Lost Mode. Using Lost Mode, a person can remotely lock the device with a four-digit passcode, and display a custom message with your phone number on your missing device's Lock screen | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |
| Many devices are commonly controlled by infrared remote controls these days – televisions, video recorders, air conditioners, and more. Using your iPhone, iPad or iPod Touch as a universal remote control gives you many accessibility advantages. You can make use of whatever accessibility features your iDevice has – VoiceOver, Zoom, Switch Control, etc. | a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | 20. The communication device [of claim 11] wherein the communication device can be interconnected through wire or wireless for communication, signals, commands and transmission of data. |
| If your iPhone, iPad, or iPod touch is lost or stolen. Turn on Lost Mode. Using Lost Mode, a person can remotely lock the device with a four-digit passcode, and display a custom message with your phone number on your missing device's Lock screen | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| Using your iPhone, iPad or iPod Touch as a universal remote control gives you many accessibility advantages. The Apple iPad communication device receives signals from the products to be monitored. Using Lost Mode, a person can remotely lock the device with a four-digit passcode. A new iPhone app turns your device's camera into a biosensor to measure your heart rate. | wherein the communication device receives a signal via any of one or more products in any product grouping categories; | 32. The communication device [of claim 11] wherein the communication device having products to be monitored, the devices that are monitoring, communication devices, communication equipment can be grouped into anti-terrorist product groupings based on the categories of similarities of design of at least one of; sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices, vehicle slowing and stopping devices, specification... similarities in material composition... ; similarities in security problems of at least one of; theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents, detection for weapons of mass destruction, biometrics for identifying terrorist, scanning to identify a terrorist threat; grouping security devices to form a network of ubiquitous sensing... |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails. | wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| | | |
|---|---|---|
| Apple's "Touch ID"; a fingerprint identity sensor that makes it easy to get into the iPad device. The biometric "Touch ID" is used with the iPhone 5s or later, iPad Pro, iPad Air 2, or iPad mini 3 or later. | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | 30. The communication device [of claim 11] wherein the communication device is designed to be used with or without biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals and preventing access to the product by unauthorized, untrained, and unequipped individuals. |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short range radio frequency (RF). | 25. The communication device of [claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| "COINS" Nano-Embedded Sensors for Smartphones | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims |
|---|---|---|
| The Center of Integrated Nanomechanical Systems (COINS) Nano-Embedded Sensors for Smartphones: is a nanoscale science and engineering center (NSEC) funded by NSF; headquartered at University of California at Berkeley; satellite campuses at Stanford, Caltech; University of California at Merced. The goal of COINS is to develop nano-enable sensors with smart phones, eventually becoming embedded in the device. Mobile, wirelessly communicating detection applications; to develop nanomaterials-enable sensing systems for real-time detection of explosives, toxicants, and radiation and interface with the Apple iPhone. | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | 18. The communication device [of claim 11] wherein the communication device having a basic monitoring terminal can be adapted and incorporated to include desktop computers, notebook, PC's, laptops, cell phones, smart phones, LCD monitors, and satellite monitoring. |
| A new iPad and iPhone app turns the device's camera into a biosensor to measure heart rate. The app from Rock Health accelerator program is called Cardiio. Cardiio is powered by cutting-edge research and science conducted at the MIT Media Lab. After a user downloads the app, they hold the iPhone or iPad up to their face, hold steady for a few seconds, and receive their resting heart rate. | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | 118. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of sensors for detecting at least one of a chemical, biological, radiological, nuclear, explosive and contraband agents and compounds which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case. |

| | | |
|---|---|---|
| Apple chip A8X delivers better CPU and graphics performance than its predecessor. With its 64-bit desktop-class architecture, iPad Air 2 is as powerful as many personal computers. The first version released runs at 1 GHz for the iPad and contains an ARM Cortex-A8 CPU core. Apple states that the iPhone Apple A9 has 70% more CPU performance than the Apple A8. | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | 12. The communication device [of claim 11] wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). |
| If your iPhone, iPad, or iPod touch is lost or stolen. Turn on Lost Mode. Using Lost Mode, a person can remotely lock the device with a four-digit passcode, and display a custom message with your phone number on your missing device's Lock screen | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |
| Many devices are commonly controlled by infrared remote controls these days – televisions, video recorders, air conditioners, and more. Using your iPhone, iPad or iPod Touch as a universal remote control gives you many accessibility advantages. You can make use of whatever accessibility features your iDevice has – VoiceOver, Zoom, Switch Control, etc. | a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | 20. The communication device [of claim 11] wherein the communication device can be interconnected through wire or wireless for communication, signals, commands and transmission of data. |
| If your iPhone, iPad, or iPod touch is lost or stolen. Turn on Lost Mode. Using Lost Mode, a person can remotely lock the device with a four-digit passcode, and display a custom message with your phone number on your missing device's Lock screen | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| Using your iPhone, iPad or iPod Touch as a universal remote control gives you many accessibility advantages. The Apple iPad communication device receives signals from the products to be monitored. Using Lost Mode, a person can remotely lock the device with a four-digit passcode. A new iPhone app turns your device's camera into a biosensor to measure your heart rate. | wherein the communication device receives a signal via any of one or more products in any product grouping categories; | 32. The communication device [of claim 11] wherein the communication device having products to be monitored, the devices that are monitoring, communication devices, communication equipment can be grouped into anti-terrorist product groupings based on the categories of similarities of design of at least one of; sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices, vehicle slowing and stopping devices, specification... similarities in material composition... ; similarities in security problems of at least one of; theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents, detection for weapons of mass destruction, biometrics for identifying terrorist, scanning to identify a terrorist threat; grouping security devices to form a network of ubiquitous sensing... |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails. | wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| | | |
|---|---|---|
| Apple's "Touch ID"; a fingerprint identity sensor that makes it easy to get into the iPad device. The biometric "Touch ID" is used with the iPhone 5s or later, iPad Pro, iPad Air 2, or iPad mini 3 or later. | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | 30. The communication device [of claim 11] wherein the communication device is designed to be used with or without biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals and preventing access to the product by unauthorized, untrained, and unequipped individuals. |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short range radio frequency (RF). | 25. The communication device of [claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

# PRODUCT GROUPING: (DETECTION SYSTEMS)



Stall-to-Stop System

Multi-Sensor
Detection System

Cell Phone Detection System

External Lock
Disabling System

Composite Cargo Container
Detection System

Internal Lock
Disabling System

**Illustration 1**

# PRODUCT GROUPING: (PRODUCTS & PERSONNEL)



1. Mail Carrier
2. Postman
3. Newspaper Vending Machine

1. Cargo Plane
2. Pilot
3. Captain
4. Cargo Ship

1. Cargo Train
2. Conductor
3. Subway Driver
4. Subway Train

1. Cargo Containers
2. Dock Worker
3. Truck Driver
4. Tractor Trailer



1. Warehouse
2. Security Guard
3. Utility Vehicle



1. Mini Storage Building
2. Bus Driver
3. Bus







**Illustration 2**

# PRODUCT GROUPING: (NETWORK)



MSDS - MULTI SENSOR DETECTION SYSTEM

STSS - STALL-TO-STOP SYSTEM

CCCDS - COMPOSITE CARGO CONTAINER DETECTION SYSTEM

ILDS - INTERNAL LOCK DISABLING SYSTEM

ELDS - EXTERNAL LOCK DISABLING SYSTEM

CPDS - CELL PHONE DETECTION SYSTEM

**Illustration 3**

## PRODUCT GROUPING: (NETWORK; WIRELESS NETWORK; WIRELESS MESH NETWORK)



Illustration 4

# EXHIBIT 7

## THE "V-TECTION" PROJECT

**Illustration 1**



Smartphone
or
Handheld

Monitoring
Site

# CELLULAR

**Illustration 2**



Smartphone
or
Handheld

Monitoring
Site

# SATELLITE

| "TOUGHBOOK 31" Laptop K-Max Self-flying Helicopter | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims |
|---|---|---|
| The Lockheed Martin K-Max unmanned helicopter is controlled from a Panasonic "TOUGHBOOK 31" Laptop. K-Max has pre-programmed load pick-ups and can fly to pre-programmed locations | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | 18. The communication device [of claim 11] wherein the communication device having a basic monitoring terminal can be adapted and incorporated to include desktop computers, notebook, PC's, laptops, cell phones, smart phones, LCD monitors, and satellite monitoring. |
| Sensa-LINX integrates with the LCD 3.3 and LCD-NEXUS chemical sensors; provides warning and reporting real-time sensor mapping capability for chemical sensors to communicate detection; C2 operator able to interrogate and control the networked sensors remotely. Easily deployable network of chemical sensors. The software can generate CBRN reports using ATP 45 messaging. In the event of a CBRNE incident, Sensa-LINX will provide an early warning. Laptop: Ruggedized Toughbook Panasonic 31. | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | 118. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of sensors for detecting at least one of a chemical, biological, radiological, nuclear, explosive and contraband agents and compounds which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case. |

| | | |
|---|---|---|
| CPU: Intel® Core™ i5-3380M vPro™ Processor; 2.9GHz with Turbo Boost up to 3.6GHz; Intel Smart Cache 3MB; Intel® Core™ i5-3340M vPro™ Processor; 2.7GHz with Turbo Boost up to 3.4GHz; Intel Smart Cache 3MB; Intel® Core™ i3-3120M Processor; 2.5GHz; Intel Smart Cache 3MB | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | 12. The communication device [of claim 11] wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). |
| Panasonic Toughbook CF-31 – commonly used with Grace-Watch; Grace-Watch receives and processes SC500 and TPASS 3 signals and transmits Call-Back, Report-In, and Roll Call signals to these telemetry devices. Radio Frequency energy signal that is sent wirelessly. RF Pass through special connectors on the back of the laptop. The Toughbook 31 uses a GOBI card capable of high speed / 4G internet. Hard Disk Lock; Kensington cable lock slot | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| Panasonic Toughbook CF-31 – commonly used with Grace-Watch; Grace-Watch receives and processes SC500 and TPASS 3 signals and transmits Call-Back, Report-In, and Roll Call signals to these telemetry devices. Radio Frequency energy signal that is sent wirelessly. RF Pass through special connectors on the back of the laptop. The Toughbook 31 uses a GOBI card capable of high speed / 4G internet. Hard Disk Lock; Kensington cable lock slot | a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |
| Optional integrated 4G LTE multi carrier mobile broadband with satellite GPS; Optional GPS (SiRFstarIII™); Intel® Centrino® Advanced-N 6235 802.11a/b/g/n; Bluetooth® v4.0 + EDR (Class 1); | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

70

| | | |
|---|---|---|
| Wireless: n Optional integrated 4G LTE multi carrier mobile broadband with satellite GPS; Optional GPS (SiRFstarIII™); Intel® Centrino® Advanced-N 6235 802.11a/b/g/n; Bluetooth® v4.0 + EDR (Class 1); Security; Authentication: LEAP, WPA, 802.1x, EAP-TLS, EAP-FAST, PEAP; Encryption: CKIP, TKIP, 128-bit and 64-bit WEP, Hardware AES; User-selectable antenna pass-through (dual standard, single optional); Slide on/off switch | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | 20. The communication device [of claim 11] wherein the communication device can be interconnected through wire or wireless for communication, signals, commands and transmission of data. |
| Security features: Password Security: Supervisor, User, Hard Disk Lock; Kensington cable lock slot; Trusted platform module (TPM) security chip v.1.22; Computrace theft protection agent in BIOS8; Intel® Anti-Theft Technology; Optional fingerprint reader; Optional insertable SmartCard reader | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| Communication device, Laptop: Ruggedized Toughbook Panasonic 31; Sensa-LINX integrates with the LCD 3.3 and LCD-NEXUS chemical sensors; Integrated Options: 4G LTE multi carrier mobile broadband with satellite GPS; GPS (SiRFstarIII™); Webcam2; 2nd LAN (10/100)2 or Modem; Insertable SmartCard reader; Fingerprint reader; Security features: Password Security: Supervisor, User, Hard Disk Lock; Kensington cable lock slot; | wherein the communication device receives a signal via any of one or more products in any product grouping categories; | 32. The communication device [of claim 11] wherein the communication device having products to be monitored, the devices that are monitoring, communication devices, communication equipment can be grouped into anti-terrorist product groupings based on the categories of similarities of design of at least one of; sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices, vehicle slowing and stopping devices, specification... similarities in material composition... ; similarities in security problems of at least one of; theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents, detection for weapons of mass destruction, biometrics for identifying terrorist, scanning to identify a terrorist threat; grouping security devices to form a network of ubiquitous sensing... |
| Optional integrated 4G LTE multi carrier mobile broadband with satellite GPS; Optional GPS (SiRFstarIII™); Intel® Centrino® Advanced-N 6235 802.11a/b/g/n; Bluetooth® v4.0 + EDR (Class 1); | wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| | | |
|---|---|---|
| Fingerprint reader. Security; Authentication: LEAP, WPA, 802.1x, EAP-TLS, EAP-FAST, PEAP | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | 30. The communication device [of claim 11] wherein the communication device is designed to be used with or without biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals and preventing access to the product by unauthorized, untrained, and unequipped individuals. |
| Optional integrated 4G LTE multi carrier mobile broadband with satellite GPS; Optional GPS (SiRFstarIII™); Intel® Centrino® Advanced-N 6235 802.11a/b/g/n; Bluetooth® v4.0 + EDR (Class 1); | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short range radio frequency (RF). | 25. The communication device of [claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| "TOUGHBOOK 31" Laptop Passport Systems Inc. Base Control Unit (BCU) | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims |
|---|---|---|
| "TOUGHBOOK 31" Laptop / Passport Systems Inc. Base Control Unit (BCU): The Passport Systems "Base Control Unit" (BCU) is implemented using the Panasonic Toughbook ruggedized laptop | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | 18. The communication device [of claim 11] wherein the communication device having a basic monitoring terminal can be adapted and incorporated to include desktop computers, notebook, PC's, laptops, cell phones, smart phones, LCD monitors, and satellite monitoring. |
| In response to the Domestic Nuclear Detection Office's (DNDO) BAA 09-102 Passport Systems, Inc. has developed a system of networked portable spectroscopic radiation detectors to improve the detection, and identification of radiological threats. | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | 118. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of sensors for detecting at least one of a chemical, biological, radiological, nuclear, explosive and contraband agents and compounds which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case. |
| CPU: Intel® Core™ i5-3380M vPro™ Processor; 2.9GHz with Turbo Boost up to 3.6GHz; Intel Smart Cache 3MB; Intel® Core™ i5-3340M vPro™ Processor; 2.7GHz with Turbo Boost up to 3.4GHz; Intel Smart Cache 3MB; Intel® Core™ i3-3120M Processor; 2.5GHz; Intel Smart Cache 3MB | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | 12. The communication device [of claim 11] wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). |

| | | |
|---|---|---|
| Panasonic Toughbook CF-31 – commonly used with Grace-Watch; Grace-Watch receives and processes SC500 and TPASS 3 signals and transmits Call-Back, Report-In, and Roll Call signals to these telemetry devices. Radio Frequency energy signal that is sent wirelessly. RF Pass through special connectors on the back of the laptop. The Toughbook 31 uses a GOBI card capable of high speed / 4G internet. Hard Disk Lock; Kensington cable lock slot | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |
| Panasonic Toughbook CF-31 – commonly used with Grace-Watch; Grace-Watch receives and processes SC500 and TPASS 3 signals and transmits Call-Back, Report-In, and Roll Call signals to these telemetry devices. Radio Frequency energy signal that is sent wirelessly. RF Pass through special connectors on the back of the laptop. The Toughbook 31 uses a GOBI card capable of high speed / 4G internet. Hard Disk Lock; Kensington cable lock slot | a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |
| Optional integrated 4G LTE multi carrier mobile broadband with satellite GPS; Optional GPS (SiRFstarIII™); Intel® Centrino® Advanced-N 6235 802.11a/b/g/n; Bluetooth® v4.0 + EDR (Class 1); | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| | | |
|---|---|---|
| Wireless: n Optional integrated 4G LTE multi carrier mobile broadband with satellite GPS; Optional GPS (SiRFstarIII™); Intel® Centrino® Advanced-N 6235 802.11a/b/g/n; Bluetooth® v4.0 + EDR (Class 1); Security; Authentication: LEAP, WPA, 802.1x, EAP-TLS, EAP-FAST, PEAP; Encryption: CKIP, TKIP, 128-bit and 64-bit WEP, Hardware AES; User-selectable antenna pass-through (dual standard, single optional); Slide on/off switch | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | 20. The communication device [of claim 11] wherein the communication device can be interconnected through wire or wireless for communication, signals, commands and transmission of data. |
| Security features: Password Security: Supervisor, User, Hard Disk Lock; Kensington cable lock slot; Trusted platform module (TPM) security chip v.1.22; Computrace theft protection agent in BIOS8; Intel® Anti-Theft Technology; Optional fingerprint reader; Optional insertable SmartCard reader | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| Communication device, Laptop: Ruggedized Toughbook Panasonic 31; Sensa-LINX integrates with the LCD 3.3 and LCD-NEXUS chemical sensors; Integrated Options: 4G LTE multi carrier mobile broadband with satellite GPS; GPS (SiRFstarIII™); Webcam2; 2nd LAN (10/100)2 or Modem; Insertable SmartCard reader; Fingerprint reader; Security features: Password Security: Supervisor, User, Hard Disk Lock; Kensington cable lock slot; | wherein the communication device receives a signal via any of one or more products in any product grouping categories; | 32. The communication device [of claim 11] wherein the communication device having products to be monitored, the devices that are monitoring, communication devices, communication equipment can be grouped into anti-terrorist product groupings based on the categories of similarities of design of at least one of; sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices, vehicle slowing and stopping devices, specification... similarities in material composition... ; similarities in security problems of at least one of; theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents, detection for weapons of mass destruction, biometrics for identifying terrorist, scanning to identify a terrorist threat; grouping security devices to form a network of ubiquitous sensing... |
| Optional integrated 4G LTE multi carrier mobile broadband with satellite GPS; Optional GPS (SiRFstarIII™); Intel® Centrino® Advanced-N 6235 802.11a/b/g/n; Bluetooth® v4.0 + EDR (Class 1); | wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| | | |
|---|---|---|
| Fingerprint reader. Security; Authentication: LEAP, WPA, 802.1x, EAP-TLS, EAP-FAST, PEAP | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | 30. The communication device [of claim 11] wherein the communication device is designed to be used with or without biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals and preventing access to the product by unauthorized, untrained, and unequipped individuals. |
| Optional integrated 4G LTE multi carrier mobile broadband with satellite GPS; Optional GPS (SiRFstarIII™); Intel® Centrino® Advanced-N 6235 802.11a/b/g/n; Bluetooth® v4.0 + EDR (Class 1); | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short range radio frequency (RF). | 25. The communication device of [claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| Apple iPAD Tablet<br>Boeing MH-6 Little Bird Helicopter | Patent #: 9,589,439; Independent Claim 13 | Patent #: RE 43,990; Dependent Claims |
|---|---|---|
| Navy engineers developed a Carbon Monoxide Sensor package that turns any helicopter with a digital flight control system into an autonomous cargo delivery robot. An authorized person is able to land a full-size Aurora Flight Services little bird helicopter by simply touching a map application on a handheld tablet computer, said Chief of Naval Research Rear. Adm. Matthew Klunder. With an iPad the system can autonomously deliver supplies. | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | 18. The communication device [of claim 11] wherein the communication device having a basic monitoring terminal can be adapted and incorporated to include desktop computers, notebook, PC's, laptops, cell phones, smart phones, LCD monitors, and satellite monitoring. |
| A new iPad and iPhone app turns the device's camera into a biosensor to measure heart rate. The app from Rock Health accelerator program is called Cardiio. Cardiio is powered by cutting-edge research and science conducted at the MIT Media Lab. After a user downloads the app, they hold the iPhone or iPad up to their face, hold steady for a few seconds, and receive their resting heart rate. | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | 118. The multi-sensor detection system [of claim 103] wherein the cell phone, the smart phone, and the cell phone detector case have a plurality of sensors for detecting at least one of a chemical, biological, radiological, nuclear, explosive and contraband agents and compounds which are capable of being disposed within the cell phone, the smart phone, or the cell phone detector case. |

| | | |
|---|---|---|
| Apple chip A8X delivers better CPU and graphics performance than its predecessor. With its 64-bit desktop-class architecture, iPad Air 2 is as powerful as many personal computers. The first version released runs at 1 GHz for the iPad and contains an ARM Cortex-A8 CPU core. Apple states that the iPhone Apple A9 has 70% more CPU performance than the Apple A8. | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices; | 12. The communication device [of claim 11] wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). |
| If your iPhone, iPad, or iPod touch is lost or stolen. Turn on Lost Mode. Using Lost Mode, a person can remotely lock the device with a four-digit passcode, and display a custom message with your phone number on your missing device's Lock screen | a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |
| Many devices are commonly controlled by infrared remote controls these days – televisions, video recorders, air conditioners, and more. Using your iPhone, iPad or iPod Touch as a universal remote control gives you many accessibility advantages. You can make use of whatever accessibility features your iDevice has – VoiceOver, Zoom, Switch Control, etc. | a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | 20. The communication device [of claim 11] wherein the communication device can be interconnected through wire or wireless for communication, signals, commands and transmission of data. |
| If your iPhone, iPad, or iPod touch is lost or stolen. Turn on Lost Mode. Using Lost Mode, a person can remotely lock the device with a four-digit passcode, and display a custom message with your phone number on your missing device's Lock screen | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | 28. The communication device [of claim 11] wherein the communication device can send and receive signals, send and receive warnings, send and receive commands, send and receive data, information and report the status of the sensors and operational equipment systems to and from a cell phone, smart phone, PDA or handheld device. |

| | | |
|---|---|---|
| Using your iPhone, iPad or iPod Touch as a universal remote control gives you many accessibility advantages. The Apple iPad communication device receives signals from the products to be monitored. Using Lost Mode, a person can remotely lock the device with a four-digit passcode. A new iPhone app turns your device's camera into a biosensor to measure your heart rate. | wherein the communication device receives a signal via any of one or more products in any product grouping categories; | 32. The communication device [of claim 11] wherein the communication device having products to be monitored, the devices that are monitoring, communication devices, communication equipment can be grouped into anti-terrorist product groupings based on the categories of similarities of design of at least one of; sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices, vehicle slowing and stopping devices, specification… similarities in material composition… ; similarities in security problems of at least one of; theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents, detection for weapons of mass destruction, biometrics for identifying terrorist, scanning to identify a terrorist threat; grouping security devices to form a network of ubiquitous sensing… |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails. | wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; | 25. The communication device [of claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

| | | |
|---|---|---|
| Apple's "Touch ID"; a fingerprint identity sensor that makes it easy to get into the iPad device. The biometric "Touch ID" is used with the iPhone 5s or later, iPad Pro, iPad Air 2, or iPad mini 3 or later. | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | 30. The communication device [of claim 11] wherein the communication device is designed to be used with or without biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals and preventing access to the product by unauthorized, untrained, and unequipped individuals. |
| The iPad and iPhone has both WiFi and Bluetooth, two wireless technologies for connecting to nearby devices (in the case of Bluetooth) and the internet (in the case of WiFi). The cellular service, originally called 3G and now called LTE; this option allows the iPad to connect to the internet anywhere cell phone works, to check emails. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short range radio frequency (RF). | 25. The communication device of [claim 11] wherein the communication device has at least one of a Bluetooth connection, a Wi-Fi connection, a short and long range radio frequency connection, a Cellular connection, a satellite connection, and a GPS connection. |

## Illustration 3

Handheld
Communication
Device



Portable
Communication
Device



Fixed
Communication
Device



# ELECTROMAGNETIC PULSE (EMP)

## Illustration 4

Handheld
Communication
Device



Portable
Communication
Device



Fixed
Communication
Device



# ELECTROSTATIC DISCHARGE (ESD)

**Illustration 5**





# HIGH POWER MICROWAVE (HPM)

**Illustration 6**



Direct Path

Tag

Specific Frequency
Emitted By A
Transmitter Antenna

Frequency
Picked Up By The
Receiver Antenna

# RADIO FREQUENCY (RF)

## Illustration 7



**PRE-PROGRAMMED AUTOMATED SYSTEM
ACTIVATED BY THE BOMB DETECTION SYSTEM**

## Illustration 8



**PRE-PROGRAMMED AUTOMATED SYSTEM
ACTIVATED BY THE PRE-CRASH SYSTEM**



**Fig. 18**

SMARTPHONE / LAPTOP

# EXHIBIT 8

## GOVERNMENT NOTICE

## *and*

## IMPLIED-IN-FACT CONTRACTS



OFFICE OF THE VICE PRESIDENT
WASHINGTON

June 3, 2003

Dear Friends:

I am responding on behalf of the Vice President to your recent letter expressing your concerns about the safety of newspaper racks in public places.

Your correspondence has been forwarded to the Department of Homeland Security for review. You will hear back directly from the Department.

The Vice President appreciates hearing from you. Thank you for taking the time to write.

Sincerely,

Cecelia Boyer

Cecelia Boyer
Special Assistant to the Vice President
for Correspondence

Mr. Larry Golden
Mr. Melvin Sullivan
522 Peach Grove Place
Mauldin, South Carolina 29662-3407

NEST F. HOLLINGS
DUTH CAROLINA

OFFICES:

125 ASSEMBLY STREET
COLUMBIA, SC 29201
803-765-6731

126 FEDERAL BUILDING
GREENVILLE, SC 29603
864-233-5366

112 CUSTOM HOUSE
200 EAST BAY STREET
CHARLESTON, SC 29401
843-727-4525

# United States Senate

125 RUSSELL OFFICE BUILDING
WASHINGTON, DC 20510-4002
202-224-6121
EMAIL: http://hollings.senate.gov

October 1, 2003

COMMITTEES:

COMMERCE, SCIENCE, AND
TRANSPORTATION: RANKING

APPROPRIATIONS
COMMERCE, JUSTICE, STATE AND
THE JUDICIARY: RANKING
DEFENSE
LABOR, HEALTH AND HUMAN SERVICES,
EDUCATION
ENERGY AND WATER DEVELOPMENT
INTERIOR

BUDGET

DEMOCRATIC POLICY COMMITTEE

Mr. Larry Golden
522 Peach Grove Place
Mauldin, SC 29662

Dear Mr. Golden:

Thank you for contacting me regarding your difficulty with receiving a response from the Department of Homeland Security. Please know that I am contacting the Secretary today to bring this matter to his attention.

Please feel free to contact Ms. Gillian Mabrey in my Washington, D.C. office if I may be of further assistance.

With kindest regards, I am

Sincerely,

Ernest F. Hollings

EFH/gm

# United States Senate

WASHINGTON, DC 20510

October 21, 2003

Larry Golden
522 Peach Grove Place
Mauldin, SC 29662

Dear Larry:

Thank you for your correspondence of recent date.

I have contacted the Department of Homeland Security on your behalf. I have asked that they review your request and respond directly to you.

If I can be of further assistance to you in matters of a federal nature, please do not hesitate to contact me.

Sincerely,

Lindsey O. Graham
United States Senator

LOG/vc



June 20, 2005

Larry Golden
Co-Owner
Budget Solutions, LLC
522 Peach Grove Place
Mauldin, South Carolina  29662-3407

Dear Larry:

Thank you for your letter regarding homeland security technology procurement. I appreciate you making me aware of your products and ideas. Please know that I have forwarded it to the Department of Homeland Security for review and response.

Again, thank you for your letter and best wishes.

Sincerely,

Andrew H. Card, Jr.

# Budget Solutions, LLC
Larry Golden, Co-owner
522 Peach Grove Place
Mauldin, SC 29662
Bus: 864.288.5605 / Cell: 864.992.7104
E-mail: lgolden5605@charter.net

May 23, 2005

President George W. Bush
1600 Pennsylvania Avenue NW
Washington, DC 20500

Dear Mr. President:

I need your help. My problem is with the Office of Senator Jim DeMint.

My name is Larry Golden. I am the co-owner of Budget Solutions, LLC. Budget Solutions is a Research and Development Company. Our mission is to identify and research those areas considered vulnerable to terrorist attacks and offer solutions to preventing terrorist attacks by developing new, innovative products, ideas, and strategies.

I am the author of three "Economic Stimulus and Terrorist Prevention Projects". The strategies behind each project is to increase jobs and create new business opportunities, increase taxable revenue to restore the Nation's Budget (an estimated $200 billion over the next ten years), reduce the cost to manufacture, and open up a world market to current distributors, suppliers, and manufacturers within the various industries.

I am the inventor of two anti-terrorist product devices and am credited with participating in the development of a third anti-terrorist product device.

**"The V-Tection Project":** invention technology involves the prevention of car and vehicle bombings by using GPS, navigational systems, and a device designed to control certain functions of the vehicle.

**"The ATPG Project":** invention technology involves the prevention, detection and containment of chemical, biological, radiological and nuclear agents and compounds in vulnerable areas such as: cargo containers, cargo planes, cargo ships, warehouses, freight train cars, tractor trailers, mail carriers (ups, FedEx, for example), airport lockers, news racks, mail drop boxes, cluster mail boxes, keyed mail boxes, mini-storage houses, bicycle lockers, stadium lockers, school lockers, and shipping containers.

**"THE SafeRack Project":** invention technology involves preventing the storage of IED's, pipe bombs, and "dirty" bombs in news racks. The invention technology involves the detection and preventing the spread of chemical and biological agents and compounds onto newspapers. The invention technology involves preventing stolen papers. By

preventing an estimated $995 million dollars annually in stolen papers we can turn the estimated $995 million dollars annually into a gain, which is taxable to the Federal Gov't. The estimated $400 million annually received as tax revenue can be used to fund other vulnerable areas subject to terrorist attacks.

I asked David Porter, Porter Technologies, the inventor of a container security lock in my area, what efforts he took to seek Federal funding. He suggested I contact my Congressman or Senator and ask them to put me in touch with a Portfolio Manager at the Dept. of Homeland Security. Senator DeMint forwarded a letter to DHS Undersecretary Asa Hutchinson dated September 30, 2003 in support of Mr. Porter's invention. Undersecretary Hutchinson traveled to South Carolina to validate Mr. Porter's invention. **I cannot help but feel Senator DeMint's treatment toward me is because I am Black. It's difficult enough for Blacks to be recognized as being competent in the technology field without being discriminated against.**

I contacted Senator DeMint's office. I communicated my request to Mr. Chris Socha. I asked Mr. Socha to help us secure $4 million dollars for R&D from the DHS by putting us in contact with a Portfolio Manager. Mr. Socha suggested I send him everything we are working on. In November 2004 I sent Mr. Socha 2 ½ years of technology and research material and made it very clear the material and the contents therein should be treated as personal and confidential.

Six months has past and for six months I have tried to contact Mr. Socha, his superiors Mr. Hoskins and Senator DeMint. For six months, every time I have called they were either out of the office, in a meeting, or currently unavailable. For six months I have sent e-mails, left messages in their mailboxes, and with the receptionist. I have also left telephone numbers, an e-mail address, and a mailing address for them to reach me. In my messages I asked for an update on any progress and asked them to return the material I forwarded to them if the Senator has decided the issues addressed in the Projects is of no concern of his.

I believe very strongly that Senator DeMint is using the inventions technology and economic strategies for personal gain and/or recognition. See (109th CONGRESS, 1st Session; S.3, January 24, 2005, A BILL, SECTION 1. SHORT TITLE. 'Protecting America in the War on Terror Act of 2005').

My fear is that Senator DeMint is sharing or has shared the inventions technology with others outside the United States for personal gain and/or recognition. In February 2005, Senator DeMint made an International trip to Iraq, Kuwait, and Germany. Senator DeMint met with U.S. and Iraqi officials, including the three leaders of the major political parties to discuss funds utilization. It's my understanding Mr. Socha has made a couple of trips out of the Country since November 2004. Sharing this information with others outside the United States could have a devastating impact on our Nation's economy and set us back years on the development and implementation of technology used to prevent terrorist activity.

Please help. You can help by opening an investigation into the actions of Senator DeMint. You can help by providing a contact person or entity that can better serve us. You can help by sending a copy of this letter back to Senator DeMint with some positive and constructive recommendations.

Please use the information in the letterhead to contact me.

Sincerely,

Larry Golden
Budget Solutions, LLC

cc:
**President:** George W. Bush

**President's Cabinet:** Richard Cheney, Andrew Card Jr., Joshua Bolton, Rob Portman, Stephen Johnson, John Walters, Mike Johanns, Gale Norton, Carlos Gutierrez, Alberto Gonzales, Donald Rumsfeld, Elaine Chao, Margaret Spellings, Condoleezza Rice, Samuel Bodman, Norman Mineta, Michael Leavitt, John Snow, Michael Chertoff, Jim Nicholson, Alphonso Jackson.

**Senators:** Daniel Akaka, Lamar Alexander, Wayne Allard, George Allen, Max Baucus, Evan Bayh, Robert Bennett, Joseph Biden, Jeff Bingaman, Christopher Bond, Barbara Boxer, Sam Brownback, Jim Bunning, Conrad Burns, Richard Burr, Robert Byrd, Maria Cantwell, Thomas Carper, Lincoln Chafee, Saxby Chambliss, Hillary Clinton, Tom Coburn, Thad Cochran, Susan Collins, Kent Conrad, John Cornyn, Jon Corzine, Larry Craig, Michael Crapo, Mark Dayton, Jim DeMint, Mike DeWine, Christopher Dodd, Elizabeth Dole, Pete Domenici, Byron Dorgan, Richard Durbin, John Ensign, Michael Enzi, Russell Feingold, Dianne Feinstein, Bill First, Lindsay Graham, Chuck Grassley, Judd Gregg, Chuck Hagel, Tom Harkin, Orrin Hatch, Kay Hutchison, James Inhofe, Daniel Inouye, Johnny Isakson, James Jeffords, Tim Johnson, Edward Kennedy, John Kerry, Herb Kohl, Jon Kyl, Mary Landrieu, Frank Lautenberg, Patrick Leahy, Carl Levin, Joseph Lieberman, Blanche Lincoln, Trent Lott, Richard Lugar, Mel Martinez, John McCain, Mitch McConnell, Barbara Mikulski, Lisa Murkowski, Patty Murray, Bill Nelson, Ben Nelson, Barack Obama, Mark Pryor, Jack Reed, Harry Reid, Pat Roberts, John Rockefeller, Ken Salazar, Rick Santorum, Paul Sarbanes, Charles Schumer, Jeff Sessions, Richard Shelby, Gordon Smith, Olympia Snowe, Arlen Specter, Debbie Stabenow, Ted Stevens, John Sununu, James Talent, Craig Thomas, John Thune, David Vitter, George Voinovich, John Warner.

**Congressional Black Caucus:** Sanford Bishop, G.K. Butterfield, Corrine Brown, Julia Carson, Donna Christensen, William Clay Jr., Emanuel Cleaver, James Clyburn, John Conyers Jr., Elijah E. Cummings, Artur Davis, Danny Davis, Chaka Fattah, Harold Ford, Al Green, Alcee Hastings, Jesse Jackson Jr., Sheila Jackson Lee, William Jefferson, Eddie Bernice Johnson, Stephanie Tubbs Jones, Carolyn Kilpatrick, Barbara Lee, John Lewis, Cynthia McKinney, Kendrick Meek, Gregory Meeks, Juanita Millender-McDonald, Gwen Moore, Eleanor Holmes Norton, Barack Obama, Major Owens, Donald Payne, Charles Rangel, Bobby Rush, David Scott, Robert Scott, Bennie Thompson, Edolphus Towns, Maxine Waters, Diane Watson, Melvin Watt, Albert Wynn



# UNITED STATES POSTAL SERVICE ®

# PRIORITY MAIL EXPRESS ®



EJ 065 254 295 US

RECEIVED

CUSTOMER USE ONLY

**FROM:** (PLEASE PRINT)   PHONE (   )

Larry Golden
740 Woodruff Rd., Apt. 1102
Greenville, SC 29607

**PAYMENT BY ACCOUNT (if applicable)**

USPS® Corporate Acct. No.

Federal Agency Acct. No. or Postal Service™ Acct. No.
A00 0

United States Court of Appeals
for the Federal Circuit

**ORIGIN (POSTAL SERVICE USE ONLY)**

| ☐ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|

**DELIVERY OPTIONS (Customer Use Only)**

☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
☐ 10:30 AM Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)   PHONE ( 202 ) 275 - 9000

U.S. COURT OF APPEALS FOR THE
FEDERAL CIRCUIT
CASE No. 19-2134 + CASE No. 19-2135
717 MADISON PLACE, N.W.
WASHINGTON, D.C.
ZIP + 4® (U.S. ADDRESSES ONLY)

2 0 4 3 • 9 -

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 29606 | 8-6-19 | $ 137.40 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 8-5-19 | ☐ 10:30 AM ☐ 3:00 PM ☑ 12 NOON | $ | $ |

| Time Accepted | 10:30 AM Delivery Fee | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 10:44 ☑AM ☐PM | $ | $ | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | $ 137.40 |

| Weight | ☐ Flat Rate | Acceptance Employee Initials | |
|---|---|---|---|
| 25 lbs. 13.2 ozs. | | | $ 137.40 |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | ☐ AM ☐ PM | Employee Signature |
|---|---|---|---|

| Delivery Attempt (MM/DD/YY) | Time | ☐ AM ☐ PM | Employee Signature |
|---|---|---|---|

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

◁ PEEL FROM THIS CORNER

LABEL 11-B, MARCH 2019   PSN 7690-02-000-9996